1    Dennis L. Kennedy
     Nevada Bar No. 1462
2    Sarah E. Harmon
     Nevada Bar No. 8106
3    Joshua P. Gilmore
     Nevada Bar No. 11576
4    BAILEY❖KENNEDY
     8984 Spanish Ridge Avenue
5    Las Vegas, Nevada 89148-1302
     Telephone: (702) 562-8820
6    Facsimile: (702) 562-8821
     dkennedy@baileykennedy.com
7    sharmon@baileykennedy.com
     jgilmore@baileykennedy.com
8
     Attorneys for Defendants/Counter-Claimants
9    DAVID URQUHART and WESTHAMPTON, LTD.

10              **UNITED STATES DISTRICT COURT**

11                  **DISTRICT OF NEVADA**

| | |
|---|---|
| 12   ABIGAIL INVESTMENTS LLC, a Nevada limited liability company, | Case No. 09-CV-1174-(JCM) (GF) |
| 13 | |
| 14                         Plaintiff, | **DEFENDANT DAVID URQUHART'S ANSWER TO PLAINTIFF'S COMPLAINT AND JURY DEMAND AND COUNTER-CLAIMANTS DAVID URQUHART AND WESTHAMPTON, LTD.'S AMENDED COUNTER-COMPLAINT AND JURY DEMAND** |
| 15              v. | |
| 16   DAVID URQUHART, an individual, | |
| 17                         Defendant. | |
| 18   DAVID URQUHART, an individual; and WESTHAMPTON, LTD., a Canadian entity, | |
| 19 | |
| 20                    Counter-claimants, | |
| 21              v. | |
| 22   ABIGAIL INVESTMENTS, LLC, a Nevada limited liability company; MORGAN CREEK ENERGY | |
| 23   CORPORATION, a Nevada corporation; MAINLAND RESOURCES, INC., a Nevada corporation; BRENT | |
| 24   PIERCE, an individual; GINO CICCI, an individual; VAUGHN BARBON, an individual; MICHAEL | |
| 25   NEWPORT, an individual; ROBERT FEDUN, an individual; SIMEON KING HORTON, an individual; | |

EMPIRE STOCK TRANSFER, INC., a Nevada
corporation; BYRON COULTHARD; and DOES I-X,
inclusive;

Counter-defendants.

## **DEFENDANT DAVID URQUHART'S ANSWER TO PLAINTIFF'S COMPLAINT**

Except as expressly admitted, qualified, or otherwise answered herein, Defendant David Urquhart ("Mr. Urquhart") denies each and every allegation of Plaintiff Abigail Investments LLC's ("Abigail") Complaint. Mr. Urquhart answers Abigail's Complaint as follows:

## **THE PARTIES**

1.     In response to the allegations contained in paragraph 1 of the Complaint, Mr. Urquhart states that he is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations that purport to apply to Abigail and, on that basis, denies them. Mr. Urquhart otherwise denies the remaining allegations contained in paragraph 1.

2.     Mr. Urquhart admits the allegations contained in paragraph 2 of the Complaint.

3.     Mr. Urquhart believes that the allegations contained in paragraph 3 of the Complaint do not require a response, because they assert legal conclusions, rather than stating factual allegations. To the extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 3.

## **GENERAL ALLEGATIONS**

4.     In response to the allegations contained in paragraph 4 of the Complaint, Mr. Urquhart admits that he served as a director of Mainland Resources, Inc. Mr. Urquhart denies the remaining allegations contained in paragraph 4.

5.     In response to the allegations contained in paragraph 5 of the Complaint, Mr. Urquhart states that he is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations that purport to apply to a third party and, on that basis, denies them. Mr. Urquhart otherwise denies the remaining allegations contained in paragraph 5.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 2 of 178

1    6.    In response to the allegations contained in paragraph 6 of the Complaint, Mr.

2    Urquhart admits that on April 8, 2008, he entered into separate agreements with Abigail, Robert

3    Fedun, Simeon King, and Michael Newport for the receipt of 500,000 shares of Mainland

4    Resources, Inc.'s stock. Mr. Urquhart denies the remaining allegations contained in paragraph

5    6. Furthermore, Mr. Urquhart states that the "Separate Agreements" speak for themselves.

6    7.    In response to the allegations contained in paragraph 7 of the Complaint, Mr.

7    Urquhart states that the "Separate Agreements" speak for themselves. Mr. Urquhart otherwise

8    denies the allegations contained in paragraph 7.

9    8.    In response to the allegations contained in the first paragraph 8 of the Complaint,

10   Mr. Urquhart admits that he did not remit payment to Abigail, Robert Fedun, Simeon King, or

11   Michael Newport in exchange for the 500,000 shares of Mainland Resources, Inc.'s stock. Mr.

12   Urquhart denies the remaining allegations contained in the first paragraph 8.

13   9.    In response to the allegations contained in the second paragraph 8 of the

14   Complaint, Mr. Urquhart states that the "Separate Agreements" speak for themselves. Mr.

15   Urquhart otherwise denies the allegations contained in the second paragraph 8.

16   10.   In response to the allegations contained in paragraph 9 of the Complaint, Mr.

17   Urquhart admits that on May 29, 2008, Mainland Resources, Inc.'s stock underwent a split of

18   1.5:1, and that as a result of this split, Mr. Urquhart was entitled to 750,000 shares of Mainland

19   Resources, Inc.'s stock. Mr. Urquhart denies the remaining allegations contained in paragraph

20   9.

21   11.   In response to the allegations contained in paragraph 10 of the Complaint, Mr.

22   Urquhart states that the "Subsequent Agreement" speaks for itself. Furthermore, Mr. Urquhart

23   states that he is without knowledge or information sufficient to form a belief as to the truth or

24   falsity of the allegations contained in paragraph 10 that purport to apply to Abigail and/or third

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1  parties and, on that basis, denies them. Mr. Urquhart otherwise denies the remaining allegations

2  contained in paragraph 10.

3        12.    In response to the allegations contained in paragraph 11 of the Complaint, Mr.

4  Urquhart states that the "Subsequent Agreement" speaks for itself. Furthermore, Mr. Urquhart

5  states that he is without knowledge or information sufficient to form a belief as to the truth or

6  falsity of the allegations in paragraph 11 that purport to apply to Abigail and/or third parties and,

7  on that basis, denies them. Mr. Urquhart otherwise denies the remaining allegations contained

8  in paragraph 11.

9        13.    In response to the allegations contained in paragraph 12 of the Complaint, Mr.

10  Urquhart states that the "Subsequent Agreement" speaks for itself. Mr. Urquhart otherwise

11  denies the allegations contained in paragraph 12.

12        14.    In response to the allegations contained in paragraph 13 of the Complaint, Mr.

13  Urquhart states that the "Subsequent Agreement" speaks for itself. Furthermore, Mr. Urquhart

14  states that he is without knowledge or information sufficient to form a belief as to the truth or

15  falsity of the allegations in paragraph 13 that purport to apply to Abigail and/or third parties and,

16  on that basis, denies them. Mr. Urquhart otherwise denies the remaining allegations contained

17  in paragraph 13.

18        15.    In response to the allegations contained in paragraph 14 of the Complaint, Mr.

19  Urquhart states that the "Subsequent Agreement" and "Separate Agreements" speak for

20  themselves. Furthermore, Mr. Urquhart states that he is without knowledge or information

21  sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 14

22  that purport to apply to Abigail and/or third parties and, on that basis, denies them. Mr.

23  Urquhart otherwise denies the remaining allegations contained in paragraph 14.

24        16.    In response to the allegations contained in paragraph 15 of the Complaint, Mr.

25  Urquhart states that he is without knowledge or information sufficient to form a belief as to the

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 4 of 178

1  truth or falsity of the allegations contained in paragraph 15 that purport to apply to third parties

2  and, on that basis, denies them. Mr. Urquhart otherwise denies the remaining allegations

3  contained in paragraph 15.

4       17.     In response to the allegations contained in paragraph 16 of the Complaint, Mr.

5  Urquhart admits that he requested that the legend be removed from the stock certificates. Mr.

6  Urquhart denies the remaining allegations contained in paragraph 16.

7       18.     In response to the allegations contained in paragraph 17 of the Complaint, Mr.

8  Urquhart states that the "demand" speaks for itself. Furthermore, Mr. Urquhart admits that on

9  February 24, 2009, he was served with a demand to immediately transfer all stock certificates

10  and other documentation representing ownership of the stock of Mainland Resources, Inc. to

11  Abigail. Mr. Urquhart denies the remaining allegations contained in paragraph 17.

12       19.     In response to the allegations contained in paragraph 18 of the Complaint, Mr.

13  Urquhart admits that he has not transferred stock certificates or other documentation of

14  ownership of shares of stock of Mainland Resources, Inc. to Abigail. Mr. Urquhart denies the

15  remaining allegations contained in paragraph 18.

16  ## CAUSE OF ACTION

17  ### (Request for Declaratory Relief)

18       20.     In response to the allegations contained in paragraph 19 of the Complaint, Mr.

19  Urquhart incorporates by this reference each of its responses set forth above.

20       21.     In response to the allegations contained in paragraph 20 of the Complaint, Mr.

21  Urquhart states that he is without knowledge or information sufficient to form a belief as to the

22  truth or falsity of the allegations in paragraph 20 that purport to apply to Abigail and, on that

23  basis, denies them. Furthermore, Mr. Urquhart believes that paragraph 20 does not require a

24  response because it asserts legal conclusions, rather than stating factual allegations. To the

25  extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 20.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1  22.  In response to the allegations contained in paragraph 21 of the Complaint, Mr.

2 Urquhart states that he is without knowledge or information sufficient to form a belief as to the

3 truth or falsity of the allegations in paragraph 21 that purport to apply to Abigail and, on that

4 basis, denies them. Furthermore, Mr. Urquhart believes that paragraph 21 does not require a

5 response because it asserts legal conclusions, rather than stating factual allegations. To the

6 extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 21.

7  23.  In response to the allegations contained in paragraph 22 of the Complaint, Mr.

8 Urquhart states that he is without knowledge or information sufficient to form a belief as to the

9 truth or falsity of the allegations in paragraph 22 that purport to apply to Abigail and, on that

10 basis, denies them. Furthermore, Mr. Urquhart believes that paragraph 22 does not require a

11 response because it asserts legal conclusions, rather than stating factual allegations. To the

12 extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 22.

13  24.  Mr. Urquhart believes that paragraph 23 of the Complaint does not require a

14 response because it asserts legal conclusions, rather than stating factual allegations. To the

15 extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 23.

16  25.  In response to the allegations contained in paragraph 24 of the Complaint, Mr.

17 Urquhart states that NRS 30.030 speaks for itself. Furthermore, Mr. Urquhart believes that

18 paragraph 24 does not require a response because it asserts legal conclusions, rather than stating

19 factual allegations. To the extent any response is required, Mr. Urquhart denies the allegations

20 contained in paragraph 24.

21  26.  In response to the allegations contained in paragraph 25 of the Complaint, Mr.

22 Urquhart states that NRS 30.030 speaks for itself. Furthermore, Mr. Urquhart believes that

23 paragraph 25 does not require a response because it asserts legal conclusions, rather than stating

24 factual allegations. To the extent any response is required, Mr. Urquhart denies the allegations

25 contained in paragraph 25.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

27. In response to the allegations contained in paragraph 26 of the Complaint, Mr. Urquhart states that NRS 30.040 speaks for itself. Furthermore, Mr. Urquhart believes that paragraph 26 does not require a response because it asserts legal conclusions, rather than stating factual allegations. To the extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 26.

28. In response to the allegations contained in paragraph 27 of the Complaint, Mr. Urquhart states that NRS 30.040 and the "Separate Agreements" speak for themselves. Furthermore, Mr. Urquhart states that he is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in paragraph 27 that purport to apply to Abigail and, on that basis, denies them. Mr. Urquhart also believes that paragraph 27 does not require a response because it asserts legal conclusions, rather than stating factual allegations. To the extent any response is required, Mr. Urquhart denies the allegations contained in paragraph 27. Finally, Mr. Urquhart denies that Abigail is entitled to the relief sought in the Complaint.

29. With respect to the Prayer for Relief appearing after paragraph 27 of the Complaint, Mr. Urquhart denies that the Abigail is entitled to the relief sought in Abigail's "Prayer."

30. Mr. Urquhart denies each and every allegation not expressly admitted above.

And now, having answered Abigail's Complaint, Mr. Urquhart sets forth his affirmative defenses as follows:

**FIRST AFFIRMATIVE DEFENSE**

The Complaint fails to set forth facts sufficient to state a claim upon which relief may be granted against Mr. Urquhart and further fails to entitle Abigail to the relief sought, or to any other relief whatsoever from Mr. Urquhart.

///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

## SECOND AFFIRMATIVE DEFENSE

2        Abigail's claims against Mr. Urquhart are barred, in whole or in part, by the doctrines of

3   laches, waiver, and/or estoppel.

4

## THIRD AFFIRMATIVE DEFENSE

5        If, as alleged, Mr. Urquhart failed to fulfill conditions precedent to the "Separate

6   Agreements," which is specifically denied, then this failure was caused, in whole or in part, by

7   the acts or omissions of others, whether individual, corporate, or otherwise, whether named or

8   unnamed in the Complaint, for whose conduct Mr. Urquhart is not responsible.

9

## FOURTH AFFIRMATIVE DEFENSE

10        If, as alleged, Mr. Urquhart failed to fulfill conditions precedent to the "Separate

11   Agreements," which is specifically denied, then this failure was caused, in whole or in part, by

12   independent, intervening, and/or superseding cause(s) for which Mr. Urquhart may not be held

13   responsible.

14

## FIFTH AFFIRMATIVE DEFENSE

15        Even if, as alleged, Mr. Urquhart failed to fulfill conditions precedent to the "Separate

16   Agreements," which is specifically denied, Abigail's recovery is barred, in whole or in part, by

17   Abigail's failure to mitigate any of its damages allegedly sustained.

18

## SIXTH AFFIRMATIVE DEFENSE

19        If, as alleged, Mr. Urquhart failed to fulfill conditions precedent to the "Separate

20   Agreements," which is specifically denied, then this failure was caused, in whole or in part, by

21   the actions of Abigail.

22

## SEVENTH AFFIRMATIVE DEFENSE

23        If, as alleged, Mr. Urquhart failed to fulfill conditions precedent to the "Separate

24   Agreements," which is specifically denied, then this failure was caused, in whole or in part, by

25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 8 of 178

1    Abigail's own negligence, carelessness, poor business judgment, and/or such acts or omissions

2    of its authorized agents.

### EIGHTH AFFIRMATIVE DEFENSE

4        If, as alleged, Mr. Urquhart failed to fulfill conditions precedent to the "Separate

5    Agreements," which is specifically denied, Abigail waived and/or ratified this alleged failure.

### NINTH AFFIRMATIVE DEFENSE

7        Abigail's claims are barred by its own fraudulent conduct.

### TENTH AFFIRMATIVE DEFENSE

9        Mr. Urquhart has been forced to retain the services of an attorney to defend this action,

10    and Mr. Urquhart is entitled to reasonable attorney's fees and costs of suit incurred herein.

### ELEVENTH AFFIRMATIVE DEFENSE

12        Mr. Urquhart reserves the right to assert any other defense that may become available or

13    appear during the discovery proceedings or otherwise in this case.

### TWELFTH AFFIRMATIVE DEFENSE

15        Mr. Urquhart has not yet completed a thorough investigation and study of all facts and

16    circumstances of the subject matter of the Complaint, and accordingly, reserves the right to

17    amend, modify, revise, or supplement his Answer, and to plead such further defenses and take

18    such further actions as it deems proper and necessary in its defense upon the completion of said

19    investigation and study.

20        WHEREFORE, Mr. Urquhart respectfully requests the Court to dismiss the Complaint

21    with prejudice and grant such further relief as the Court deems proper.

22    ///

23    ///

24    ///

25    ///

1

**JURY DEMAND**

2      Pursuant to Federal Rule of Civil Procedure 38(b), Mr. Urquhart demands a jury trial of

3   all issues so triable.

4

5

6   **COUNTER-CLAIMANTS DAVID URQUHART AND WESTHAMPTON, LTD.'S**

7   **AMENDED COUNTER-COMPLAINT AND JURY DEMAND**

8      Defendant/Counter-claimant David Urquhart ("Mr. Urquhart") and, pursuant to Federal

9   Rule of Civil Procedure 13(h), Counter-Claimant Westhampton, Ltd. ("Westhampton"), by and

10  through their undersigned counsel of record, bring the following amended counterclaims against

11  Plaintiff/Counter-defendant Abigail Investments, LLC ("Abigail"), and, pursuant to Federal

12  Rule of Civil Procedure 13(h), bring the following counterclaims against additional Counter-

13  defendants Morgan Creek Energy Corporation ("Morgan Creek"), Mainland Resources, Inc.

14  ("Mainland"), Brent Pierce ("Mr. Pierce"), Gino Cicci ("Mr. Cicci"), Vaughn Barbon ("Mr.

15  Barbon"), Michael Newport ("Mr. Newport"), Robert Fedun ("Mr. Fedun"), Simeon King

16  Horton ("Ms. King Horton"), Byron Coulthard ("Mr. Coulthard"), and Empire Stock Transfer,

17  Inc. ("Empire") (collectively, with Abigail, referred to as "Counter-defendants"), and alleges as

18  follows.

19

**PARTIES**

20      1.      Mr. Urquhart is an individual residing in Calgary, Alberta, Canada.

21      2.      Westhampton is a Canadian entity with its principal place of business in Calgary,

22  Alberta, Canada.

23      3.      Mr. Urquhart is the President and Chief Executive Officer of Westhampton.

24      4.      Mr. Urquhart and Westhampton are informed and believe that Abigail is a

25  Nevada limited liability company.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 10 of 178

1        5.    Mr. Urquhart and Westhampton are informed and believe that Morgan Creek is a

2    Nevada corporation with its principal place of business in Dallas, Texas.

3        6.    Mr. Urquhart and Westhampton are informed and believe that Mainland is a

4    Nevada corporation with its principal place of business in Houston, Texas.

5        7.    Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce is a

6    resident of Vancouver and/or West Vancouver, British Columbia, Canada.

7        8.    Mr. Urquhart and Westhampton are informed and believe that Mr. Cicci is a

8    resident of Vancouver and/or West Vancouver, British Columbia, Canada.

9        9.    Mr. Urquhart and Westhampton are informed and believe that Mr. Barbon is a

10   resident of Vancouver and/or White Rock, British Columbia, Canada.

11       10.    Mr. Urquhart and Westhampton are informed and believe that Mr. Newport is a

12   resident of Cypress, Texas.

13       11.    Mr. Urquhart and Westhampton are informed and believe that Mr. Fedun is a

14   resident of Las Vegas, Nevada.

15       12.    Mr. Urquhart and Westhampton are informed and believe that Ms. King Horton

16   is a resident of Bossier City, Louisiana.

17       13.    Mr. Urquhart and Westhampton are informed and believe that Mr. Coulthard is a

18   resident of Vancouver, British Columbia, Canada.

19       14.    Mr. Urquhart and Westhampton are informed and believe that Empire is a

20   Nevada corporation with its principal place of business in Henderson, Nevada.

21       15.    The true names and capacities of the counter-defendants named herein as Does I-

22   X, inclusive, are unknown to Mr. Urquhart and Westhampton, who therefore sue said counter-

23   defendants by such fictitious names. Mr. Urquhart and Westhampton will amend this Counter-

24   Complaint to allege the true names and capacities of said counter-defendants when ascertained.

25   Mr. Urquhart and Westhampton are informed and believe and thereon allege that each of the

1  DOE counter-defendants is liable to Mr. Urquhart and/or Westhampton for the events alleged

2  herein.

3      16.    Mr. Urquhart and Westhampton are informed and believe that at all times

4  relevant to this dispute, Counter-defendants, and each of them, were acting as an agent,

5  employee, consultant, other representative, and/or alter ego of each of the Counter-defendants,

6  within the course and scope of said agency, employment, consultancy, and/or representative

7  capacity, and with full knowledge and consent of each of the other Counter-defendants.  Each of

8  the acts and/or omissions complained of herein was alleged and made known to, and ratified by,

9  each of the other Counter-defendants.

10                          **JURISDICTION AND VENUE**

11      17.    This Court has subject matter jurisdiction over Mr. Urquhart and Westhampton's

12  counter-claims pursuant to 28 U.S.C. § 1367, because they arise out of the same transaction as

13  Abigail's claims – namely, the purchase and sale of shares of stock of Mainland and related

14  transactions.

15      18.    This Court has personal jurisdiction over the Counter-defendants, because

16  Abigail, Mainland, Morgan Creek, and Empire are Nevada limited liability companies and/or

17  corporations.  Mr. Fedun is a Nevada resident.  Moreover, each of the individual counter-

18  defendants are, as detailed more fully herein: (1) personally involved in the operation and

19  management of Abigail, Mainland, and/or Morgan Creek; (2) an agent of Abigail, Mainland,

20  and/or Morgan Creek; (3) an alter ego of Abigail, Mainland, and/or Morgan Creek; and/or (4)

21  direct or indirect stockholders of Mainland and/or Morgan Creek who personally benefitted

22  from Mainland's and Morgan Creek's actions and conduct as set forth herein.

23      19.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the

24  property that is the subject of this action is the stock of Nevada corporations in this judicial

25  district.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 12 of 178

**FACTUAL ALLEGATIONS**

20.     Mr. Pierce is a stock promoter who has assisted several start-up companies in becoming public corporations.

21.     Mr. Cicci and Mr. Barbon are Mr. Pierce's "right-hands."

22.     In fact, Mr. Pierce, Mr. Cicci, and Mr. Barbon have a long history of acting as the non-publicly-disclosed alter egos of public corporations in the United States, including, but not limited to, Lexington Resources, Inc., f/k/a Intergold Corporation ("Lexington Resources"); Transax International Limited, f/k/a Vega-Atlantic Corporation ("Transax"); Goldstate Corporation ("Goldstate"); Petrogen Corporation, f/k/a Hadro Resources, Inc., f/k/a Hadrosaurus Resources, Inc. ("Petrogen"); Genemax Corporation, f/k/a Eduverse.com ("Genemax"); Uranium Energy Corporation ("Uranium Energy"); Geneva Resources, Inc., f/k/a Geneva Gold Corporation, f/k/a Revelstoke Industries, Inc. ("Geneva Resources"); and Uranium International Corporation, f/k/a Nu-Mex Uranium Corporation ("Uranium International") (collectively the "Public Companies").

23.     Mr. Pierce, Mr. Cicci, and Mr. Barbon obtained control and influence over the management and business decisions of the Public Companies, and, therefore, become the alter egos of the Public Companies, by: (1) having individuals within Mr. Pierce, Mr. Cicci, and Mr. Barbon's influence and control appointed as officers and/or directors of the Public Companies; (2) by having private companies within Mr. Pierce, Mr. Cicci, and Mr. Barbon's influence and control retained to provide consulting, financial, and/or management services to the Public Companies; and/or (3) having individuals, trusts, and/or private companies within Mr. Pierce, Mr. Cicci, and Mr. Barbon's influence and control acquire shares of stock and/or stock options in the Public Companies – whether through purchase agreements, settlement of debts, or compensation for services rendered.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    24.    After seizing direct and/or indirect ownership, control, and/or influence over the

2    Public Companies, Mr. Pierce, Mr. Cicci, and Mr. Barbon engage in campaigns to publicize, and

3    ultimately raise the price of, the stock of the Public Companies.  Then, after inflating the stock

4    price, Mr. Pierce, Mr. Cicci, and Mr. Barbon sell off their stock holdings in the Public

5    Companies and walk away with millions of dollars in profits.

6    25.    However, due to past troubles with securities regulators and/or legal authorities,

7    Mr. Pierce, Mr. Cicci, and Mr. Barbon have each learned to seize ownership, control, and/or

8    influence over a corporation from behind the scenes.

9    26.    Specifically, in 1989, Mr. Pierce was a "control person" behind the Canadian

10    entity Valet Video and Pizza Services, Ltd. ("Valet"), and his "nominee" served as the President

11    and sole Director of Valet.  Mr. Pierce and Valet assisted the publicly-traded Canadian company

12    Bu-Max Gold Corporation ("Bu-Max") with the circulation of a prospectus for a securities

13    offering for proceeds necessary for an exploration program.

14    27.    However, the British Columbia Securities Commission ("BCSC") ultimately

15    determined that almost half of the proceeds from the Bu-Max securities offering were paid to

16    Valet for purposes that benefited Mr. Pierce and his nominee at Valet, rather than Bu-Max.

17    Therefore, in 1993, the BCSC fined Mr. Pierce $15,000.00 and barred him for fifteen years from

18    serving as an officer or director of any "reporting issuer" or serving as the officer of director for

19    any "issuer" that provides management, administrative, promotional, or consulting services to a

20    "reporting issuer."

21    28.    In 1995, the BCSC prohibited Mr. Cicci from participating in the British

22    Columbia securities market for six months as a result of his involvement in DNI Holdings, Inc.

23    and the company's dissemination of promotional materials that misrepresented the value and

24    prospects of one of its mineral properties.  The BCSC also prohibited Mr. Cicci from acting as

25    an officer or director of any issuer for three years.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

29.     Mr. Urquhart and Westhampton are informed and believe that Mr. Barbon served two years in prison for allegedly embezzling $2.2 million from his former employer, Montreal Trust.

30.     Due to their troubles with BCSC-regulated corporations, Mr. Pierce, Mr. Cicci, and Mr. Barbon began concentrating their promoting activities across the border in the United States and were better at concealing their involvement with the public corporations.

**The Individuals, Private Companies, and Trusts Through Which Mr. Pierce, Mr. Cicci, and Mr. Barbon Obtain Ownership, Control, and/or Influence Over Public Corporations**

Individuals

31.     In the early 1990s, Mr. Pierce met Grant Atkins ("Mr. Atkins"), when Mr. Pierce hired Mr. Atkins to write a business plan for a company founded by Mr. Pierce.  Since that time, Mr. Pierce and Mr. Atkins continued to work together promoting several public corporations, but Mr. Pierce's activities occurred behind the scenes through the direction, control, and influence over Mr. Atkins.

32.     Mr. Pierce also began working regularly with Marcus Johnson ("Mr. Johnson"), D. Bruce Horton ("Mr. Horton"), Stephen Jewett ("Mr. Jewett"), William Thomas ("Mr. Thomas"), Gary Powers ("Mr. Powers"), Norm MacKinnon ("Mr. MacKinnon"), Marek Kreczmer ("Mr. Kreczmer"), Richard Elliot Square ("Mr. Square"), Alexander Cox ("Mr. Cox"), Leonard Braumberger ("Mr. Braumberger"), and Robert Stevens ("Mr. Stevens") (collectively, Mr. Atkins, "Controlled and Influenced Officers, Directors, Employees, Agents, and/or Consultants") in promoting several of the Public Companies – but again, Mr. Pierce's activities occurred behind the scenes through the direction, control, and influence over these individuals.

33.     The Controlled and Influenced Officers, Directors, Employees, Agents, and/or Consultants each gained positions as officers, directors, employees, agents, and/or consultants

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 15 of 178

1    with one or more of the Public Companies, and, in these positions, the Controlled and

2    Influenced Officers, Directors, Employees, Agents, and/or Consultants permitted Mr. Pierce,

3    Mr. Cicci, and Mr. Barbon to direct, control, and/or influence the Public Companies.

4        34.    Like Mr. Pierce, Mr. Cicci, and Mr. Barbon, Mr. Jewett has also had past troubles

5    in British Columbia which have forced him to seek involvement with United States public

6    corporations. Specifically, Mr. Urquhart and Westhampton are informed and believe that Mr.

7    Jewett was barred by the British Columbia Institute of Chartered Accountants from auditing any

8    public company after he committed errors in the audit of a Vancouver public company.

9        35.    However, Mr. Jewett's past has not stopped him from earning appointments as an

10   officer and/or director for several of the Public Companies influenced an controlled by Mr.

11   Pierce, Mr. Cicci, and Mr. Barbon.

12   <u>Private Consulting Companies</u>

13       36.    Mr. Pierce, Mr. Cicci, and Mr. Barbon also gained control and influence over the

14   Public Companies by utilizing several private consulting companies – consulting companies

15   within Mr. Pierce, Mr. Cicci, and/or Mr. Barbon's ownership, direction, influence, and/or

16   control – that could enter into consulting contracts with the Public Companies, agreeing to

17   provide the Public Companies with a variety of consulting, financial, management, and

18   administrative services.

19       37.    In fact, in or around June 2010, in an Order to institute cease and desist

20   proceedings, the Securities and Exchange Commission ("SEC") alleged that in order to conceal

21   his activities and avoid having to be identified in the SEC filings of entities like the Public

22   Companies, Mr. Pierce uses various private consulting companies – companies within his

23   control – to provide stock-promotion and capital-raising services to entities like the Public

24   Companies.

25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 16 of 178

1      38.    The private consulting companies include, but are not limited to, Investor

2  Communications International, Inc. ("ICI"), International Market Trend AG and/or International

3  Market Trend, Inc. ("IMT"), Tristar Financial Services, Inc. ("Tristar"), Amerocan Marketing,

4  Inc. ("Amerocan"), Parc Place Investments AG ("Parc Place") (collectively, "Controlled and

5  Influenced Corporate Consultants").

6                        *ICI*

7      39.    In June 2009, the SEC determined that, during the relevant times of this dispute,

8  Mr. Pierce is and/or was the President, Director, and/or consultant of ICI, and that he was the

9  "driving force" behind ICI. In fact, during the relevant times of this dispute, Mr. Pierce has

10  identified himself, varyingly, as the President, sole shareholder, and/or contractor of ICI in

11  several contracts he executed on behalf of ICI and in documents he has filed with the SEC.

12      40.    Based on information in a May 2001 SEC filing, Mr. Cicci is and/or was, during

13  the relevant times of this dispute, an employee, agent, consultant, and/or contractor of ICI.

14      41.    In June 2009, the SEC determined that, during the relevant times of this dispute,

15  Mr. Barbon is and/or was a consultant of ICI, and that ICI paid his salary for the services he

16  provided to some and/or all of the Public Companies contracting with ICI.

17      42.    In June 2009, the SEC determined that, during the relevant times of this dispute,

18  Mr. Atkins is and/or was a consultant of ICI, and that ICI paid his salary for the services he

19  provided to some and/or all of the Public Companies contracting with ICI.

20      43.    In June 2009, the SEC determined that, during the relevant time of this dispute,

21  Mr. Johnson is and/or was a consultant of ICI, but Mr. Johnson identified himself as the

22  President, Secretary, Treasurer, and sole Director of ICI in several contracts he executed on

23  behalf of ICI and in documents he filed with the SEC. Mr. Johnson is and/or was also the

24  beneficial owner of 45 percent of the stock of ICI.

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    44.    Based on information in a May 2000 SEC filing, Mr. Powers is and/or was,

2  during the relevant times of this dispute, an employee, agent, consultant, and/or contractor of

3  ICI.

4    45.    In June 2009, the SEC determined that, during the relevant times of this dispute,

5  Mr. Square is and/or was a consultant of ICI.

6    46.    In or around June 2009, the SEC determined that, during the relevant times of

7  this dispute, Mr. Braumberger is and/or was a consultant of ICI.

8    47.    In or around June 2009, the SEC determined that, during the relevant times of

9  this dispute, Mr. Cox is and/or was a consultant of ICI.

10    48.    During the relevant times of this dispute, the Ocean Sea & Empire Trust is and/or

11  was the beneficial owner of 24 percent of the stock of ICI.

12    49.    Based on SEC documents filed in or around 2002, Nessa Financial Corporation

13  ("Nessa Financial") was, during the relevant times of this dispute, the sole shareholder of ICI –

14  likely, before Mr. Johnson and the Ocean Sea & Empire Trust became shareholders.

15    50.    In or around 2005, the Internal Revenue Service ("IRS") issued a subpoena to

16  Bank of America (the "2005 IRS Subpoena") during its investigation of the tax liability of ICI,

17  seeking the records of over 41 companies and trusts believed to be related to ICI and/or Mr.

18  Pierce, and the Ocean Sea & Empire Trust was one of the trusts whose records were

19  subpoenaed.

20    51.    During the relevant times of this dispute, ICI's office is and/or was located at 435

21  Martin Street, Suite 2000, Blaine, Washington 98230.

22                                    *IMT*

23    52.    In June 2009, the SEC determined that, during the relevant times of this dispute,

24  Mr. Pierce is and/or was an officer and director of IMT, and that he had been instrumental in the

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 18 of 178

1  formation of IMT.  Based on a November 2004 SEC filing, Mr. Pierce is and/or was, during the

2  relevant times of this dispute, also a consultant of IMT.

3      53.    In June 2009, the SEC also determined that, during the relevant times of this

4  dispute, Mr. Pierce negotiated with consultants on behalf of IMT and entered into oral contracts

5  with these consultants for the services they would provide to IMT's clients.  Moreover, when

6  IMT's consultants submitted invoices to IMT for payment, the SEC determined that Mr. Pierce

7  would review and approve the invoices for payment.

8      54.    The 2005 IRS Subpoena sought the records of IMT as one of the entities the IRS

9  believed was related to ICI and/or Mr. Pierce.

10      55.    During the relevant times of this dispute, Mr. Square is and/or was an officer,

11  director, employee, agent, and/or consultant of IMT.

12      56.    During the relevant times of this dispute, Mr. Braumberger is and/or was a

13  consultant of IMT.

14      57.    During the relevant times of this dispute, Mr. Cox is and/or was a consultant of

15  IMT.

16      58.    During the relevant times of this dispute, Mr. Stevens is and/or was a consultant

17  of IMT.

18      59.    During the relevant times of this dispute, the office of IMT and/or IMT's affiliate,

19  International Market Trend, Inc., is and/or was located in the same office as ICI – at 435 Martin

20  Street, Suite 2000, Blaine, Washington 98230.

21                                    *Tristar*

22      60.    Based on a September 2000 SEC filing, Mr. Pierce is and/or was, during the

23  relevant times of this dispute, a consultant for Tristar.

24

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    61.    Based on a September 2000 SEC filing, as well as his biography included in

2    numerous other SEC filings, Mr. Atkins is and/or was, during the relevant times of this dispute,

3    a consultant for Tristar.

4    62.    During the relevant times of this dispute, Mr. Johnson identified himself as the

5    President, Secretary, and sole Director of Tristar in several contracts he executed on behalf of

6    Tristar and/or in documents he filed with the SEC.

7    63.    During the relevant times of this dispute, Colonial Financial Group, Inc.

8    ("Colonial Financial") is and/or was the sole shareholder of Tristar.

9    64.    The 2005 IRS Subpoena sought the records of Colonial Financial as one of the

10    entities the IRS believed was related to ICI and/or Mr. Pierce.

11    65.    During the relevant times of this dispute, Robert Bandfield ("Mr. R. Bandfield")

12    is and/or was the President of Colonial Financial.

13    66.    During the relevant times of this dispute, Tristar's office is and/or was located in

14    the same office as ICI and IMT – at 435 Martin Street, Suite 2000, Blaine, Washington 98230.

15    *Amerocan*

16    67.    During the relevant times of this dispute, Mr. Atkins is and/or was employed by

17    Amerocan, and according to the SEC filings of one or more of the Public Companies, Amerocan

18    paid Mr. Atkins' salary for the services he provided to one or more of the Public Companies that

19    contracted with Amerocan.

20    68.    During the relevant times of this dispute, Mr. Johnson identified himself as the

21    President, Secretary, and Director of Amerocan in several contracts he executed on behalf of

22    Amerocan and/or in documents he filed with the SEC.

23    69.    During the relevant times of this dispute, Colonial Financial is and/or was the

24    sole shareholder of Amerocan.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 20 of 178

1      70.     The 2005 IRS Subpoena sought the records of Amerocan as one of the entities

2   the IRS believed was related to ICI and/or Mr. Pierce.

3                                        *Parc Place*

4      71.     In June 2009, the SEC determined that, during the relevant times of this dispute,

5   Mr. Pierce is and/or was an officer and director of Parc Place.

6      72.     During the relevant times of this dispute, Mr. Pierce shared dispositive and voting

7   power with Phillip Mast, a/k/a Phillipe Mast ("Mr. Mast") and Sean Kelly ("Mr. Kelly") over

8   some and/or all of Parc Place's stock holdings.

9      73.     Mr. Urquhart and Westhampton are informed and believe that during the relevant

10  times of this dispute, additional ties between the Controlled and Influenced Corporate

11  Consultants and Mr. Pierce, Mr. Cicci, and/or Mr. Barbon (and/or others within their influence

12  and control) will be obtained through discovery, as the Controlled and Influenced Corporate

13  Consultants are private companies whose organizational information is not available to the

14  public.

15                                     Shareholders

16     74.     Mr. Pierce, Mr. Cicci, and Mr. Barbon also gained ownership, influence, and/or

17  control over the Public Companies by having individuals, trusts, and/or private companies –

18  individuals, trusts, and companies within Mr. Pierce, Mr. Cicci, and/or Mr. Barbon's direction,

19  influence, and/or control – acquire shares of stock and/or stock options in the Public Companies

20  through purchase agreements, settlement of debts, and/or compensation for services rendered.

21     75.     During the relevant times of this dispute, Mr. Pierce, Mr. Cicci, and/or Mr.

22  Barbon each owned stock and/or stock options in one or more of the Public Companies, but they

23  were usually very careful to ensure that their total direct beneficial ownership of the Public

24  Companies was lower than the 5-percent reporting requirements under the securities laws.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 21 of 178

1       76.     During the relevant times of this dispute, the Controlled and Influenced Officers,

2   Directors, Employees, Agents, and/or Consultants also each owned stock and/or stock options in

3   one or more of the Public Companies, and Mr. Urquhart and Westhampton are informed and

4   believe that Mr. Pierce, Mr. Cicci, and/or Mr. Barbon had influence and/or control over the

5   dispositive and voting power of these shares.  Therefore, the stock holdings of the Controlled

6   and Influenced Officers, Directors, Employees, Agents, and/or Consultants should be included

7   in Mr. Pierce, Mr. Cicci, and/or Mr. Barbon's total direct and/or indirect beneficial ownership of

8   the Public Companies.

9       77.     During the relevant times of this dispute, the Controlled and Influenced

10  Corporate Consultants also each owned stock and/or stock options in one or more of the Public

11  Companies, and Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce, Mr.

12  Cicci, and/or Mr. Barbon had influence and/or control over the dispositive and voting power of

13  these shares.  Therefore, the stock holdings of the Controlled and Influenced Corporate

14  Consultants should be included in Mr. Pierce, Mr. Cicci, and/or Mr. Barbon's total direct and/or

15  indirect beneficial ownership of the Public Companies.

16      78.     During the relevant times of this dispute, several private companies – many of

17  which were organized in Belize, Turks & Caicos, Antigua, and other countries outside the

18  United States – also owned stock and/or stock options in one or more of the Public Companies,

19  and Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce, Mr. Cicci, and/or

20  Mr. Barbon had influence and/or control over the dispositive and voting powers of these shares.

21  Therefore, the stock holdings of these companies should be included in Mr. Pierce, Mr. Cicci,

22  and/or Mr. Barbon's total direct and/or indirect beneficial ownership of the Public Companies.

23      79.     These private companies include, but are not limited to, Newport Capital

24  Corporation ("Newport Capital"), Spartan Asset Group ("Spartan Asset"), Pacific Rim

25  Financial, Inc. ("Pacific Rim"), Rising Sun Capital Corporation ("Rising Sun"), Eastern Capital

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 22 of 178

1    Corporation ("Eastern Capital"), Calista Capital Corporation ("Calista Capital"), Phoenix Asset

2    Corporation ("Phoenix Asset"), Verona Capital International ("Verona Capital"), Longfellow

3    Industries (B.C.) Ltd. ("Longfellow Industries"), Orient Explorations, Ltd. ("Orient

4    Explorations"), Eiger Properties, Inc. ("Eiger Properties"), Eiger East Finance, Ltd. ("Eiger

5    East"), Fairmont East Finance, Ltd. ("Fairmont"), and Clip Foundation ("Clip") (collectively,

6    "Controlled and Influenced Stockholders").

7                                    *Newport Capital*

8        80.    In or around June 2009, the SEC determined that, during the relevant times of

9    this dispute, Mr. Pierce is and/or was the President, Director, and beneficial owner of Newport

10   Capital.  The SEC also determined that Mr. Pierce had worked for Newport Capital for more

11   than 7 years, and that he had received a salary of $800,000.00 to $900,000.00 from Newport

12   Capital in 2005.

13       81.    In or around June 2010, the SEC alleged, in an Order to institute new cease and

14   desist proceedings against Mr. Pierce, that Mr. Pierce has served as President and Director of

15   Newport Capital since 2000.

16       82.    During the relevant times of this dispute, Mr. Pierce has also varyingly identified

17   himself as the President, Secretary, Director, and shareholder of Newport Capital in several

18   contracts he executed on behalf of Newport Capital and/or in documents he has filed with the

19   SEC.

20       83.    In or around June 2009, the SEC determined that, during the relevant times of

21   this dispute, Mr. Atkins is and/or was a consultant for Newport Capital, and that Mr. Pierce

22   controlled Mr. Atkins' assignments for Newport Capital.

23       84.    The SEC also determined that, during the relevant times of this dispute, Newport

24   Capital made several loans to Mr. Atkins.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 23 of 178

1    85.    In or around June 2009, the SEC also determined that, during the relevant times

2    of this dispute, ICI was the vehicle Newport Capital used to contract with clients in the United

3    States, as Newport Capital is incorporated in Belize.

4    86.    In or around June 2009, the SEC further determined that, during the relevant

5    times of this dispute, IMT borrowed money from Newport Capital to cover its expenses.

6    87.    During the relevant times of this dispute, the Emerald Trust was the sole

7    shareholder of Newport Capital in the early 2000s, and Mr. Jewett was the trustee of the

8    Emerald Trust during this time period.

9    88.    During the relevant times of this dispute, Cockburn Directors, Ltd. ("Cockburn

10   Directors") is and/or was an officer and director of Newport Capital.

11   89.    During the relevant times of this dispute, Barry Dempsey ("Mr. Dempsey") is

12   and/or was an officer and director of Cockburn Directors.

13   90.    The 2005 IRS Subpoena sought the records of Newport Capital as one of the

14   entities the IRS believed was related to ICI and/or Mr. Pierce.

15   *Spartan Asset*

16   91.    In or around June 2009, the SEC determined that, during the relevant times of

17   this dispute, Mr. Pierce is and/or was an officer and director of Spartan Asset.

18   92.    Based on a May 2002 SEC filing, Mr. Square is and/or was, during the relevant

19   times of this dispute, also the President, Secretary, and Director of Spartan Asset.

20   93.    During the relevant times of this dispute, Kingsbridge Capital Limited

21   ("Kingsbridge") is and/or was the sole shareholder of Spartan Asset, and Mr. Square is and/or

22   was also the officer and director of Kingsbridge and/or Kingsbridge's related entity, Kingsbridge

23   Capital S.A.

24   ///

25   ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

*Pacific Rim*

2    94.    SEC filings between 2000 and 2003 varyingly indicate that, during the relevant

3  times of this dispute, either Mr. Square or Mr. R. Bandfield was the President, Secretary, and

4  Director of Pacific Rim.

5    95.    SEC filings between 2000 and 2003 also varyingly indicate that, during the

6  relevant times of this dispute, either the Four Winds Trust or Nessa Financial was the sole

7  shareholder of Pacific Rim.

8    96.    The 2005 IRS Subpoena sought the records of Pacific Rim as one of the entities

9  the IRS believed was related to ICI and/or Mr. Pierce.

10

*Rising Sun*

11    97.    In or around 2000, the Four Winds Trust was the sole shareholder of Rising Sun.

12    98.    In or around 2002, and during the relevant times of this dispute, the Hornback

13  Trust was the sole shareholder of Rising Sun.

14    99.    The 2005 IRS Subpoena sought the records of the Hornback Trust as one of the

15  trusts the IRS believed was related to ICI and/or Mr. Pierce.

16    100.    The 2005 IRS Subpoena also sought the records of Rising Sun as one of the

17  entities the IRS believed was related to ICI and/or Mr. Pierce.

18

*Eastern Capital*

19    101.    During the relevant times of this dispute, the Emerald Trust is and/or was the sole

20  shareholder of Eastern Capital.

21    102.    During the relevant times of this dispute, Mr. Jewett is and/or was the trustee of

22  the Emerald Trust.

23    103.    The 2005 IRS Subpoena also sought the records of Eastern Capital as one of the

24  entities the IRS believed was related to ICI and/or Mr. Pierce.

25  ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 25 of 178

1

*Calista Capital*

2      104.    During the relevant times of this dispute, the Ocean Sea & Empire Trust is and/or

3   was the sole shareholder of Calista Capital.

4      105.    The 2005 IRS Subpoena also sought the records of Calista Capital as one of the

5   entities the IRS believed was related to ICI and/or Mr. Pierce.

6

*Phoenix Asset*

7      106.    Fitzroy Holdings, Ltd. is and/or was the sole Director of Phoenix Asset, and Mr.

8   Dempsey is the signatory for Fitzroy Holdings, Ltd.

9      107.    The 2005 IRS Subpoena also sought the records of Phoenix Asset as one of the

10   entities the IRS believed was related to ICI and/or Mr. Pierce.

11

*Longfellow Industries*

12      108.    During the relevant times of this dispute, Mr. Cox is and/or was the beneficial

13   owner of some and/or all of the stock owned by Longfellow Industries

14      109.    During the relevant times of this dispute, Mr. Cox's wife, Irene Cox, is and/or

15   was the sole shareholder of Longfellow Industries.

16      110.    During the relevant times of this dispute, Mr. Cox's children, Catherine Lambert

17   and William Cox, are and/or were two of the directors of Longfellow Industries.

18

*Orient Explorations*

19      111.    During the relevant times of this dispute, Cockburn Directors is and/or was the

20   sole Director of Orient Explorations, and Barry Dempsey possesses and/or possessed sole and

21   exclusive voting and dispositive rights over Orient Explorations' stock holdings.

22      112.    The 2005 IRS Subpoena also sought the records of Orient Explorations as one of

23   the entities the IRS believed was related to ICI and/or Mr. Pierce.

24   ///

25   ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 26 of 178

1

*Eiger Properties*

2   113.   During the relevant times of this dispute, Brent Bandfield ("Mr. B. Bandfield") is

3   and/or was the President, Secretary, and sole Director of Eiger Properties.

4   114.   During the relevant times of this dispute, Golden West Investments, Ltd.

5   ("Golden West") is and/or was the sole shareholder of Eiger Properties.

6   115.   During the relevant times of this dispute, Rising Sun is and/or was the sole

7   shareholder of Golden West.

8   116.   During the relevant times of this dispute, Mr. Dempsey or Cockburn Directors is

9   and/or was the sole Director of Golden West.

10  117.   During the relevant times of this dispute, Mr. B. Bandfield is the President of

11  Golden West.

12  118.   The 2005 IRS Subpoena also sought the records of Golden West as one of the

13  entities the IRS believed was related to ICI and/or Mr. Pierce.

14  *Verona Capital, Eiger East, Fairmont, and Clip*

15  119.   During the relevant times of this dispute, Mr. Mast is and/or was the sole officer

16  and director of Verona Capital.

17  120.   During the relevant times of this dispute, Mr. Mast has and/or had dispositive and

18  voting power over the stock holdings of Eiger East.

19  121.   During the relevant times of this dispute, Mr. Mast also has and/or had

20  dispositive and voting power over the stock holdings of Fairmont.

21  122.   During the relevant times of this dispute, the Hornback Trust is and/or was the

22  sole shareholder of Clip.[1]

23

---

24  [1]   A chart graphically summarizing the process by which Mr. Pierce, Mr. Cicci, and/or Mr. Barbon gained
    ownership, control, and/or influence over the Public Companies, while also concealing their direct involvement

25  with the Public Companies, by utilizing the Controlled and Influenced Officers, Directors, Employees, Agents,
    and/or Consultants, the Controlled and Influenced Corporate Consultants, and the Controlled and Influenced
    Stockholders, as set forth in ¶¶ 20-122, 438-474, *supra*, is attached as Exhibit A.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

**Mr. Pierce, Mr. Cicci, and Mr. Barbon's Ownership, Control,
and/or Influence Over the Public Companies**

Lexington Resources

123.   One of the Public Companies Mr. Pierce worked to promote in the 1990s and 2000s was Lexington Resources.

124.   Lexington Resources (and/or its predecessor) was incorporated in Nevada, in or around July 1996, and, shortly thereafter, Mr. Pierce began asserting his direct and/or indirect ownership, control, and/or influence over the new company.

*Officers, Directors, Employees, Agents, and/or Consultants*

125.   Mr. Atkins was appointed as the Secretary, Treasurer, and Director of Lexington Resources in or around September 1998, and he was appointed as President and Chief Executive Officer in or around 2002.  Mr. Atkins served as Secretary and Treasurer until in or around November 2003, and he continues to serve as President, Chief Executive Officer, and Director of Lexington Resources today.

126.   During the relevant times of this dispute, Mr. Atkins also served as the Secretary, Treasurer, and Director of Lexington Resources' wholly-owned subsidiary International Gold Corporation.

127.   In or around June 2009, the SEC determined that, during the relevant times of this dispute, Mr. Atkins regularly consulted with Mr. Pierce as to the management of Lexington Resources.

128.   Moreover, in June 2009, the SEC determined that the relationship between Mr. Pierce and Mr. Atkins, in and of itself, was sufficient to find that Mr. Pierce controlled the management and business decisions of Lexington Resources.

129.   Mr. Cicci was appointed as a Director of Lexington Resources in or around June 2006, and he served in this position until in or around May 2007.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 28 of 178

1    130.    Mr. Barbon was appointed as Chief Financial Officer and Treasurer of Lexington

2    Resources in or around 2003, and he served in these positions until in or around January 2007.

3    During the relevant times of this dispute, Mr. Barbon also served as President and/or manager of

4    Lexington Resources' wholly-owned subsidiary Lexington Oil and Gas, Ltd.

5    131.    Mr. Jewett was appointed as a Director and a member of the audit committee of

6    Lexington Resources in or around April 2004, and he served in these positions until in or around

7    February 2008.

8    132.    Mr. Powers was appointed as President and Director of Lexington Resources in

9    or around September 1998, and he served in these positions until in or around early 2002, when

10   Mr. Atkins was appointed as President.  He also served as President, Secretary, Treasurer, and

11   Director of Lexington Resources' wholly-owned subsidiary International Gold Corporation from

12   in or around 1998 or 1999 until in or around 2002 or 2003, when Mr. Atkins was appointed to

13   these positions.

14   133.    Mr. MacKinnon was appointed as a Director and the Chair of the audit committee

15   of Lexington Resources in or around April 2004, and he served in these positions until in or

16   around July 2007.  Mr. MacKinnon was also appointed as the Chief Financial Officer, Treasurer,

17   and Secretary of Lexington Resources in or around January 2007, and he served in these

18   positions until in or around July 2007.

19   *Private Consultants*

20   134.    In addition to the involvement of the Controlled and Influenced Officers,

21   Directors, Employees, Agents, and/or Consultants in Lexington Resources, the Controlled and

22   Influenced Corporate Consultants also contracted with Lexington Resources during the relevant

23   times of this dispute.

24   135.    In or around January 1999, Lexington Resources' wholly-owned subsidiary

25   International Gold Corporation, entered into a two-year consulting services and management

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 29 of 178

1    agreement with Amerocan, which was renewed in or around January 2001, before being

2    permitted to expire in or around January 2003.

3        136.    In or around January 1999, Lexington Resources entered into a two-year

4    consulting services and management agreement with ICI, which was renewed in or around

5    January 2001, and was then extended on a month-to-month basis from in or around January

6    2003 until in or around March 2004.

7        137.    Lexington Resources paid ICI up to $75,000.00 per month for the services

8    provided by ICI pursuant to the above-referenced consulting agreement.

9        138.    In or around November 2003, Lexington Resources entered into a one-year

10    financial consulting services agreement with IMT, which was renewed annually until in or

11    around 2007.

12        139.    Mr. Square executed the above-referenced contract on behalf of IMT.

13        140.    IMT also served as Lexington Resources' investor relations contact for

14    Europeans, as designated in a Lexington Resources' press release in or around November 2004.

15        141.    In or around November 2003, Lexington Resources entered into a financial

16    consulting services agreement with Parc Place, pursuant to which Parc Place was required to

17    obtain European investors for Lexington Resources.  For these services, Parc Place was entitled

18    to a finder's fee of 20-percent of the private placement capital Parc Place raised from the

19    European investors, with the fee to be paid partly in cash and partly in stock in Lexington

20    Resources.

21        142.    In or around June 2009, the SEC determined that Mr. Pierce represented Parc

22    Place in its dealings with Lexington Resources for the above-referenced capital-raising services.

23                      *Shareholders*

24        143.    In addition to the involvement of the Controlled and Influenced Officers,

25    Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 30 of 178

1    Consultants in Lexington Resources, many of the Controlled and Influenced Stockholders

2    owned Lexington Resources' stock and/or stock options during the relevant times of this

3    dispute.

*ICI*

4

5         144.    Between 1997 and 2003, ICI made numerous loans and/or advances of funds to

6    Lexington Resources.  Subsequently, between 2000 and 2004, Lexington Resources settled these

7    debts by issuing millions of shares of stock in Lexington Resources to ICI and/or ICI's

8    designates and/or assignees.

9         145.    Specifically, ICI assigned portions of the debts owed by Lexington Resources to

10   various designates like IMT, Mr. Pierce, and others.  Lexington Resources then satisfied these

11   debts in one of three ways: (1) issuing shares of stock in Lexington Resources to ICI's

12   assignees; (2) issuing options in Lexington Resources stock to ICI's assignees; or (3) permitting

13   the assignee to exercise its options in exchange for Lexington Resources stock in an amount

14   equal to the value of the debt.

15        146.    In addition to receiving stock in exchange for loans, Lexington Resources also

16   sold approximately 1,000,000 shares of stock in Goldstate (another public company which Mr.

17   Pierce, Mr. Cicci, and/or Mr. Barbon direct, influence, and/or control, as detailed *infra* at ¶¶

18   273-300) to ICI in or around February 2000, for approximately $150,000.00 – a 114-percent

19   premium on the market value of these securities.

20        147.    During the relevant times of this dispute, ICI publicly disclosed that it was a

21   beneficial owner of approximately 8-percent to 12-percent of the stock and/or options of

22   Lexington Resources.

23   ///

24   ///

25   ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

***IMT***

2     148.    In or around November 2003, Lexington Resources granted IMT and/or IMT's

3  designates over 2.8 million options in Lexington Resources' stock under Lexington Resources'

4  stock option plan.

5     149.    IMT and/or IMT's non-publicly-disclosed consultants and designates were also

6  assignees of portions of the debts that Lexington Resources owed to ICI.

7     150.    Specifically, between 2003 and 2004, Lexington Resources satisfied

8  approximately $1,000,000.00 in debt owed to ICI – debt that ICI had assigned to IMT and/or

9  IMT's consultants and designates – by permitting IMT and/or IMT's consultants and designates

10  to exercise their options in Lexington Resources stock in an amount equal to the value of the

11  assigned debts.

12     151.    During the relevant times of this dispute, IMT publicly disclosed that it was a

13  beneficial owner of at least a 21 percent of the stock and/or options of Lexington Resources.

14

***Mr. Pierce***

15     152.    In or around January 1999, Mr. Pierce was granted over 1.3 million options in

16  Lexington Resources' stock in exchange for non-publicly-disclosed services that he provided for

17  non-publicly-disclosed purposes as a "significant" consultant to Lexington Resources.

18     153.    Between 2001 and 2003, Mr. Pierce personally made numerous loans and/or

19  advances of funds to Lexington Resources.

20     154.    Mr. Pierce was not only one of the assignees of the debts owed by Lexington

21  Resources to ICI, but he was also one of the designates of IMT who received options in

22  Lexington Resources' stock under Lexington Resources' stock option plan.

23     155.    In or around November 2003, Lexington Resources satisfied approximately

24  $175,000.00 in debt that it owed to ICI – debt that ICI had assigned to Mr. Pierce – for the

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 32 of 178

1    exercise price of approximately 350,000 options in Lexington Resources' stock that IMT had

2    assigned to Mr. Pierce.

3         156.    In or around June 2009, the SEC determined that, during the relevant times of

4    this dispute, Newport Capital had provided Mr. Pierce with a revolving line of credit which he

5    used to pay the exercise price for some of his options in Lexington Resources' stock, and Mr.

6    Pierce then paid down this loan by transferring shares of his Lexington Resources' stock to

7    Newport Capital.

8         157.    During the relevant times of this dispute, Mr. Pierce publicly disclosed he was a

9    beneficial owner of approximately 7 percent to 9 percent of the stock and/or options of

10    Lexington Resources; however, in or around June 2009, the SEC determined that Mr. Pierce

11    owned nearly 24 percent of Lexington Resources as of February 2004.

12    ***Grant Atkins***

13         158.    Between 2001 and 2003, Mr. Atkins made numerous loans and/or advances of

14    funds to Lexington Resources.

15         159.    As an officer and director of Lexington Resources, Mr. Atkins also received

16    options in Lexington Resources' stock pursuant to the company's stock option plan.

17         160.    During the relevant times of this dispute, Mr. Atkins publicly disclosed that he

18    was a beneficial owner of less than 1 percent of the stock and/or options of Lexington

19    Resources.

20    ***Amerocan***

21         161.    Between 1997 and 2002, Amerocan made numerous loans and/or advances of

22    funds to Lexington Resources.

23         162.    In or around March 2000, Lexington Resources' wholly-owned subsidiary,

24    International Gold Corporation, settled a debt owed to Amerocan by issuing millions of shares

25    of stock in Lexington Resources to Amerocan.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 33 of 178

163.    In fact, during the relevant times of this dispute, Amerocan publicly disclosed that it was a beneficial owner of 8 percent to 12 percent of the stock and/or options of Lexington Resources.

### *Tristar*

164.    Between 1997 and 2002, Tristar made numerous loans and/or advances of funds to Lexington Resources.

165.    In or around March 2003, Lexington Resources settled a debt of approximately $600,000.00 owed to Tristar by issuing over 30 million shares of stock in Lexington Resources to Tristar.

166.    During the relevant times of this dispute, Tristar publicly disclosed that it was a beneficial owner of over 20 percent  of the stock and/or options of Lexington Resources.

### *Newport Capital*

167.    In or around June 2009, the SEC determined that, during the relevant times of this dispute, several blocks of options in Lexington Resources' stock that had been issued to IMT and/or IMT's consultants and designates had been subsequently assigned to Newport Capital at Mr. Pierce's direction.

168.    Newport Capital then sold some and/or all of these options to non-publicly disclosed individuals and entities during the relevant times of this dispute.

169.    During the relevant times of this dispute, Newport Capital publicly disclosed that it was a beneficial owner of approximately 1-percent to 7-percent of the stock and/or options of Lexington Resources.

### *Mr. Cox*

170.    Between 1999 and 2000, Mr. Cox made numerous loans and/or advances of funds to Lexington Resources.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 34 of 178

1      171.   In or around March 2000, Lexington Resources granted Mr. Cox over 8.8 million

2 shares of stock in Lexington Resources in settlement of a debt that Lexington Resources owed to

3 Mr. Cox in an amount totaling over $265,000.00.

4      172.   During the relevant times of this dispute, ICI assigned to Mr. Cox a $50,000.0

5 debt that Lexington Resources owed to ICI.

6      173.   During the relevant times of this dispute, Mr. Cox was also one of the designates

7 of IMT who received options in Lexington Resources' stock under Lexington Resources' stock

8 option plan.

9      174.   In or around January 2004, Lexington Resources exchanged the $50,000.00 debt

10 assigned to Mr. Cox by ICI for the exercise price of approximately 100,000 options in Lexington

11 Resources' stock that IMT had assigned to Mr. Cox.

12      175.   During the relevant times of this dispute, Mr. Cox publicly disclosed that he was

13 a beneficial owner of approximately 6 percent to 25 percent of the stock and/or options of

14 Lexington Resources.

15                                        ***Mr. Square***

16      176.   In or around June 2009, the SEC determined that, during the relevant times of

17 this dispute, when Mr. Square provided non-publicly-disclosed services to Lexington Resources

18 in his capacity as a consultant for ICI, he reported to Mr. Pierce, not Mr. Atkins.

19      177.   During the relevant times of this dispute, ICI assigned to Mr. Square a debt that

20 Lexington Resources owed to ICI in an amount totaling over $800,000.00.

21      178.   During the relevant times of this dispute, Mr. Square was also one of the

22 designates of IMT who received options in Lexington Resources' stock under Lexington

23 Resources' stock option plan.

24      179.   Between in or around January 2004 and in or around May 2004, Lexington

25 Resources exchanged over $800,000.00 in debt assigned to Mr. Square by ICI for the exercise

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    price of nearly 1.1 million options in Lexington Resources' stock that IMT had assigned to Mr.

2    Square.

3        180.    During the relevant times of this dispute, Mr. Square subsequently assigned some

4    of his Lexington Resources' stock and/or options to Eiger East and Jenirob.

5        181.    During the relevant times of this dispute, Mr. Square's percentage of beneficial

6    ownership in Lexington Resources' stock and/or options was not made readily-available to the

7    public.

8                                    *Mr. Stevens*

9        182.    In or around June 2009, the SEC determined that, during the relevant times of

10   this dispute, Mr. Stevens was the head of Global Securities Transfer, Inc., a/k/a X-Clearing

11   Group, a transfer agent used by Lexington Resources.  The SEC further determined that, during

12   the relevant times of this dispute, when Lexington Resources failed to pay the transfer agent for

13   its services in a timely manner, Mr. Pierce was the person that Mr. Stevens would ask to rectify

14   the problem.

15       183.    During the relevant times of this dispute, ICI assigned to Mr. Stevens a debt that

16   Lexington Resources owed to ICI in an amount totaling $12,500.00.

17       184.    During the relevant times of this dispute, Mr. Stevens was also one of the

18   designates of IMT who received options in Lexington Resources' stock under Lexington

19   Resources' stock option plan.

20       185.    Between in or around November 2003, Lexington Resources exchanged

21   $12,500.00 in debt assigned to Mr. Stevens by ICI for the exercise price of 25,000 options in

22   Lexington Resources' stock that IMT had assigned to Mr. Stevens.

23       186.    During the relevant times of this dispute, Mr. Stevens' percentage of beneficial

24   ownership in the stock and/or options of Lexington Resources was not made readily available to

25   the public.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 36 of 178

1

***Mr. Braumberger***

2      187.    During the relevant times of this dispute, ICI assigned to Mr. Braumberger a debt

3   that Lexington Resources owed to ICI in an amount totaling $12,500.00.

4      188.    During the relevant times of this dispute, Mr. Braumberger was also one of the

5   designates of IMT who received options in Lexington Resources' stock under Lexington

6   Resources' stock option plan.

7      189.    In or around November 2003, Lexington Resources exchanged the $12,500.00

8   debt assigned to Mr. Braumberger by ICI for the exercise price of approximately 25,000 options

9   in Lexington Resources' stock that IMT had assigned to Mr. Braumberger.

10     190.    During the relevant times of this dispute, Mr. Braumberger's percentage of

11   beneficial ownership in Lexington Resources' stock and/or options was not made readily

12   available to the public.

13                       ***Additional Shareholders***

14     191.    During the relevant times of this dispute, Mr. Barbon publicly disclosed that he

15   was the beneficial owner of less than 1 percent of the stock and/or options of Lexington

16   Resources.

17     192.    In or around January 1999, Mr. Johnson was granted approximately 400,000

18   options in Lexington Resources' stock in exchange for non-publicly-disclosed services that he

19   provided for non-publicly-disclosed purposes to Lexington Resources.  However, during the

20   relevant times of this dispute, Mr. Johnson's percentage of beneficial ownership in Lexington

21   Resources' stock and/or options was not made readily available to the public.

22     193.    During the relevant times of this dispute, ICI assigned Mr. Jewett portions of the

23   debts that Lexington Resources owed to ICI, and Mr. Jewett was permitted to use the assigned

24   debts to satisfy the exercise price of options he owned in Lexington Resources' stock.  Mr.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 37 of 178

1   Jewett publicly disclosed that he was the beneficial owner of less than 1 percent of the stock

2   and/or options of Lexington Resources.

3       194.    During the relevant times of this dispute, Mr. Powers and his spouse owned stock

4   and/or options in Lexington Resources, and he publicly disclosed that he was the beneficial

5   owner of less than 1 percent of the stock and/or options of Lexington Resources.

6       195.    During the relevant times of this dispute, ICI assigned Mr. MacKinnon portions

7   of the debts that Lexington Resources owed to ICI, and Mr. MacKinnon was permitted to use

8   the assigned debts to satisfy the exercise price of options he owned in Lexington Resources'

9   stock. Mr. MacKinnon publicly disclosed that he was the beneficial owner of less than 1 percent

10   of the stock and/or options of Lexington Resources.

11       196.    During the relevant times of this dispute, Mr. Mast personally owned shares of

12   Lexington Resources' stock, but his percentage of beneficial ownership in the company was not

13   made readily available to the public.

14       197.    In or around February 2003, Lexington Resources issued stock to Parc Place in

15   satisfaction of a debt that Lexington Resources owed to Parc Place. Parc Place publicly

16   disclosed that it was the beneficial owner of less than 1 percent of the stock and/or options of

17   Lexington Resources.

18       198.    During the relevant times of this dispute, Orient Explorations owned millions of

19   shares of stock in Lexington Resources, and Orient Explorations publicly disclosed that it was

20   the beneficial owner of 15 percent to 63 percent of the stock and/or options of Lexington

21   Resources.

22       199.    During the relevant times of this dispute, Phoenix Asset publicly disclosed that it

23   was the beneficial owner of over 7 percent of the stock and/or options of Lexington Resources.

24

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    200.    During the relevant times of this dispute, Longfellow Industries publicly

2  disclosed that it was the beneficial owner of 17 percent to 18 percent of the stock and/or options

3  of Lexington Resources.

4    201.    During the relevant times of this dispute, Eastern Capital owned over 2 million

5  shares of stock in Lexington Resources, and Eastern Capital publicly disclosed that it was the

6  beneficial owner of less than 1 percent of the stock and/or options of Lexington Resources.

7    202.    During the relevant times of this dispute, Verona Capital publicly disclosed that it

8  was the beneficial owner of over 3 percent of the stock and/or options of Lexington Resources.

9    203.    During the relevant times of this dispute, Eiger East received shares of stock in

10  Lexington Resources as a finder's fee related to a Lexington Resources' stock offering, and

11  Eiger East publicly disclosed that it was the beneficial owner of less than 1 percent of the stock

12  and/or options of Lexington Resources.

13    204.    During the relevant times of this dispute, Fairmont East publicly disclosed that it

14  was the beneficial owner of less than 1 percent of the stock and/or options of Lexington

15  Resources.

16              *SEC Investigations and Cease and Desist Orders*

17    205.    In or around June 2009, the SEC ordered Mr. Pierce to cease and desist from

18  violating provisions of the Securities Act of 1933 and the Securities Act of 1934.  Specifically,

19  Mr. Pierce was ordered to cease: (1) re-selling unregistered shares of Lexington Resources'

20  stock; and (2) assigning options in Lexington Resources' stock to individuals and corporations

21  he had ties with in order to conceal his ownership of the options and/or stock.  The SEC

22  determined that Mr. Pierce's actions were an attempt to avoid the SEC's beneficial ownership

23  reporting requirements.

24    206.    As a result of his actions with Lexington Resources, Mr. Pierce was ordered to

25  disgorge $2,043,362.33 in profits relating to his shares of stock in the company.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 39 of 178

207.    Recently, on or about June 9, 2010, the SEC issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 against Mr. Pierce, Newport Capital, and Jenirob Company, Ltd. ("Jenirob") for selling unregistered shares of stock. Specifically, the Division of Enforcement of the SEC seeks to recover an additional $7,700,000.00 in profits from Mr. Pierce relating to his sales of Lexington Resources' stock through two off-shore companies he controls – Newport Capital and Jenirob.

208.    In fact, in or around June 2009, the SEC determined that Mr. Pierce is and/or was the beneficial owner of Jenirob.

209.    The SEC alleges that Mr. Pierce controlled Lexington Resources in 2003 and 2004, by providing one of his consultants to serve as the Chief Executive Officer of the company and by holding a majority of the company's stock.

210.    The SEC further alleges that in 2003 and 2004, Mr. Pierce directed Mr. Atkins to issue 3.2 millions shares of Lexington stock, without restrictive legends, to Mr. Pierce and one of his associates (not publicly named by the SEC). After engaging in a massive campaign to tout Lexington Resources' stock, when Lexington Resources' stock price was at a high, Mr. Pierce sold 1.6 million of his shares to the public through Newport Capital and Jenirob's accounts at an offshore bank earning approximately $7.7 million in profits.

211.    The SEC further alleges that in or around October 2003, Mr. Pierce controlled more than 70-percent of Lexington Resources' stock.

212.    The SEC also alleges that in 2003, Lexington Resources purchased an interest in an oil and gas property owned by Mr. Pierce, and then Lexington Resources hired another company controlled by Mr. Pierce to drill a well on that property. However, Lexington Resources never generated any meaningful revenue as a result of this property or the handful of other oil and gas properties it acquired.

///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 40 of 178

1

Transax

2    213.    Transax was another of the Public Companies that Mr. Pierce worked to promote

3    in the 1990s and/or early 2000s.

4    214.    Transax (and/or its predecessor) was incorporated in Colorado, in or around

5    January 1987, and shortly before the company became public in the late 1990s, Mr. Pierce began

6    asserting his direct and/or indirect ownership, control, and/or influence over Transax.

7    *Officers, Directors, Employees, Agents, and/or Consultants*

8    215.    Mr. Atkins was appointed as the Secretary, Treasurer, and Director of Transax in

9    or around September 1998, and he was appointed as President of the company in or around

10    October 1998.  Mr. Atkins served as a Director of Transax until 2003 or 2004, and he served as

11    President, Secretary, and Treasurer until in or around June 2003.

12    216.    Mr. Atkins was also appointed as Chief Executive Officer and Chief Financial

13    Officer in June 2003, and he served in that capacity until in or around August 2003.

14    217.    Mr. Powers served as a Director of Transax from in or around December 2000 to

15    at least July 2002.

16    218.    Mr. Powers also served as the investor relations contact for Transax, as

17    designated in some of Transax's press releases issued in or around May 2000 and June 2000.

18    *Private Consultants*

19    219.    In addition to the involvement of the Controlled and Influenced Officers,

20    Directors, Employees, Agents, and/or Consultants in Transax, the Controlled and Influenced

21    Corporate Consultants also contracted with Transax.

22    220.    In or around April 1999, Transax and ICI entered into a two-year consulting

23    agreement for management, administrative, financial, marketing, and operational services,

24    pursuant to which ICI was to receive up to $75,000.000 per month for its services under this

25    contract.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   221.   The 1999 agreement between Transax and ICI was extended for an additional 2

2   years in or around April 2001.

3   222.   In or around July 2003, Transax and ICI entered into a new consulting agreement

4   for finance and managerial services.  Pursuant to this agreement, ICI was to receive $10,000.00

5   per month for its services.

6   223.   The 2003 agreement between Transax and ICI was terminated in or around

7   September 2003.

8   224.   In 1999, Amerocan and Transax entered into a management agreement pursuant

9   to which Transax paid Amerocan approximately $300,000.00 for its services.

10   225.   In or around January 1998, Transax and Tristar entered into a consulting

11   agreement which was terminated in or around March 1999.

12   226.   In or around 2003, Transax publicly disclosed the existence of a financial

13   consulting services agreement with IMT; however, no details regarding this agreement have

14   been disclosed to the public.

15   *Shareholders*

16   227.   In addition to the involvement of the Controlled and Influenced Officers,

17   Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

18   Consultants in Transax, many of the Controlled and Influenced Stockholders owned Transax's

19   stock and/or stock options.

20   ***ICI***

21   228.   Between 1999 and 2000, ICI advanced and/or loaned funds to Transax.

22   229.   Between 2000 and 2003, Transax settled several debts owed to ICI, totaling over

23   $1 million, by issuing ICI over 7.1 million shares of stock in Transax.

24

25

BAILEY✠KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    230.    In or around September 2003, Transax publicly disclosed that it owed a debt to

2  ICI, totaling over $750,000.00, for services rendered under the two consulting agreements

3  between Transax and ICI.

4    231.    ICI entered into assignment agreements with its non-publicly-disclosed creditors

5  – creditors that Transax claims each performed "bona fide consulting services" to Transax

6  pursuant to a non-publicly disclosed consulting services arrangement between Transax and IMT

7  – assigning a portion of the above-referenced $750,000.00 debt to each creditor in satisfaction

8  and release of the debts ICI owed to each creditor.

9    232.    The assigned debts were then satisfied and released when Transax permitted the

10  assignees to exercise an equivalent number of stock options in Transax stock through IMT.

11    233.    During the relevant times of this dispute, ICI publicly disclosed that it was the

12  beneficial owner of approximately 6 percent to 27 percent of the stock and/or options of

13  Transax.

14                                        ***IMT***

15    234.    In 2003, Transax issued 2.5 million options in Transax stock to IMT and/or

16  IMT's employees and consultants pursuant to a non-publicly-disclosed financial consulting

17  agreement between Transax and IMT.

18    235.    As a result of ICI's assignment-of-debt agreements described above,

19  approximately 1.2 million of IMT's 2.5 million options in Transax stock were exercised.

20    236.    On or around April 2004, after Mr. Pierce began slowly relinquishing his control

21  over Transax, IMT's remaining stock options were canceled.

22    237.    During the relevant times of this dispute, IMT's percentage of beneficial

23  ownership of the stock and/or options of Transax was not made readily available to the public.

24                                     ***Amerocan***

25    238.    Between 1998 and 1999, Amerocan loaned and/or advanced funds to Transax.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 43 of 178

1     239.    In or around March 2000, Transax settled a debt owed to Amerocan, totaling over

2  $74,000.00, by issuing Amerocan over 149,000 shares of stock in Transax.

3     240.    During the relevant times of this dispute, Amerocan's percentage of beneficial

4  ownership of the stock and/or options of Transax was not made readily available to the public.

5                           ***Tristar***

6     241.    Between 1998 and 2000, Tristar loaned and/or advanced funds to Transax.

7     242.    Between 2000 and 2002, Transax settled debts owed to Tristar, totaling nearly

8  $260,000.00, by issuing Tristar over 1.6 million shares of stock in Transax.

9     243.    During the relevant times of this dispute, Tristar publicly disclosed that it was the

10  beneficial owner of over 5 percent of the stock and/or options of Transax.

11                           ***Mr. Pierce***

12     244.    Between 2000 and 2002, Mr. Pierce loaned and/or advanced funds to Transax.

13     245.    In or around August 2002, Transax settled a debt owed to Mr. Pierce, totaling

14  over $42,000.00, by issuing him over 1.4 million shares of stock in Transax.

15     246.    During the relevant times of this dispute, Mr. Pierce publicly disclosed that he

16  was the beneficial owner of over 8 percent of the stock and/or options of Transax.

17                           ***Mr. Cox***

18     247.    In 2000, Mr. Cox loaned and/or advanced over $114,000.00 to Transax.

19     248.    In or around December 2000, Transax settled a debt with Mr. Cox by issuing him

20  a convertible promissory note in the amount of over $99,000.00.

21     249.    Transax also issued Mr. Cox over 270,000 shares of stock in Transax in

22  settlement of the accrued interest on the $99,000.00 debt.

23     250.    Shortly after the issuance of the note, Mr. Cox converted the promissory note into

24  over 3,300,000 shares of stock in Transax.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 44 of 178

1    251.    During the relevant time of this dispute, Mr. Cox publicly disclosed that he was

2    the beneficial owner of approximately 11 percent to 21 percent of the stock and/or options of

3    Transax.

4                            ***Newport Capital***

5    252.    Between 1998 and 2000, Newport Capital loaned and/or advanced funds to

6    Transax.

7    253.    In or around March 2000, Transax settled a debt owed to Newport Capital,

8    totaling over $16,000.00, by issuing Newport Capital over 32,000 shares of stock in Transax.

9    254.    In or around December 2000, Transax settled a debt with Newport Capital by

10   issuing Newport Capital a convertible promissory note in the amount of over $29,000.00.

11   255.    Transax also issued Newport Capital over 100,000 shares of stock in Transax in

12   settlement of the accrued interest on the $29,000.00 debt.

13   256.    Shortly after the issuance of the note, Newport Capital converted the promissory

14   note into over 986,000 shares of stock in Transax.

15   257.    During the relevant time of this dispute, Newport Capital publicly disclosed that

16   it was the beneficial owner of approximately 5 percent to 9 percent of the stock and/or options of

17   Transax.

18                              ***Pacific Rim***

19   258.    In or around December 2000, Transax settled a debt with Pacific Rim by issuing

20   Pacific Rim a convertible promissory note in the amount of $25,000.00.

21   259.    Shortly thereafter, Pacific Rim converted the promissory note into over 833,000

22   shares of stock in Transax.

23   260.    During the relevant time of this dispute, Pacific Rim publicly disclosed that it

24   was the beneficial owner of approximately 5 percent to 8 percent of the stock and/or options of

25   Transax.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 45 of 178

| | |
|---|---|
| 1 | ***Rising Sun*** |
| 2 | 261.    In or around December 2000, Transax settled a debt with Rising Sun by issuing |
| 3 | Rising Sun a convertible promissory note in the amount of $20,000.00. |
| 4 | 262.    Shortly thereafter, Rising Sun converted the promissory note into over 666,000 |
| 5 | shares of stock in Transax. |
| 6 | 263.    During the relevant time of this dispute, Rising Sun publicly disclosed that it was |
| 7 | the beneficial owner of over 5 percent of the stock and/or options of Transax. |
| 8 | ***Calista Capital*** |
| 9 | 264.    In or around December 2000, Transax settled a debt with Calista Capital by |
| 10 | issuing Calista Capital a convertible promissory note in the amount of over $27,000.00. |
| 11 | 265.    Shortly thereafter, Calista Capital converted the promissory note into over |
| 12 | 916,000 shares of stock in Transax. |
| 13 | 266.    During the relevant time of this dispute, Calista Capital publicly disclosed that it |
| 14 | was the beneficial owner of approximately 5 percent to 9 percent of the stock and/or options of |
| 15 | Transax. |
| 16 | ***Additional Shareholders*** |
| 17 | 267.    During the relevant times of this dispute, Mr. Cicci owned options in the stock of |
| 18 | Transax; however, his percentage of beneficial ownership of the company was not made readily |
| 19 | available to the public. |
| 20 | 268.    During the relevant times of this dispute, Mr. Atkins publicly disclosed that he |
| 21 | was the beneficial owner of less than 1 percent of the stock and/or options of Transax. |
| 22 | 269.    During the relevant times of this dispute, Mr. Johnson owned options in the stock |
| 23 | of Transax; however, his percentage of beneficial ownership of the company was not made |
| 24 | readily available to the public. |
| 25 | |

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 46 of 178

1    270.    During the relevant times of this dispute, Mr. Powers publicly disclosed that he

2    was the beneficial owner of less than 1 percent of the stock and/or options of Transax.

3    271.    During the relevant times of this dispute, Mr. Stevens owned stock and/or options

4    in Transax; however, his percentage of beneficial ownership was not made readily available to

5    the public.

6    272.    During the relevant times of this dispute, Clip publicly disclosed that it was the

7    beneficial owner of over 5 percent of the stock and/or options of Transax.

8    Goldstate

9    273.    Goldstate was another of the Public Companies that Mr. Pierce worked to

10    promote in the 1990s and/or early 2000s.

11    274.    Goldstate (and/or its predecessor) was incorporated in Nevada, in 1996, and

12    shortly before the company became public in the late 1990s, Mr. Pierce began asserting his

13    direct and/or indirect ownership, control, and/or influence over Goldstate.

14    *Private Consultants*

15    275.    In or around January 1999, Goldstate entered into a 6-month consulting services

16    and management agreement with Tristar, pursuant to which Tristar was to be paid up to

17    $100,000.00 per month.

18    276.    Goldstate's agreement with Tristar was renewed in or around July 1999, and was

19    rescinded in or around April 2000.

20    277.    In or around July 1999, Goldstate entered into a two-year contract with ICI for

21    management, administrative, financial, marketing, and public company operational services,

22    pursuant to which ICI was to be paid up to $75,000.00 per month.

23    278.    Goldstate's agreement with ICI was rescinded in or around April 2000.

24    279.    The management team that ICI provided to Lexington Resources was comprised

25    of the same individuals managing Goldstate.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 47 of 178

1    280.    The non-publicly-disclosed management team that Amerocan provided to

2    Lexington Resources was comprised of the same non-publicly-disclosed individuals who

3    managed the operations of Goldstate

4                                    *Shareholders*

5    281.    In addition to the involvement of the Controlled and Influenced Corporate

6    Consultants in Goldstate, many of the Controlled and Influenced Stockholders owned

7    Goldstate's stock and/or stock options.

8                                    **Mr. Pierce**

9    282.    In 1999, Mr. Pierce loaned and/or advanced funds to Goldstate in exchange for

10   two convertible promissory notes, and he converted these notes into the stock of Goldstate in or

11   around May 2000.

12   283.    Mr. Pierce owned options in Goldstate stock in 1999 and 2000, before

13   transferring the options back to Goldstate in 2000.

14   284.    During the relevant times of this dispute, Mr. Pierce's percentage of beneficial

15   ownership of the stock and/or options of Goldstate was not made readily available to the public.

16                                    **ICI**

17   285.    In 1999, ICI loaned and/or advanced over $295,000.00 to Goldstate.

18   286.    In or around March 2000, Goldstate settled this debt by issuing ICI over 16.9

19   million shares of stock in Goldstate.

20   287.    During the relevant times of this dispute, ICI's percentage of beneficial

21   ownership of the stock and/or options of Goldstate was not made readily available to the public.

22                                    **Amerocan**

23   288.    In 1999, Amerocan loaned and/or advanced over $48,000.00 to Goldstate.

24   289.    In or around March 2000, Goldstate settled this debt by issuing Amerocan over

25   2.7 million shares of stock in Goldstate.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 48 of 178

1    290.    During the relevant times of this dispute, Amerocan's percentage of beneficial

2    ownership of the stock and/or options of Goldstate was not made readily available to the public.

3                                          ***Tristar***

4    291.    In 1999, Tristar loaned and/or advanced over $57,000.00 to Goldstate.

5    292.    In or around March 2000, Goldstate settled this debt by issuing Tristar over 3.2

6    million shares of stock in Goldstate.

7    293.    During the relevant times of this dispute, Tristar's percentage of beneficial

8    ownership of the stock and/or options of Goldstate was not made readily available to the public.

9                                        ***Rising Sun***

10   294.    In 1999, Rising Sun loaned and/or advanced funds to Goldstate in exchange for a

11   convertible promissory note.

12   295.    In or around May 2000, Rising Sun converted its promissory note into the stock

13   of Goldstate.

14   296.    During the relevant times of this dispute, Rising Sun's percentage of beneficial

15   ownership of the stock and/or options of Rising Sun was not made readily available to the

16   public.

17                                ***Additional Shareholders***

18   297.    Mr. Cicci owned options in Goldstate stock in 1999 and 2000, before transferring

19   the options back to Goldstate in 2000.  During the relevant times of this dispute, Mr. Cicci's

20   percentage of beneficial ownership of the stock and/or options of Goldstate was not made

21   readily available to the public.

22   298.    Mr. Atkins owned options in Goldstate stock in 1999 and 2000, before

23   transferring the options back to Goldstate in 2000.  During the relevant times of this dispute, Mr.

24   Atkins' percentage of beneficial ownership of the stock and/or options of Goldstate was not

25   made readily available to the public.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 49 of 178

1      299.    Mr. Johnson owned options in Goldstate stock in 1999 and 2000, before

2  transferring the options back to Goldstate in 2000.  During the relevant times of this dispute, Mr.

3  Johnson's percentage of beneficial ownership of the stock and/or options of Goldstate was not

4  made readily available to the public.

5      300.    During the relevant times of this dispute, Lexington Resources owned stock

6  and/or options in Goldstate, and Lexington Resources publicly disclosed that it was the

7  beneficial owner of over 7 percent of the stock and/or options of Goldstate.

8  Petrogen

9      301.    Petrogen was another of the Public Companies that Mr. Pierce worked to promote

10  in the 1990s and/or early 2000s.

11     302.    Petrogen (and/or its predecessor) was incorporated in Nevada, in or around

12  December 1997, and soon thereafter, Mr. Pierce began asserting his direct and/or indirect

13  ownership, control, and/or influence over Petrogen.

14  *Officers, Directors, Employees, Agent, and/or Consultants*

15     303.    In or around September 2000, Mr. Atkins was appointed as President and

16  Director of Petrogen, and in or around December 2000, he was also appointed as Treasurer of

17  the company.  Mr. Atkins served as President and Treasurer until in or around March 2003, and

18  he served as a Director until 2003 or 2004.

19     304.    Mr. Jewett was nominated for election to the Board of Directors of Petrogen in or

20  around May 2002, but whether or not he was ever actually appointed as a Director of Petrogen,

21  even for a brief period of time, was not readily disclosed to the public

22     305.    Mr. MacKinnon was nominated for election to the Board of Directors of Petrogen

23  in or around May 2002, but whether or not he was ever actually appointed as a Director of

24  Petrogen, even for a brief period of time, was not readily disclosed to the public.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821