1   306.   In or around May 2001, Mr. Cicci served as the investor relations contact for

2   Petrogen, as designated in at least one of Petrogen's press releases.

3   307.   Mr. Johnson also served as the investor relations contact for Petrogen, as

4   designated in some of Petrogen's press releases issued in or around September 2001 and

5   October 2001.

6   *Private Consultants*

7   308.   In addition to the involvement of the Controlled and Influenced Officers,

8   Directors, Employees, Agent, and/or Consultants in Petrogen, the Controlled and Influenced

9   Corporate Consultants also contracted with Petrogen.

10   309.   In or around February 2003, Petrogen and ICI entered into a consulting services

11   agreement for financial and general managerial services, and Petrogen agreed to pay ICI

12   $10,000.00 per month for its services.

13   310.   Petrogen's contract with ICI was terminated in or around August 2003.

14   *Shareholders*

15   311.   In addition to the involvement of the Controlled and Influenced Officers,

16   Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

17   Consultants in Petrogen, many of the Controlled and Influenced Stockholders owned Petrogen's

18   stock and/or stock options.

19   ***ICI***

20   312.   Between 2001 and 2003, Petrogen settled debts with ICI totaling over

21   $1,800,000.00 – for either services rendered and/or loans and/or advances of funds – by issuing

22   to ICI over 5.7 million shares of Petrogen's stock and a convertible debenture for over $723,000.

23   313.   In or around February 2003, Petrogen, pursuant to the terms of its consulting

24   agreement with ICI, granted ICI and/or ICI's designates over 1 million options in Petrogen's

25   stock – over 50 percent of the total options issued by Petrogen.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 51 of 178

1    314.   By the end of March 2003, ICI and/or its designates had exercised all 1 million

2    options in Petrogen's stock.

3    315.   During the relevant times of this dispute, ICI publicly disclosed that it was the

4    beneficial owner of 6 percent to 25 percent of the stock and/or options of Petrogen.

5                                      ***Tristar***

6    316.   In or around 2002, Petrogen settled debts it owed to Tristar, for services rendered

7    and/or loans and/or advances of funds, by issuing Tristar shares of Petrogen's stock.

8    317.   During the relevant times of this dispute, Tristar publicly disclosed that it was the

9    beneficial owner of approximately 6 percent to 26 percent of the stock and/or options of

10   Petrogen.

11                                     ***Mr. Pierce***

12   318.   In or around September 2000, when Mr. Pierce began assuming control and

13   influence over Petrogen, Mr. Pierce purchased 500,000 shares of Petrogen's stock from one of

14   the original officers and directors of the corporation

15   319.   In 2002, Petrogen settled debts it owed to Mr. Pierce, for services he rendered

16   and/or loans and/or advances he made to Petrogen, by issuing Mr. Pierce shares of Petrogen's

17   stock.

18   320.   During the relevant times of this dispute, Mr. Pierce publicly disclosed that he

19   was the beneficial ownership of over 4 percent of the stock and/or options of Petrogen.

20                                  ***Newport Capital***

21   321.   In 2002, Petrogen settled debts it owed to Newport Capital, for services rendered

22   and/or loans and/or advances of funds, by issuing Newport Capital a convertible promissory

23   note in the amount of the debts.

24   322.   In or around February 2002, Newport Capital acquired all of Petrogen's capital

25   stock in Petrogen's wholly-owned subsidiary Oakhills Energy, Inc.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 52 of 178

1    323.    During the relevant times of this dispute, Newport Capital's percentage of

2    beneficial ownership of the stock and/or options of Petrogen was not made readily available to

3    the public.

4                                      ***Spartan Asset***

5    324.    In 2002, Petrogen settled debts it owed to Spartan Asset, for services rendered

6    and/or loans and/or advances of funds, by issuing Spartan Asset a convertible promissory note in

7    the amount of the debts.

8    325.    During the relevant times of this dispute, Spartan Asset's percentage of beneficial

9    ownership in the stock and/or options of Petrogen was not made readily available to the public.

10                                 ***Additional Shareholders***

11    326.    During the relevant times of this dispute, Mr. Atkins publicly disclosed that he

12    was the beneficial owner over 2 percent of the stock and/or options of Petrogen.

13    327.    During the relevant times of this dispute, Mr. Cox publicly disclosed that he was

14    the beneficial owner of approximately 7 percent to 17 percent of the stock and/or options of

15    Petrogen.

16    328.    During the relevant times of this dispute, Rising Sun owned stock and/or options

17    in Petrogen; however, Rising Sun's percentage of beneficial ownership in Petrogen was not

18    made readily available to the public.

19                                       Genemax

20    329.    Genemax was another of the Public Companies that Mr. Pierce worked to

21    promote in the 1990s and early 2000s.

22    330.    Genemax (and/or its predecessor) was incorporated in Nevada, in or around

23    October 1991, and shortly after the company became public in the late 1990s and/or early 2000,

24    Mr. Pierce began asserting his direct and/or indirect ownership, control, and/or influence over

25    Transax.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 53 of 178

*Officers, Directors, Employees, Agents, and/or Consultants*

331.    In or around March 2001, Mr. Atkins was appointed as President, Secretary, and Treasurer, of Genemax, and he served in these positions until in or around June or July 2002.

332.    Mr. Atkins was then re-appointed as Chief Financial Officer, Secretary, and Treasurer in or around May 2003, and he served in these positions until in or around April 2004.

333.    Mr. Atkins also served as a Director of Genemax from in or around March 2001 to in or around 2004 or 2005.

334.    Mr. Jewett was nominated for election to the Board of Directors of Genemax in or around May 2002, but whether or not he was ever actually appointed as a Director of Genemax, even for a brief period of time, was not readily disclosed to the public.

335.    In or around November 2000, Mr. Powers was appointed as Director of Genemax, and he served in this position until at least May 2001, as his date of resignation as Director was not made readily available to the public.

336.    In or around January 2004, Mr. MacKinnon was appointed as Director of Genemax, and he served in this position until in or around April 2005.

*Private Consultants*

337.    In addition to the involvement of the Controlled and Influenced Officers, Directors, Employees, Agents, and/or Consultants in Genemax, the Controlled and Influenced Corporate Consultants also contracted with Genemax.

338.    In or around October 2000, Genemax and ICI entered into a consulting services and management agreement, and under the terms of the agreement, Genemax paid ICI up to $75,000.00 per month.

339.    In or around August 2002, Genemax and ICI entered into a second consulting agreement, and, pursuant to the terms of this contract, ICI was entitled to $10,000.00 per month for its services.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 54 of 178

1      340.   In or around December 2003, Genemax's contract with ICI was terminated.

2      341.   In or around October 2003, Genemax entered into a financial consulting services

3   agreement with Parc Place, and, pursuant to the terms of the agreement, Parc Place was entitled

4   to receive a 20-percent finder's fee for all capital raised for Genemax from European and other

5   non-United States sources.

6      342.   In or around December 2003, Genemax's agreement with Parc Place was

7   terminated, but the termination did not take effect until the second quarter of 2004.

8                                   *Shareholders*

9      343.   In addition to the involvement of the Controlled and Influenced Officers,

10   Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

11   Consultants in Genemax, many of the Controlled and Influenced Stockholders owned

12   Genemax's stock and/or stock options.

13                                       ***ICI***

14      344.   Between 2001 and 2003, Genemax settled multiple debts to ICI totaling

15   $490,000.00 – for services rendered and/or loans and/or advances of funds – by issuing ICI over

16   15.5 million shares of stock in Genemax.

17      345.   In 2002, when the predecessor to Genemax, Eduverse.com, became Genemax,

18   ICI helped to raise capital for Genemax and advanced funds to a subsidiary of Genemax.

19      346.   In or around September 2003, Genemax publicly disclosed that it owed a debt of

20   over $260,000.00 to ICI for services rendered under the consulting agreements between

21   Genemax and ICI.

22      347.   ICI entered into assignment agreements with its non-publicly-disclosed creditors

23   – creditors that Genemax claims each performed "bona fide services" to Genemax pursuant to a

24   non-publicly-disclosed consulting services arrangement between Genemax and IMT – assigning

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1  a portion of this debt to each creditor in satisfaction and release of the debts ICI owed to each
2  creditor.

3      348.    The assigned debts were then satisfied and released when Genemax permitted the
4  assignees to exercise an equivalent number of stock options in Genemax's stock through IMT.

5      349.    During the relevant times of this dispute, ICI publicly disclosed that it was the
6  beneficial owner of approximately 3.5 percent to 55 percent of the stock and/or options of
7  Genemax.

8      ***IMT***

9      350.    In 2002, Genemax issued 500,000 options in Genemax's stock to IMT and/or
10  IMT's employees and consultants for non-publicly disclosed services rendered.

11      351.    In 2003, ICI assigned to IMT a $70,000.00 debt owed to ICI by Genemax, and
12  Genemax subsequently satisfied this debt by issuing options in Genemax's stock to IMT and/or
13  IMT's consultants.

14      352.    During the relevant times of this dispute, IMT's percentage of beneficial
15  ownership of the stock and/or options of Genemax was not made readily available to the public.

16      ***Mr. Pierce***

17      353.    In 2002, Mr. Pierce received some of the options in Genemax's tock that had
18  been issued to ICI.

19      354.    In or around December 2002, Mr. Pierce exercised approximately 102,000 of his
20  options.

21      355.    During the relevant times of this dispute, Mr. Pierce's percentage of beneficial
22  ownership of the stock and/or options of Genemax was not made readily available to the public.

23      ***Mr. Barbon***

24

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1     356.   Between 1999 and 2000, Genemax issued Mr. Barbon over 20,000 shares of

2 Genemax's stock, in five different transactions, as compensation for non-publicly-disclosed

3 services rendered.

4     357.   In or around March 2001, Genemax settled a debt with Mr. Barbon totaling over

5 $27,000.00 – for non-publicly-disclosed financial, administrative, managerial, or employment

6 services rendered and/or loans and/or advances of funds – by issuing Mr. Barbon nearly 3

7 million shares of Genemax's stock.

8     358.   During the relevant times of this dispute, Mr. Barbon publicly disclosed that he

9 was the beneficial owner of approximately 2 percent to 9 percent of the stock and/or options in

10 Genemax.

11                                   ***Mr. Cox***

12     359.   In or around March 2001, Genemax settled a debt with Mr. Cox totaling over

13 $52,000.00 – for financial, administrative, managerial, or employment services and/or loans

14 and/or advances of funds – by issuing Mr. Cox nearly 1.8 million shares of stock in Genemax.

15     360.   During the relevant times of this dispute, Mr. Cox publicly disclosed that he was

16 the beneficial owner of approximately 5 percent to 17 percent of the stock and/or options in

17 Genemax.

18                               ***Newport Capital***

19     361.   In October 2003, Genemax settled a debt owed to Newport Capital, totaling

20 $100,000.00, by permitting Newport Capital to assign $55,000.00 of the debt to a creditor of

21 Newport Capital, and then allowing the creditor to use the $55,000.00 debt as consideration for

22 the cash payment for the exercise of 55,000 options in Genemax stock.

23     362.   During the relevant times of this dispute, Newport Capital publicly disclosed that

24 he was the beneficial owner of over 8 percent of the stock and/or options in Genemax.

25                               ***Parc Place***

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

363.     During the relevant times of this dispute, Genemax paid Parc Place $50,000.00 in cash and over $71,000.00 shares of stock in Genemax in exchange for services that Parc Place rendered under the consulting agreement with Genemax.

364.     During the relevant times of this dispute, Parc Place's percentage of beneficial ownership of the stock and/or options of Genemax was not made readily available to the public.

### *Additional Shareholders*

365.     During the relevant times of this dispute, Mr. Atkins publicly disclosed that he was the beneficial owner of over 1 percent of the stock and/or options of Genemax.

366.     During the relevant times of this dispute, Mr. MacKinnon publicly disclosed that he was the beneficial owner of less than 1 percent of the stock and/or options of Genemax.

367.     During the relevant times of this dispute, Spartan Asset publicly disclosed that it was the beneficial owner of over 8 percent of the stock and/or options of Genemax.

368.     During the relevant times of this dispute, Calista Capital publicly disclosed that it was the beneficial owner of over 8 percent of the stock and/or options of Genemax.

369.     During the relevant times of this dispute, Pacific Rim publicly disclosed that it was the beneficial owner of over 8 percent of the stock and/or options of Genemax.

370.     During the relevant times of this dispute, Rising Sun publicly disclosed that it was the beneficial owner of over 8 percent of the stock and/or options of Genemax.

371.     During the relevant times of this dispute, Eastern Capital publicly disclosed that it was the beneficial owner of over 8 percent of the stock and/or options of Genemax.

372.     During the relevant times of this dispute, Eiger Properties, Inc. ("Eiger Properties") – a wholly-owned subsidiary of Petrogen, created during Mr. Pierce's control and/or influence over Petrogen in order to purchase an equity interest in a German project for Petrogen –publicly disclosed that it was the beneficial owner of over 8 percent of the stock and/or options of Genemax.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

<div align="center">Uranium Energy</div>

373.   Uranium Energy was another of the Public Companies that Mr. Pierce worked to promote in the 1990s and/or early 2000s.

374.   Uranium Energy (and/or its predecessor) was incorporated in Nevada, in or around May 2003, and shortly before the company became public, Mr. Pierce began asserting his direct and/or indirect ownership, control, and/or influence over Uranium Energy.

<div align="center">*Officers, Directors, Employees, Agents, and/or Consultants*</div>

375.   In or around January 2005, Mr. Atkins was appointed Chief Financial Officer, Treasurer, and Director of Uranium Energy, and he served in these positions until in or around February 2006.

376.   In or around January 2005, Mr. Horton was appointed as a Director of Uranium Energy, and in or around February 2006, he was also appointed as Chief Financial Officer and Treasurer.  Mr. Horton served in these positions until in or around August 2006.

377.   In or around January 2005, Mr. Jewett was appointed as a Director of Uranium Energy, and he served in this position until in or around August 2006.

378.   In 2006, IMT served as Uranium Energy's investor relations contact, as described in several of Uranium Energy's press releases.

<div align="center">*Private Consultants*</div>

379.   In addition to the involvement of the Controlled and Influenced Officers, Directors, Employees, Agents, and/or Consultants in Uranium Energy, the Controlled and Influenced Corporate Consultants also contracted with Uranium Energy.

380.   In or around December 2005, Uranium Energy and IMT entered into a 1-year financial consulting agreement, which terminated in or around February 2007.

381.   IMT received $10,000.00 per month under the terms of this consulting agreement.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

*Shareholders*

2     382.    In addition to the involvement of the Controlled and Influenced Officers,

3 Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

4 Consultants in Uranium Energy, many of the Controlled and Influenced Stockholders owned

5 Uranium Energy's stock and/or stock options.

6     383.    During the relevant times of this dispute, Mr. Atkins publicly disclosed that he

7 was the beneficial owner of over 1 percent of the stock and/or options of Uranium Energy.

8     384.    During the relevant times of this dispute, Mr. Horton publicly disclosed that he

9 was the beneficial owner of less than 1 percent of the stock and/or options of Uranium Energy.

10     385.    During the relevant times of this dispute, Mr. Jewett publicly disclosed that he

11 was the beneficial owner of less than 1 percent of the stock and/or options of Uranium Energy.

12     386.    During the relevant times of this dispute, Mr. Johnson publicly disclosed that he

13 was the beneficial owner of less than 1 percent of the stock and/or options of Uranium Energy.

14     387.    During the relevant times of this dispute, Mr. Cox publicly disclosed that he was

15 the beneficial owner of nearly 3 percent of the stock and/or options of Uranium Energy.

16     388.    IMT and/or its nominees received 1.3 million options in Uranium Energy stock as

17 consideration for its consulting contract with Uranium Energy; however, during the relevant

18 times of this dispute, IMT's percentage of beneficial ownership of stock and/or options of

19 Uranium Energy was not made readily available to the public.

20     389.    During the relevant times of this dispute, Newport Capital publicly disclosed that

21 it was the beneficial owner of less than one percent of the stock and/or options of Uranium

22 Energy.

23     390.    During the relevant times of this dispute, Jenirob publicly disclosed that it was

24 the beneficial owner of less than 1 percent of the stock and/or options of Uranium Energy.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 60 of 178

1  391.   During the relevant times of this dispute, Golden West publicly disclosed that it

2  was the beneficial owner of approximately 4 percent to 30 percent of the stock and/or options of

3  Uranium Energy, before Golden West began selling of its stock holdings in 2007.

4  392.   During the relevant times of this dispute, Verona Capital publicly disclosed that it

5  was the beneficial owner of over 1 percent of the stock and/or options of Uranium Energy.

6  <u>Geneva Resources</u>

7  393.   Geneva Resources was another of the Public Companies that Mr. Pierce worked

8  to promote in the 1990s and/or early 2000s.

9  394.   Geneva Resources (and/or its predecessor) was incorporated in Nevada, in or

10  around April 2004, and shortly thereafter, Mr. Pierce began asserting his direct and/or indirect

11  ownership, control, and/or influence over Geneva Resources.

12  *Officers, Directors, Employees, Agents, and/or Consultants*

13  395.   Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce was an

14  employee, agent, consultant and/or direct and/or indirect stockholder of Geneva Resources, and

15  that he directly and/or indirectly owned, controlled, and/or influenced Geneva Resources and its

16  operations and/or business and management decisions.  Mr. Pierce's involvement with Geneva

17  Resources is detailed more fully *infra*, at ¶¶ 589-851.

18  396.   Mr. Urquhart and Westhampton are further informed and believe that Mr. Pierce,

19  either individually or with a group of investors that Mr. Pierce controlled and/or influenced,

20  funded the operations of Geneva Resources.

21  397.   Mr. Urquhart and Westhampton are informed and believe that Mr. Cicci was an

22  employee, agent, consultant, and/or direct and/or indirect stockholder of Geneva Resources, and

23  that he, along with Mr. Pierce, directly and/or indirectly controlled and/or influenced Geneva

24  Resources and its operations and/or business and management decisions.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 61 of 178

1    398.    Mr. Urquhart and Westhampton are informed and believe that at all times
2    relevant to this dispute, Mr. Cicci supervised, drafted, approved, instructed, controlled, and/or
3    was otherwise involved with Geneva Resources' press releases, and he was always concerned
4    with promoting Geneva Resources to German investors.  Mr. Cicci's involvement with Geneva
5    Resources is detailed more fully *infra*, at ¶¶ 589-851.

6    399.    Mr. Urquhart and Westhampton are informed and believe that Mr. Barbon was an
7    employee agent, consultant, and/or direct and/or indirect stockholder of Geneva Resources, and
8    that he, along with Mr. Pierce and Mr. Cicci, directly and/or indirectly controlled and/or
9    influenced Geneva Resources, and its operations and/or business and management decisions.
10   Mr. Barbon's involvement with Geneva Resources is detailed more fully *infra*, at ¶¶ 589-851.

11   400.    In fact, based on an October 2007 SEC filing, Mr. Barbon is and/or was the
12   Controller of Geneva Resources; however, his term of service in this position was not made
13   readily available to the public.

14   401.    In or around March 2006, Mr. Johnson was appointed President, Chief Executive
15   Officer, Principal Executive Officer, Chief Financial Officer, Treasurer, and Director of Geneva
16   Resources.  Mr. Johnson served as Chief Financial Officer and Treasurer until in or around May
17   2006, and he served as President, Chief Executive Officer, and Principal Executive Officer until
18   in or around June 2007.

19   402.    In or around July 2007, Mr. Johnson was reappointed as President and Chief
20   Executive Officer of Geneva Resources, and he continues to serve in these positions today.  Mr.
21   Johnson also continues to serve as a Director of Geneva Resources.

22   403.    In or around May 2006, Mr. Horton was appointed as Secretary, Treasurer, Chief
23   Financial Officer, Principal Accounting Officer, and Director of Geneva Resources, and he
24   continues to serve in each of these positions today.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 62 of 178

1     404.    In or around May 2006, Mr. Jewett was appointed as a Director of Geneva

2 Resources, and he served in this position until in or around December 2008.

3     405.    Mr. Urquhart and Westhampton are informed and believe that, during the

4 relevant time of this dispute, Mr. Square was an officer, director, employee agent, consultant,

5 and/or direct and/or indirect stockholder of Geneva Resources.

6     406.    Mr. Urquhart and Westhampton are informed and believe that, during the

7 relevant times of this dispute, Mr. Braumberger was an employee, agent, and/or consultant of

8 Geneva Resources, and he supervised, drafted, approved, instructed, controlled, and/or was

9 otherwise involved with Geneva Resources' press releases.

10 <div align="center">*Private Consultants*</div>

11     407.    In addition to the involvement of the Controlled and Influenced Officers,

12 Directors, Employees, Agents, and/or Consultants in Geneva Resources, the Controlled and

13 Influenced Corporate Consultants also contracted with Geneva Resources.

14     408.    No information about Geneva Resources' contracts with private consulting

15 companies was made readily available to the public; however, Geneva Resources – like

16 Lexington Resources, Transax, Petrogen, Genemax, and Uranium Energy – publicly disclosed

17 that it operated without any full-time or part-time employees and that general services were

18 provided through "outsourcing, consultant, and special purpose contracts."

19     409.    Moreover, IMT served as the investor relations contact for Europe for Geneva

20 Resources, as described in a February 2007 press release issued by Geneva Resources.

21 <div align="center">*Shareholders*</div>

22     410.    In addition to the involvement of the Controlled and Influenced Officers,

23 Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

24 Consultants in Geneva Resources, many of the Controlled and Influenced Stockholders owned

25 Geneva Resources' stock and/or stock options.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 63 of 178

411.    Based on an October 2007 SEC filing, Mr. Cicci was a shareholder of Geneva Resources; however, his percentage of beneficial ownership of the stock and/or options of Geneva Resources was not made readily available to the public.

412.    During the relevant times of this dispute, Mr. Johnson publicly disclosed that he was the beneficial owner of approximately 15 percent to 17 percent of the stock and/or options of Geneva Resources.

413.    During the relevant times of this dispute, Mr. Horton publicly disclosed that he was the beneficial owner of less than 1 percent of the stock and/or options of Geneva Resources.

414.    During the relevant times of this dispute, Mr. Jewett publicly disclosed that he was the beneficial owner of less than 1 percent of the stock and/or options of Geneva Resources.

415.    Based on an October 2007 SEC filing, Mr. Square was a shareholder of Geneva Resources; however, his percentage of beneficial ownership of the stock and/or options of Geneva Resources was not made readily available to the public.

416.    During the relevant times of this dispute, Calista Capital publicly disclosed that it was the beneficial owner of over 4 percent of the stock and/or options of Geneva Resources.

417.    During the relevant times of this dispute, Verona Capital publicly disclosed that it was the beneficial owner of over 3 percent of the stock and/or options of Geneva Resources.

418.    On or around December 2009, Geneva Resources settled a debt with a non-publicly-disclosed creditor, for outstanding advances, loans, and accrued interest totaling over $1,700,000.00, by issuing the non-publicly-disclosed creditor a convertible promissory note. The creditor immediately assigned portions of the debt and promissory note to 12 non-publicly-disclosed assignees – all non-United States residents.

419.    Three days later, the assignees converted the promissory note, and Geneva Resources issued over 59 million shares of stock to the assignees. The assignees' percentage of

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    beneficial ownership of the stocks and/or options of Geneva Resources was not made readily

2    available to the public.

3    <div align="center">*Geneva Resources' Relationship With the Other Public Companies*</div>

4       420.     In or around May 1999, Lexington Resources entered into a technology sub-

5    license agreement with Geneva Resources relating to Lexington Resources' property in Idaho.

6       421.     In or around March 1999, Geneva Resources entered into a joint venture

7    agreement with Transax to explore gold and silver in Idaho. Under this agreement, Transax

8    transferred 500,000 shares of stock in Transax to Geneva Resources.

9       422.     In or around March 1999, Transax and Geneva Resources also entered into a

10    technology sublicense agreement involving a laboratory's services. In or around May 2000,

11    Transax assigned its rights and potential claims against the laboratory under the technology

12    sublicense agreement to Geneva Resources.

13       423.     In or around March 1999, Geneva Resources also loaned Transax $250,000.00.

14    <div align="center">Uranium International</div>

15       424.     Uranium International was another of the Public Companies that Mr. Pierce

16    worked to promote in the 1990s and/or early 2000s.

17       425.     Uranium International (and/or its predecessor) was incorporated in Nevada, in or

18    around October 2004, and shortly thereafter, Mr. Pierce began asserting his direct and/or indirect

19    ownership, control, and/or influence over Uranium International.

20    <div align="center">*Officers, Directors, Employees, Agents, and/or Consultants*</div>

21       426.     Mr. Horton was appointed as a Director of Uranium International in or around

22    July 2007, and he was also appointed as Interim President and Chief Executive Officer one

23    month later in or around August 2007. Mr. Horton served in these positions until in or around

24    April 2008.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    427.    In or around August 2008, Mr. Thomas was appointed as the Chief Financial

2    Officer, Treasurer, and Secretary of Uranium International, and he continues to serve in these

3    positions today.

4    428.    In or around July 2008, Mr. Kreczmer was appointed as President, Chief

5    Executive Officer and Director of Uranium International, and he served in these positions until

6    in or around January 2010.

7                                *Private Consultants*

8    429.    No information about Uranium International's contracts with private consulting

9    companies was made readily available to the public; however, Uranium International – like

10   Lexington Resources, Transax, Petrogen, Genemax, Uranium Energy, and Geneva Resources –

11   publicly disclosed that it operated without any full-time or part-time employees and that general

12   services were provided through "outsourcing, consultant, and special purpose contracts."

13                                *Shareholders*

14   430.    In addition to the involvement of the Controlled and Influenced Officers,

15   Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

16   Consultants in Uranium International, many of the Controlled and Influenced Stockholders

17   owned Uranium International's stock and/or stock options.

18   431.    During the relevant times of this dispute, Mr. Horton publicly disclosed that he

19   was the beneficial owner of over 21 percent of the stock and/or options of Uranium

20   International, and he sold approximately 2 million shares of stock in Uranium International

21   when he resigned from the company in or around April 2008.

22   432.    During the relevant times of this dispute, Mr. Thomas publicly disclosed that he

23   was the beneficial owner of less than 1 percent of the stock and/or options of Uranium

24   International.

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 66 of 178

1    433.    During the relevant times of this dispute, Mr. Kreczmer publicly disclosed that he

2  was the beneficial owner of over 7 percent of the stock and/or options of Uranium International.

3    434.    In or around November 2007, Uranium International entered into a letter

4  agreement with NWT Uranium Corporation ("NWT"), pursuant to which Uranium International

5  was to acquire 100 percent of NWT; however, in or around February 2008, the agreement was

6  terminated due to "market circumstances."

7    435.    Mr. Kreczmer was appointed as President, Chief Executive Officer, and Director

8  of NWT in or around October 2005, and he served in these positions until in or around June

9  2008.  Mr. Thomas was appointed as Chief Financial Officer of NWT from in or around July

10  2007, and he served in this position until in or around July 2008.

11    436.    Given the high level of involvement of the Controlled and Influenced Officers,

12  Directors, Employees, Agents, and/or Consultants, the Controlled and Influenced Corporate

13  Consultants, the Controlled and Influenced Stockholders in each of the Public Companies – and

14  the extent of their ties to Mr. Pierce – Mr. Pierce exercises great control and influence over each

15  of the Public Companies.

16    437.    Similarly, given the collective beneficial ownership of each of the Controlled and

17  Influenced Officers, Directors, Employees, Agents, and/or Consultants, the Controlled and

18  Influenced Corporate Consultants, the Controlled and Influenced Stockholders, Mr. Pierce

19  indirectly owns a controlling interest in each of the Public Companies which allows him to

20  exercise his control and influence over them.

21    **Pierco Petroleum and Pierco Energy**

22    438.    In addition to the Public Companies, Mr. Pierce, Mr. Cicci, and Mr. Barbon also

23  own, control, and/or influence two private companies – Pierco Petroleum, Inc. ("Pierco

24  Petroleum") and Pierco Energy Corporation ("Pierco Energy") – with ties to and relationships

25  with the Public Companies.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 67 of 178

1       439.   Mr. Urquhart and Westhampton are informed and believe that Pierco Petroleum

2   and Pierco Energy are related entities.

3       440.   In fact, during the relevant times of this dispute, Pierco Energy used Pierco

4   Petroleum's Vancouver office for its business meetings.

5       441.   There are several individuals employed by and/or otherwise associated with

6   Pierco Petroleum, who assist Mr. Pierce, Mr. Cicci, and/or Mr. Barbon in controlling and/or

7   influencing the Public Companies.

8   <center>Mr. Pierce, Mr. Cicci, and Mr. Barbon</center>

9       442.   Mr. Urquhart and Westhampton are informed and believe that at all times

10   relevant to this dispute, Mr. Pierce is and/or was an owner, officer, director, employee, agent,

11   consultant and/or direct and/or indirect stockholder of Pierco Petroleum, and he directly and/or

12   indirectly owns, controls, and/or influences Pierco Petroleum and its operations and/or business

13   and management decisions.

14       443.   In fact, in or around June 2009, the SEC determined that, during the relevant

15   times of this dispute, Mr. Pierce is and/or was an officer and director of Pierco Petroleum.  Mr.

16   Pierce's involvement with Pierce Petroleum is detailed more fully *infra*, at ¶¶ 589-851.

17       444.   Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce also is

18   an owner, officer, director, employee, agent, consultant, and/or direct and/or indirect stockholder

19   of Pierco Energy, and he directly and/or indirectly owns, controls, and/or influences Pierco

20   Energy and its operation and/or business and management decisions.  Mr. Pierce's involvement

21   with Pierco Energy is detailed more fully *infra*, at ¶¶ 589-851.

22       445.   Mr. Urquhart and Westhampton are informed and believe that Mr. Cicci is an

23   owner, officer, director, employee, agent, consultant, and/or direct and/or indirect stockholder of

24   both Pierco Petroleum and Pierco Energy, and that he, along with Mr. Pierce directly and/or

25   indirectly controls and/or influences the operations and/or business and management decisions

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 68 of 178

1   of Pierco Petroleum and Pierco Energy.  Mr. Cicci's involvement with Pierco Petroleum and
2   Pierco Energy is detailed more fully *infra*, at ¶¶ 589-851.

3        446.   At all times relevant to this dispute, Mr. Cicci used an e-mail address with Pierco
4   Petroleum's domain name, and he used Pierco Petroleum business cards.

5        447.   During the relevant times of this dispute, Mr. Barbon is and/or was the Chief
6   Financial Officer of Pierco Petroleum, and he is and/or was the President of Pierco Energy.

7        448.   Mr. Urquhart and Westhampton are informed and believe that Mr. Barbon, along
8   with Mr. Pierce and Mr. Cicci, also directly and/or indirectly controls and/or influences the
9   operations and/or business and management decisions of Pierco Petroleum.  Mr. Barbon's
10  involvement with Pierco Petroleum and Pierco Energy is detailed more fully *infra*, at ¶¶ 589-
11  851.

12       449.   At all times relevant to this dispute, Mr. Barbon used several e-mail addresses,
13  including one with a "Pierco" designation, and he also used Pierco Petroleum business cards.

14  <div align="center">Mr. Paige</div>

15       450.   Mr. Urquhart and Westhampton are informed and believe that, during the
16  relevant times of this dispute, Bruce Paige ("Mr. Paige") is and/or was an officer, director,
17  employee, agent, consultant, and/or stockholder of both Pierco Petroleum and Pierco Energy.

18       451.   Mr. Urquhart and Westhampton are informed and believe that at all times
19  relevant to this dispute, Mr. Paige, a Canadian attorney, performed legal services for Pierco
20  Petroleum and Pierco Energy – as well as for Geneva Resources.

21       452.   Specifically, Mr. Paige: (1) reviewed and approved all of Pierco Petroleum's
22  corporate agreements and contracts for execution by the relevant parties; (2) reviewed and
23  approved all of Pierco Energy's corporate agreements and contracts for execution by the
24  relevant parties; and (3) served as "special counsel" for Geneva Resources in the company's
25  dispute with a former president of Geneva Resources.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 69 of 178

1    453.    At all times relevant to this dispute, Mr. Paige also used Pierco Petroleum

2   business cards.

3                                   Mr. Braumberger

4    454.    Mr. Urquhart and Westhampton are informed and believe that, during the

5   relevant times of this dispute, Mr. Braumberger is and/or was an employee, agent, and/or

6   consultant of Pierco Petroleum and Pierco Energy.

7    455.    At all relevant times of this dispute, Mr. Braumberger was involved in designing

8   Pierco Petroleum and Pierco Energy's business cards, letterhead, and/or logos

9                                      Mr. Harris

10    456.    Mr. Urquhart and Westhampton are informed and believe that, during the

11   relevant times of this dispute, Bob Harris ("Mr. Harris") is and/or was an officer, director,

12   employee, agent, consultant, and/or direct and/or indirect stockholder of Pierco Petroleum.

13    457.    At all relevant times of this dispute, the signature block of Mr. Harris' e-mails

14   included the address of Pierco Petroleum's Vancouver office, located at Parc Place, 666 Burrard

15   Street, Suite 1240, Vancouver, British Columbia V6C 2X8, Canada ("Pierco Petroleum's

16   Vancouver office").

17    458.    Mr. Harris was also appointed as the Secretary and Director of Genemax in or

18   around June 1998, and he served in this position until in or around March 2001.

19                                    Ms. Limanova

20    459.    Mr. Urquhart and Westhampton are informed and believe that, during the

21   relevant times of this dispute, Katerina Limanova ("Ms. Limanova") is and/or was an officer,

22   director, employee, agent, consultant, and/or direct and/or indirect stockholder of Pierco

23   Petroleum.

24    460.    At all relevant times of this dispute, the signature block of Ms. Limanova's e-

25   mails included the address of Pierco Petroleum's Vancouver office.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 70 of 178

1

<div align="center">Ms. Ebert</div>

2   461.   Mr. Urquhart and Westhampton are informed and believe that, during the

3   relevant times of this dispute, Stephanie Ebert ("Ms. Ebert") is and/or was an officer, director,

4   employee, agent, consultant, and/or direct and/or indirect stockholder of both Pierco Petroleum

5   and Pierco Energy.

6   462.   Ms. Ebert also notarized or witnessed documents for Lexington Resources,

7   Geneva Resources, and Transax, including, for example: (1) the 1997 amendment to articles of

8   incorporation for Lexington Resources; (2) the 1999 technology sublicense agreement between

9   Lexington Resources and Geneva Resources; and (3) the 1999 joint venture agreement between

10   Geneva Resources and Transax.

11

<div align="center">Ms. Fralick</div>

12   463.   Mr. Urquhart and Westhampton are informed and believe that, during the

13   relevant times of this dispute, Pamela Fralick ("Ms. Fralick") is and/or was an employee, agent,

14   and/or consultant of Pierco Petroleum and/or Pierco Energy.

15   464.   Ms. Fralick also notarized or witnessed documents for Lexington Resources,

16   Geneva Resources, and Transax, including, for example: (1) the 1998 amendment to articles of

17   incorporation for Lexington Resources; and (2) the 1999 joint venture agreement between

18   Geneva Resources and Transax.

19

<div align="center">Mr. Thompson</div>

20   465.   Mr. Urquhart and Westhampton are informed and believe that, during the

21   relevant times of this dispute, Nicholas Thompson ("Mr. Thompson") is and/or was an officer,

22   director, employee, agent, consultant, and/or direct and/or indirect stockholder of Pierco

23   Petroleum.

24   466.   At all relevant times of this dispute, Mr. Thompson used a Pierco Petroleum e-

25   mail address.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 71 of 178

1       467.    In or around June 2009, the SEC determined that, during the relevant times of

2   this dispute, Mr. Pierce had a brokerage account with Mr. Thompson at vFinance that Mr. Pierce

3   used to hold Newport Capital's shares of Lexington Resources' stock, and Mr. Pierce gave Mr.

4   Thompson discretionary power to trade the Lexington Resources stock in Newport Capital's

5   brokerage account.

6   <div align="center">Additional Employees, Agents, Consultants, and/or Contractors</div>

7       468.    Mr. Urquhart and Westhampton are informed and believe that, during all times

8   relevant to this dispute, William Begley ("Mr. Begley") is and/or was an agent, employee,

9   consultant, and/or contractor of both Pierco Petroleum and Pierco Energy.

10       469.    Mr. Urquhart and Westhampton are informed and believe that, during all times

11   relevant to this dispute, Thomas Markham ("Mr. Markham") is and/or was an agent, employee,

12   consultant, and/or contractor of both Pierco Petroleum and Pierco Energy.

13       470.    Mr. Urquhart and Westhampton are informed and believe that, during all times

14   relevant to this dispute, James Linniman ("Mr. Linniman"), a production accountant, tracked the

15   profits and losses of well production for Pierco Petroleum and Pierco Energy.

16   <div align="center">Additional Ties to Geneva Resources and Lexington Resources</div>

17       471.    During the relevant times of this dispute, Geneva Resources used Pierco

18   Petroleum's Vancouver office for its business meetings.

19       472.    During the relevant times of this dispute, Pierco Petroleum owned a percentage of

20   Lexington Resources' working interest in four of Lexington Resources' wells, and Pierco

21   Petroleum assigned this interest to a third party in or around May 2007.

22       473.    Lexington Resources operated Pierco Petroleum's shale wells in Oklahoma.

23       474.    Pierco Petroleum purchased many of its properties from Lexington Resources.

24   ///

25   ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

## The Public Companies Share an Attorney and Office Space

2    475.    In addition to all the other connections between the Public Companies and Mr.

3  Pierce, Mr. Cicci, and Mr. Barbon, as described above, many of the Public Companies also

4  shared an attorney and office space.

5    476.    Diane Dalmy ("Ms. Dalmy") is a Colorado attorney who was banned, in or

6  around September 2009, from submitting any further letters or legal opinions on behalf of public

7  companies to Pink Sheets – an electronic quotation system operated by Pink OTC Markets that

8  displays quotes from broker-dealers for many over-the-counter securities, like the stock of many

9  of the Public Companies.

10    477.    During the relevant times of this dispute, Ms. Dalmy has performed legal services

11  for Geneva Resources, Lexington Resources, Genemax, Petrogen, Transax, Uranium

12  International, Uranium Energy, and Goldstate.

13    478.    Not only have ICI, IMT, and Tristar had an office located at 435 Martin Street,

14  Suite 2000, Blaine, Washington 98230, during the relevant times of this dispute, but Lexington

15  Resources, Genemax, Petrogen, and Transax have also had an office located at that same

16  address.

17

## Mainland and Morgan Creek

18    479.    As Mr. Pierce, Mr. Cicci, and Mr. Barbon's involvement in some of the Public

19  Companies began to diminish in the mid-2000s, Mr. Pierce, Mr. Cicci, and Mr. Barbon began to

20  look for new start-up companies to become involved with and to control and influence behind

21  the scenes in order to make millions of dollars in profits from stock sales.

22    480.    Utilizing the same methods by which they gained ownership, control, and/or

23  influence over the Public Companies, Mr. Pierce, Mr. Cicci, and Mr. Barbon gained ownership,

24  control, and/or influence over the management and business decisions of Mainland and Morgan

25  Creek.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 73 of 178

1

<u>Morgan Creek</u>

2     481.    Morgan Creek's stock trades on the National Association of Securities Dealers

3 ("NASD") Over-the-Counter Bulletin Board ("OTC-BB"), where stock transactions are

4 conducted through a telephone and computer network rather than on the floor of an organized

5 national or regional stock exchange.

6     482.    Morgan Creek is an independent oil exploration, development, and production

7 company.

8     483.    Morgan Creek was incorporated in Nevada, in or around October 2004, and Mr.

9 Pierce began asserting his direct and/or indirect ownership, control, and/or influence over

10 Morgan Creek almost from inception.

11     484.    From inception to at least March 2010, Morgan Creek never generated any oil or

12 gas revenue, and its total net loss from inception to March 2010 was over $8.9 million.

13     485.    From inception, Morgan Creek has been funded through private placement stock

14 offerings and loans and/or advances from related parties.

15

*Officers, Directors, Employees, Agents, and/or Consultants*

16

***Controlled and Influenced Officers, Directors, Employees, Agents, and/or Consultants***

17     486.    Morgan Creek has never had any full-time or part-time employees; rather,

18 Morgan Creek's Chief Executive Officer and Chief Financial Officer are primarily responsible

19 for Morgan Creek's day-to-day operations.

20     487.    Mr. Urquhart and Westhampton are informed and believe that during the relevant

21 times of this dispute, Mr. Pierce is and/or was an employee, agent, consultant, and/or direct

22 and/or indirect stockholder of Morgan Creek, and that he directly and/or indirectly owned,

23 controlled, and/or influenced Morgan Creek and its operations and/or business and management

24 decisions.

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    488.   Mr. Urquhart and Westhampton are informed and believe that during the relevant

2    times of this dispute, Mr. Cicci is and/or was an employee, agent, consultant, and/or direct

3    and/or indirect stockholder of Morgan Creek, and that he, along with Mr. Pierce, directly and/or

4    indirectly owned, controlled, and/or influenced Morgan Creek and its operations and/or business

5    and management decisions.

6    489.   Mr. Urquhart and Westhampton are informed and believe that during the relevant

7    times of this dispute, Mr. Barbon is and/or was an employee, agent, consultant, and/or direct

8    and/or indirect stockholder of Morgan Creek, and that he, along with Mr. Pierce and Mr. Cicci,

9    directly and/or indirectly owned, controlled, and/or influenced Morgan Creek and its operations

10   and/or business and management decisions.

11   490.   In or around October 2004, Mr. Atkins was appointed as the Treasurer, Chief

12   Financial Officer, Secretary, and Director of Morgan Creek, and he served in these positions

13   until in or around August 2006.

14   491.   In or around October 2006, Mr. Johnson was appointed as President, Chief

15   Executive Officer, Principal Executive Officer, and Chairman of the Board for Morgan Creek,

16   and he served in these positions until in or around April 2009.  From in or around August 2006

17   to in or around December 2009, Mr. Johnson also served as a Director of Morgan Creek.

18   492.   Mr. Johnson also served as a member of Morgan Creek's audit committee from

19   in or around August 2006 to in or around September 2009, and he was a member of  Morgan

20   Creek's compensation committee from in or around December 2008 to in or around December

21   2009.

22   493.   In or around August 2006, Mr. Horton was appointed as Secretary, Treasurer,

23   Chief Financial Officer, Principal Accounting Officer, and Stock Option Plan Administrator of

24   Morgan Creek in or around August 2006, and he served in these positions until in or around

25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 75 of 178

1  January 2008.  Mr. Horton was also appointed as a Director of Morgan Creek in or around

2  August 2006, and he continues to serve in that position today.

3      494.  In or around October 2004, Mr. Jewett was appointed as a Director of Morgan

4  Creek, and he served in this position until in or around December 2008.

5      495.  In or around January 2009, Mr. Thomas was appointed as Chief Financial

6  Officer, Secretary, Treasurer, and Principal Accounting Officer of Morgan Creek, and he

7  continues to serve in these positions today.

8      496.  At inception, Ms. Ebert served as Morgan Creek's Secretary, and she signed

9  Morgan Creek's bylaws as such.  Her current position with Morgan Creek is unknown; however,

10  during the relevant times of this dispute, she often forwarded Morgan Creek-related documents

11  to Mr. Barbon's attention.

12      497.  Mr. Urquhart and Westhampton are informed and believe that during the relevant

13  times of this dispute, Mr. Braumberger is and/or was an employee, agent, and/or consultant of

14  Morgan Creek, and he designed the press releases, business cards, letterhead, logo, and

15  brochures for Morgan Creek.

16      498.  During the relevant times of this dispute, Mr. Braumberger also supervised,

17  drafted, approved, instructed, controlled, issued, and/or was otherwise involved with Morgan

18  Creek's press releases.

19      499.  Mr. Urquhart and Westhampton are informed and believe that Mr. Braumberger

20  also designed and/or oversaw the design of Morgan Creek's website.

21      500.  Mr. Urquhart and Westhampton are informed and believe that, during the

22  relevant times of this dispute, Mr. Harris is and/or was an employee, agent, and/or consultant for

23  Morgan Creek.

24

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 76 of 178

1      501.    Mr. Urquhart and Westhampton are informed and believe that, during the

2  relevant times of this dispute, Mr. Paige performed legal services for Morgan Creek which

3  included negotiating, drafting, and reviewing contracts.

4      502.    In or around August 2006, Mr. Markham was appointed as the Chief Geologist

5  and Director of Morgan Creek.  Mr. Markham served as the Chief Geologist until in or around

6  April 2009, and he served as a Director until in or around July 2008.

7                    ***Additional Officers, Directors, Employees, Agents and/or Consultants***

8      503.    Mr. Urquhart and Westhampton are informed and believe that, during the

9  relevant times of this dispute, Mr. Newport was an employee, agent, and/or consultant of

10  Morgan Creek, as he was extensively involved in Morgan Creek's land leasing and acquisition

11  efforts.

12      504.    From in or around September 2008 to the present, Angelo Viard ("Mr. Viard")

13  has been a director of Morgan Creek, and from in or around December 2008 to the present, he

14  has also been a member of Morgan Creek's audit and compensation committees.

15      505.    From in or around September 2008 to the present, Peter Wilson ("Mr. Wilson")

16  has served as the President, Chief Executive Officer, Principal Executive Officer, and Director

17  of Morgan Creek.

18                              <u>*Private Consultants*</u>

19      506.    In addition to the involvement of the Controlled and Influenced Officers,

20  Directors, Employees, Agents, and/or Consultants in Morgan Creek, the Controlled and

21  Influenced Corporate Consultants also contracted with Morgan Creek.

22      507.    Because Morgan Creek has no full-time or part-time employees, services are

23  provided to Morgan Creek by outsourcing, consultant, and/or special purpose contracts.

24      508.    In or around June 2005, Morgan Creek entered into a consulting agreement with

25  IMT, pursuant to which IMT was to perform a wide-range of management, administrative,

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 77 of 178

1  financial, and business development services for Morgan Creek in exchange for $10,000.00 per

2  month.

3       509.    In or around February 2005, prior to entering into its contract with IMT, Morgan

4  Creek paid IMT approximately $50,000.00 to develop a corporate identity package for Morgan

5  Creek, including a logo, trade name, website, and other administrative, identity-related items.

6       510.    In 2005, Morgan Creek paid IMT over $204,000.00 for consulting fees, the

7  corporate identity package, and administrative expenses.

8       511.    In 2006, Morgan Creek paid IMT over $425,000.00 for consulting fees,

9  assistance in obtaining a listing on the Frankfurt Exchange in Germany, administrative fees, the

10  implementation of an investor awareness mailing program in Germany, an update of Morgan

11  Creek's website, and other office-related expenses.

12       512.    In 2007, Morgan Creek paid IMT at least $30,000.00 in consulting fees.

13       513.    In 2008, Morgan Creek paid IMT at least $30,000 in consulting fees.

14       514.    In 2005, IMT paid Mr. Atkins at least $15,000.00 in management fees for his

15  services rendered as an officer and director of Morgan Creek, and in 2006, IMT paid him an

16  additional $40,000 in management fees.

17                            *Shareholders*

18       515.    In addition to the involvement of the Controlled and Influenced Officers,

19  Directors, Employees, Agents, and/or Consultants and the Controlled and Influenced Corporate

20  Consultants in Morgan Creek, many of the Controlled and Influenced Stockholders owned

21  Morgan Creek's stock and/or stock options.

22       ***Non-Publicly Disclosed Shareholder Who Serves as Officer and/or Director of IMT***

23       516.    During the relevant times of this dispute, Morgan Creek received a significant

24  amount of advances from a non-publicly disclosed shareholder that happened to be an officer

25  and/or director of IMT.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 78 of 178

1  517.  Specifically, between at least in or around January 2006 to in or around

2  December 2008, this non-publicly disclosed shareholder advanced Morgan Creek, at a

3  minimum, of $2,250,000.00.

4  518.  In 2006, these loans were unsecured, non-interest-bearing, and had no definite

5  repayment terms.  In 2007, the loans remained unsecured with no definite repayment terms, but

6  they began accruing interest at 8-percent per annum.

7  519.  In or around January 2007, Morgan Creek acquired a 100-percent working

8  interest and a 77-percent net revenue interest in two fully-equipped oil leases in Webb and

9  Duval Counties, Texas, for approximately $55,000.00.  In or around April 2007, Morgan Creek

10  sold its interest in these leases to the non-publicly-disclosed shareholder for $65,000.00, with the

11  purchase price to be offset against the amounts due and owing from Morgan Creek for the loans

12  made by the non-publicly-disclosed shareholder.

13  520.  In 2008, the non-publicly disclosed shareholder assigned portions of the debt

14  owed by Morgan Creek to various non-publicly-disclosed assignees – all non-United States

15  residents.

16  521.  As of December 2008, Morgan Creek had settled over $1.5 million of this debt

17  through the issuance of over 7.5 million shares of stock in Morgan Creek (pre-April 2008 stock

18  split) to the non-publicly disclosed assignees, plus the repayment of $500,000.00 in cash.

19  522.  As of December 31, 2008, when $310,000.00 remained due and owing to the

20  non-publicly-disclosed shareholder, the non-publicly-disclosed shareholder advanced Morgan

21  Creek an additional $100,000.00.

22  523.  In or around July 2009, Morgan Creek issued 1.6 million "units" (with each unit

23  comprised of one common share of Morgan Creek stock and one non-transferable share

24  purchase warrant exercisable for 12 months from issuance) to this non-publicly-disclosed

25  shareholder in settlement of $200,000.00 of the outstanding debt.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 79 of 178

***IMT***

524.     Between in or around January 2007 and in or around March 2008, IMT directly loaned and/or advanced Morgan Creek over $56,000.00, and Morgan Creek owed IMT an additional $30,000.00 in unpaid consulting fees.

525.     In or around March 2008, Morgan Creek settled these debts by issuing IMT over 430,000 shares of Morgan Creek stock (pre-April 2008 stock split).

526.     During the relevant times of this dispute, IMT's percentage of beneficial ownership of the stock and/or options of Morgan Creek was not made readily available to the public.

***Geneva Energy***

527.     In 2004, Geneva Energy Corporation ("Geneva Energy") sold Morgan Creek its first two assets – two petroleum and natural gas leases in Oklahoma – for $300,000.00 cash and the issuance of 6 million shares of stock in Morgan Creek, making it the beneficial owner of 59 percent of the stock and/or options of Morgan Creek.

528.     By December 31, 2005, Morgan Creek publicly disclosed that it had decided not to proceed with development of these leases and that it intended to sell its interests in the leases; however, Morgan Creek never publicly disclosed any subsequent sale of the leases or an loss or gain on the sale.

529.     During the relevant times of this dispute, Geneva Energy's holdings increased to 24 million shares due to stock splits.

530.     In or around December 2006, Geneva Energy agreed to cancel 12 million shares of its Morgan Creek stock for no consideration.  Geneva Energy also transferred the other 12 million shares to 12 separate, mostly non-publicly-disclosed shareholders in a series of private transactions.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    531.    Three million of the transferred shares were sold to Mr. Johnson for $3,000.00,

2    and 1.4 million of the transferred shares were sold to Phoenix Asset.  The transferees of the

3    remaining shares were not publicly disclosed.

4                              ***Additional Shareholders***

5    532.    During the relevant times of this dispute, Mr. Johnson publicly disclosed that he

6    was between the beneficial owner of 7 percent to 11 percent of the stock and/or options of

7    Morgan Creek.

8    533.    During the relevant times of this dispute, Mr. Horton publicly disclosed that he

9    was the beneficial owner of 1 percent of the stock and/or options of Morgan Creek.

10   534.    During the relevant times of this dispute, Mr. Jewett publicly disclosed that he

11   was the beneficial owner of less than 1 percent of the stock and/or options of Morgan Creek.

12   535.    During the relevant times of this dispute, Mr. Thomas publicly disclosed that he

13   was the beneficial owner of over 1 percent of the stock and/or options of Morgan Creek.

14   536.    During the relevant times of this dispute, Mr. Mast publicly disclosed that he was

15   the beneficial owner of 1 percent of the stock and/or options of Morgan Creek.

16   537.    During the relevant times of this dispute, Mr. Pierce's wife, Dana Pierce publicly

17   disclosed that she was the beneficial owner of 1 percent of the stock and/or options of Morgan

18   Creek.

19   538.    During the relevant times of this dispute, a relative of Mr. Cicci, Matthew Cicci,

20   publicly disclosed that he was the beneficial owner of less than 1 percent of the stock and/or

21   options of Morgan Creek.

22   539.    During the relevant times of this dispute, Newport Capital publicly disclosed that

23   it was the beneficial owner of approximately 1 percent to 5 percent of the stock and/or options of

24   Morgan Creek.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 81 of 178

1    540.   During the relevant times of this dispute, Jenirob publicly disclosed that it was

2    the beneficial owner of over 2 percent of the stock and/or options of Morgan Creek.

3    541.   During the relevant times of this dispute, Pacific Rim publicly disclosed that it

4    was the beneficial owner of 5 percent of the stock and/or options of Morgan Creek.

5    542.   During the relevant times of this dispute, Eastern Capital publicly disclosed that it

6    was the beneficial owner of over 2 percent of the stock and/or options of Morgan Creek.

7    543.   During the relevant times of this dispute, Spartan Asset publicly disclosed that it

8    was the beneficial owner of over 2 percent of the stock and/or options of Morgan Creek.

9    544.   During the relevant times of this dispute, Verona Capital publicly disclosed that it

10   was the beneficial owner of 1 percent of the stock and/or options of Morgan Creek.

11   545.   During the relevant times of this dispute, Kingsbridge publicly disclosed that it

12   was the beneficial owner of less than 1 percent of the stock and/or options of Morgan Creek.

13   546.   During the relevant times of this dispute, Longfellow Industries publicly

14   disclosed that it was the beneficial owner of 2.5 percent of the stock and/or options of Morgan

15   Creek.

16   547.   During the relevant times of this dispute, Mr. Markham publicly disclosed that he

17   was the beneficial owner of approximately 3 percent to 7 percent of the stock and/or options of

18   Morgan Creek.

19   548.   During the relevant times of this dispute, Mr. Wilson publicly disclosed that he

20   was the beneficial owner of over 5 percent of the stock and/or options of Morgan Creek.

21   549.   During the relevant times of this dispute, Mr. Viard publicly disclosed that he

22   was the beneficial owner of less than 1 percent of the stock and/or options of Morgan Creek.

23                                    Mainland

24   550.   Like Morgan Creek, Mainland's stock is traded on the OTC-BB.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 82 of 178

1      551.    Like Morgan Creek, Mainland is an independent oil exploration, development,

2  and production company.

3      552.    Mainland was incorporated in Nevada, in or around May 2006, and Mr. Pierce

4  began asserting his direct and/or indirect ownership, control, and/or influence over Mainland in

5  or around early 2008.

6      553.    Mainland did not commence business operations until 2008, and while it has just

7  recently begun generating a small revenue, its total net losses since inception total over $17.9

8  million.

9      554.    Since the time that Mr. Pierce, Mr. Cicci, and Mr. Barbon assumed ownership,

10  control, and/or influence over Mainland, Mainland has been funded through private placement

11  stock offerings and loans and/or advances from related parties.

12                     *Officers, Directors, Employees, Agents, and/or Consultants*

13             **Controlled and Influenced Officers, Directors, Employees, Agents and/or Consultants**

14      555.    Since the time that Mr. Pierce, Mr. Cicci, and Mr. Barbon assumed ownership,

15  control, and/or influence over Mainland, Mainland has never had any full-time or part-time

16  employees; rather Mainland's Chief Executive Officer and Chief Financial Officer are

17  primarily responsible for Mainland's day-to-day operations.

18      556.    Mr. Urquhart and Westhampton are informed and believe that during the relevant

19  times of this dispute, Mr. Pierce is and/or was an employee, agent, consultant, and/or direct

20  and/or indirect stockholder of Mainland, and he directly and/or indirectly owned, controlled,

21  and/or influenced Mainland and its operations and/or business and management decisions.

22      557.    Mr. Urquhart and Westhampton are informed and believe that during the relevant

23  times of this dispute, Mr. Cicci is and/or was an employee, agent, consultant, and/or direct

24  and/or indirect stockholder of Mainland, and he, along with Mr. Pierce, directly and/or

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 83 of 178

1  indirectly owned, controlled, and/or influenced Mainland and its operations and/or business and

2  management decisions.

3      558.    Mr. Urquhart and Westhampton are informed and believe that during the relevant

4  times of this dispute, Mr. Barbon is and/or was an employee, agent, consultant, and/or direct

5  and/or indirect stockholder of Mainland, and he, along with Mr. Pierce and Mr. Cicci, directly

6  and/or indirectly owned, controlled, and/or influenced Mainland and its operations and/or

7  business and management decisions.

8      559.    Mr. Thomas was appointed as the Chief Financial Officer, Treasurer, and

9  Secretary of Mainland in or around July 2008, and he served in these positions until in or

10  around September 2009. Mr. Thomas was reappointed as Chief Financial Officer and

11  Treasurer of Mainland in or around March 2010, and he continues to serve in these positions

12  today.

13      560.    Mr. Thomas was also appointed as a Director of Mainland in or around

14  September 2009, and a member of Mainland's audit committee in or around November 2009,

15  and he continues to serve in both of these positions today.

16      561.    Mr. Urquhart and Westhampton are informed and believe that during the relevant

17  times of this dispute, Mr. Braumberger is and/or was an employee, agent, and/or consultant of

18  Mainland, and he designed the press releases, business cards, letterhead, logo, and brochures for

19  Mainland.

20      562.    During the relevant times of this dispute, Mr. Braumberger also supervised,

21  drafted, approved, instructed, controlled, issued, and/or was otherwise involved with

22  Mainland's press releases.

23      563.    Mr. Urquhart and Westhampton are informed and believe that during the relevant

24  times of this dispute, Mr. Paige performed legal services for Mainland which included

25  negotiating, drafting, and reviewing contracts.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 84 of 178

1

***Additional Officers, Directors, Employees, Agents, and/or Consultants***

2    564.    Mr. Urquhart and Westhampton are informed and believe that, during the

3    relevant times of this dispute, Mr. Coulthard was an employee, agent, consultant, and/or direct

4    and/or indirect stockholder of Mainland, and that he, along with Mr. Pierce, Mr. Cicci, and Mr.

5    Barbon, directly and/or indirectly owned, controlled, and/or influenced Mainland and its

6    operations and/or business and management decisions.

7    565.    In or around February 2008, Mr. Newport was appointed as the President and

8    Chief Executive Officer of Mainland, and he continues to serve in these positions today.  Mr.

9    Newport also served as a Director of Mainland from in or around February 2008 to in or around

10   December 2009.

11   566.    In or around February 2008, Mr. Fedun was appointed as the Secretary,

12   Treasurer, and Chief Financial Officer of Mainland, and he served in these positions until in or

13   around July 2008.  Mr. Fedun also served as a Director of Mainland from in or around February

14   2008 to in or around October 2009.

15   567.    In or around February 2008, Ms. King Horton served as the Chief Geologist and

16   Director of Mainland, and he served in these positions until in or around March 2008.

17   568.    In or around August 2008, Ms. King Horton was re-appointed as a Director of

18   Mainland, and she continues to serve in that position today.

19   569.    From in or around July 2008 to in or around October 2009, Mr. Sorochan served

20   as a Director Mainland, and from in or around February 2009 to in or around October 2009, he

21   also served as a member of Mainland's audit committee.

22   570.    In or around September 2008, Mr. Viard was appointed as a Director of

23   Mainland, and he continues to serve in that position today.

24

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 85 of 178

1      571.    In or around December 2009, Mr. Wilson was appointed as the Vice-President of

2  Business Development and Director of Mainland, and he continues to serve in these positions

3  today.

*Private Consultants*

5      572.    Because Mainland has no full-time or part-time employees, Mainland has

6  publicly disclosed that, during the relevant times of this dispute, services are provided to

7  Mainland by outsourcing, consultant, and/or special purpose contracts.  However, Mainland has

8  carefully refrained from providing the public with any details as to these consulting contracts.

9      573.    Mr. Urquhart and Westhampton are informed and believe that some of the

10  Controlled and Influenced Corporate Consultants are involved with Mainland, and/or that Mr.

11  Pierce, Mr. Cicci, and Mr. Barbon have formed new private consulting companies to consult

12  with Mainland – further concealing Mr. Pierce, Mr. Cicci, and Mr. Barbon's involvement with

13  Mainland.

*Shareholders*

15      574.    Many of the Controlled and Influenced Stockholders owned Mainland's stock

16  and/or stock options.

**Parklane**

18      575.    In or around February 2008, Parklane Investments, Inc. ("Parklane") purchased

19  over 274,000 shares of Mainland's common stock from a former officer and director of

20  Mainland.

21      576.    Parklane publicly disclosed that as a result of this transaction, it was the

22  beneficial owner of 24.5 percent of the stock of Mainland.

23      577.    As a result of numerous stock splits, Parklane's holdings of Mainland stock have

24  increased to 16.4 million shares, and Parklane has disclosed that it presently remains the

25  beneficial owner of 20.3 percent of the stock of Mainland.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 86 of 178

578.   Parklane, a Nevada corporation organized just three days prior to purchasing the shares of Mainland stock, is reportedly an "investment opportunities" company.

579.   During the relevant times of this dispute, Mr. Thompson is and/or was the President and Director of Parklane.

### *Additional Shareholders*

580.   During the relevant times of this dispute, Mr. Thomas publicly disclosed that he was the beneficial owner of nearly 2 percent of the stock and/or options of Mainland.

581.   During the relevant times of this dispute, Mr. Newport publicly disclosed that he was the beneficial owner of 3 percent of the stock and/or options of Mainland.

582.   During the relevant times of this dispute, Mr. Fedun publicly disclosed that he was the beneficial owner of 1 percent of the stock and/or options of Mainland.

583.   During the relevant times of this dispute, Ms. King Horton publicly disclosed that she was the beneficial owner of 1 percent of the stock and/or options of Mainland.

584.   During the relevant times of this dispute, Mr. Sorochan publicly disclosed that he was the beneficial owner of less than 1 percent of the stock and/or options of Mainland.

585.   During the relevant times of this dispute, Mr. Viard publicly disclosed that he was the beneficial owner of less than 1 percent of the stock and/or options of Mainland.

586.   Mr. Urquhart and Westhampton are informed and believe that during the relevant times of this dispute, many of the other Controlled and Influenced Stockholders have owned stock and/or options in Mainland.  However, Mainland has not publicly disclosed the identity of any of its shareholders – other than those whose stock holdings fall within the public reporting guidelines – since the time that Mr. Pierce, Mr. Cicci, and Mr. Barbon took over ownership, influence, and/or control of Mainland in or around February 2008.

587.   Due to Mr. Pierce, Mr. Cicci, and Mr. Barbon's extensive involvement with the Public Companies over the last 10 or more years, Mr. Pierce, Mr. Cicci, and Mr. Barbon have

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   become very adept at limiting their stock ownership – and that of the individuals, companies,

2   and trusts within their influence and control – to amounts which fall below the securities

3   reporting requirements.

4        588.    Regardless of the lack of publicly-available information as to Mainland's

5   consultants and stockholders, Mr. Urquhart's and Westhampton's involvement and dealings

6   with Mainland sufficiently demonstrate the ownership, influence, and control that Mr. Pierce,

7   Mr. Cicci, and Mr. Barbon exhibited over Mainland – as well as Morgan Creek and some of the

8   other Public Companies.[2]

9                       **Consultant for Geneva Resources, Inc.**

10        589.    Mr. Urquhart has over thirty-five years of operational, engineering, management,

11   and executive experience in the oil and gas industry.

12        590.    In 1991, Mr. Urquhart founded Westhampton, which is a company specializing in

13   project management and market development.

14        591.    From mid-2005 to mid-2007, Mr. Urquhart served as the Executive Director and

15   Chief Operating Officer of Mart Resources, Inc. ("Mart Resources"), an independent oil and gas

16   company which focuses on bringing proven, but undeveloped, West African oil fields into

17   production.  During his work with Mart Resources, Mr. Urquhart became acquainted with

18   Equator Exploration Limited, a British company that engaged in the exploration and

19   development of offshore oil and gas projects in West Africa.

20        592.    In or around late March 2007 or early April 2007, Mr. Urquhart was in the

21   process of resigning from his positions with Mart Resources when he was approached by Stacy

22   

23   [2]     A chart graphically summarizing the Public Companies which are owned, influenced, and/or controlled by
24   Mr. Pierce, Mr. Cicci, Mr. Barbon, and/or Mr. Coulthard, and the Controlled and Influenced Officers, Directors,
Employees, Agents, and/or Consultants, Controlled and Influenced Corporate Consultants, and/or the Controlled
25   and Influenced Stockholders involved in each Public Company, as set forth in ¶¶ 20-588, *supra*, is attached as
Exhibit B.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 88 of 178

1    Kivel ("Ms. Kivel"), the Vice-President of Business Development and Legal Affairs for Equator

2    Exploration Limited, regarding an opportunity to work as a mining consultant for a financial

3    group in Vancouver, British Columbia, Canada, that was involved in Geneva Resources.  During

4    this time period, Ms. Kivel was also serving as the Director and Head of Development for

5    Geneva Resources.

6        593.    In or around early April 2007, Ms. Kivel arranged for a telephone conference

7    between Mr. Urquhart and Mr. Cicci, who she introduced as Geneva Resources' "technical

8    expert" or a "mining professional" who advises Geneva Resources.  This conference call was

9    followed by a meeting in Vancouver, British Columbia, Canada, on or about April 24, 2007,

10    between Mr. Urquhart, Mr. Cicci, Mr. Barbon, and Mr. Johnson, who was serving as the

11    President of Geneva Resources at this time.

12        594.    Despite the fact that in or around April 2007, Geneva Resources' principal

13    executive office was located in Reno, Nevada, the April 24, 2007 meeting – and all other

14    meetings between Mr. Urquhart and Geneva Resources' representatives – took place at Pierco

15    Petroleum's Vancouver office.

16        595.    During the April 24, 2007 meeting, Mr. Cicci, Mr. Barbon, and Mr. Johnson

17    explained to Mr. Urquhart that Geneva Resources wanted to retain him and Westhampton as

18    consultants to prepare a due diligence report on a mineral property that Geneva Resources had

19    agreed to acquire from Allied Minerals in northern Nigeria. They also represented that after the

20    Nigerian deal was finalized, Mr. Urquhart would be appointed as a non-executive director of

21    Geneva Resources.

22        596.    Mr. Urquhart and Westhampton agreed to undertake the field study and prepare a

23    due diligence report for Geneva Resources.

24        597.    In or around late April 2007, when Geneva Resources entered into the property

25    option agreement and the finance operating agreement with Allied Minerals in Nigeria, Ms.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 89 of 178

1  Kivel sent a copy of the draft agreements to Mr. Cicci, Mr. Pierce, Mr. Barbon, and Mr. Square

2  for review and comment.

3      598.    In or around late April 2007, Ms. Kivel also asked Mr. Pierce, Mr. Cicci, Mr.

4  Barbon, and Mr. Square if Geneva Resources wanted to do a press release regarding the

5  agreement with Allied Minerals in Nigeria.

6      599.    Prior to Mr. Kivel's appointment as President of Geneva Resources, in June

7  2007, Ms. Kivel provided Mr. Cicci, Mr. Barbon, Mr. Pierce, and Mr. Square with status

8  updates as to the progress of the Nigerian deal.

9      600.    In or around early June 2007, Mr. Cicci stressed to Mr. Johnson, Ms. Kivel, and

10  Mr. Urquhart the need to move past the due diligence period on the project with Allied Minerals,

11  as due diligence "does not make for strong press releases," and without the ability to raise

12  money, Geneva Resources would not be able to get the Nigerian leases into the production stage.

13      601.    In fact, throughout the course of Mr. Urquhart's field study, Mr. Cicci was

14  always very concerned about raising money with potential investors for Geneva Resources, and

15  the majority of Mr. Urquhart's and Mr. Cicci's conversations centered around obtaining assay

16  results from core drilling tests in Nigeria so that Geneva Resources could issue press releases

17  and have concrete results to show its investors.

18      602.    On or about September 25, 2007, Mr. Urquhart met with Mr. Cicci, Mr. Johnson,

19  Mr. Barbon, Mr. Pierce, and their German fundraiser at Pierco Petroleum's Vancouver office,

20  and they asked Mr. Urquhart to oversee the project in Nigeria if and when the due diligence

21  obligation was satisfactorily completed.

22      603.    During the relevant times of this dispute, Mr. Cicci and Mr. Johnson represented

23  to Mr. Urquhart that Mr. Pierce was the "money behind Geneva Resources."

24

25

BAILEY✧KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   604.   In or around late November 2007, Mr. Harris submitted a credit application to

2   ACME Labs on behalf of Geneva Resources so that the assays from its Nigerian project could

3   be analyzed during the project's due diligence period.

4   605.   On or about December 12, 2007, Mr. Urquhart met with Mr. Cicci and Mr. Pierce

5   at Pierco Petroleum's Vancouver office to discuss the status of the field study and due diligence

6   report for the Nigerian project.  They also discussed the possibility of a gold lease in Mexico for

7   Geneva Resources.

8   606.   During the term of Mr. Urquhart's filed study for Geneva Resources, he reported

9   directly to Mr. Cicci.

10   607.   At the conclusion of the field study, on or about January 2, 2008, Mr. Urquhart

11   determined that the land in Nigeria held no commercial lead, zinc, or copper, and he

12   recommended that Geneva Resources forego finalizing the acquisition of the leases.  Geneva

13   Resources agreed with Mr. Urquhart's assessment and informed Allied Minerals of this decision

14   in or around late January 2008 or early February 2008.

15   608.   Throughout the course of Mr. Urquhart's field study, the monthly invoices for the

16   services that Mr. Urquhart and Westhampton rendered to Geneva Resources were directed to

17   Mr. Cicci's attention at Geneva Resources, but the invoices were sent care of Pierco Petroleum,

18   at Pierco Petroleum's Vancouver office.

19   609.   Moreover, whenever Allied Minerals required payment of the costs and expenses

20   it incurred, under Mr. Urquhart's supervision, in proving up Geneva Resources' leases in

21   Nigeria, Mr. Urquhart and Westhampton are informed and believe that Mr. Barbon was

22   responsible for coordinating Geneva Resources' payment of these costs and expenses.

23   610.   In or about June 2008, a Canadian attorney for Geneva Resources was working to

24   remedy Geneva Resources' failure to publicly disclose its decision to abandon the project in

25   Nigeria, and he sought information from Mr. Johnson, Mr. Paige, Mr. Cicci, Ms. Dalmy, Mr.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 91 of 178

1   Braumberger, and Mr. Barbon about the abandonment of the project in order to remedy the

2   disclosure problem.

3   ### Negotiation of a Joint Venture Project in the Congo

4       611.   Mr. Urquhart and Mr. Cicci developed a working relationship during Mr.

5   Urquhart's field study for Geneva Resources, and Mr. Cicci seemed to value Mr. Urquhart's

6   opinions as to mineral property opportunities for Mr. Cicci, Mr. Pierce, Pierco Petroleum, and

7   Pierco Energy.

8       612.   In or around late September 2007, Mr. Cicci and Mr. Pierce informed Mr.

9   Urquhart that Mr. Pierce owned a small oil company – Morgan Creek – that was interested in

10   investing in a Nigerian development project and that the money necessary to finance such a

11   project could be raised through Morgan Creek.  However, this proposal was never seriously

12   pursued due to the problems which seemed to plague Geneva Resources' Nigerian project

13   during this time period.

14       613.   In or around early October 2007, Mr. Urquhart's friend, Tom Cavanagh ("Mr.

15   Cavanagh"), a geologist and geophysicist with over 30 years' experience in oil exploration and

16   production in North and West Africa, informed Mr. Urquhart of a potential oil field project in

17   the Congo.  Mr. Urquhart brought this project to Mr. Cicci's attention on or about October 8,

18   2007, and proposed a consulting agreement and/or joint venture between Morgan Creek and Mr.

19   Cavanagh's company, CSB Petroleum, Inc. ("CSB").

20       614.   By late October 2007, Mr. Cicci informed Mr. Urquhart that he and Mr. Pierce

21   could use the private entity, Pierco Petroleum, to fund the Congo project if it looked like a small

22   project, or, alternatively, they could use the public company, Morgan Creek, if they needed to

23   raise money for a larger-scale project.

24       615.   In or around early November 2007, Mr. Cicci informed Mr. Urquhart that he and

25   Mr. Pierce were involved with a public company interested in developing a uranium prospect in

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   Nigeria, and Mr. Cicci asked Mr. Urquhart to evaluate the potential deal.  However, all uranium

2   deposits in Nigeria are controlled by the government, and there were no new uranium lease

3   opportunities at that time.  Mr. Pierce and Mr. Cicci quickly lost interest in this potential project,

4   and, thereafter, the main focus for new projects in or around November 2007, quickly turned to

5   the potential Congo deal.

6        616.   On or about November 16, 2007, Mr. Cicci informed Mr. Urquhart that Pierco

7   Petroleum – not Morgan Creek – would pursue the Congo project with CSB, and the parties

8   spent the next several months negotiating the terms of consulting and/or joint venture contracts

9   and trying to schedule a meeting among Mr. Cavanagh, Mr. Cicci, and Mr. Pierce to discuss the

10  project.

11       617.   On or about December 11, 2007, Mr. Urquhart and Mr. Cavanagh attended a

12  meeting at Pierco Petroleum's Vancouver office with Mr. Cicci and Mr. Barbon to discuss the

13  potential Congo project between Pierco Petroleum and CSB.

14       618.   On or about December 12, 2007, Mr. Urquhart met with Mr. Pierce and Mr. Cicci

15  at Pierco Petroleum's Vancouver office to further discuss the details of the Congo project,

16  including the possibility of getting Pierco Energy involved in the project.

17       619.   On or about December 20, 2007, Mr. Cicci informed Mr. Urquhart that he and

18  Mr. Pierce had changed their mind, and they now believed that CSB should pursue the Congo

19  deal with Morgan Creek, rather than with Pierco Petroleum.

20       620.   Between in or around late December 2007 and early February 2008, Mr.

21  Urquhart, Mr. Cavanagh, Mr. Cavanagh's attorney, Mr. Cicci, Mr. Barbon, Mr. Pierce, and Mr.

22  Paige (acting as the attorney for Morgan Creek) had numerous conversations regarding the

23  proposed deal, and they exchanged numerous drafts of a "Moving Forward Agreement" relating

24  to a joint venture project in the Congo.

25

1    621.    Although Mr. Cicci and Mr. Paige assumed primary responsibility for negotiating

2 the contract with Mr. Urquhart and Mr. Cavanagh, Mr. Cicci routinely copied Mr. Pierce on

3 correspondence negotiating the terms of the agreement.

4    622.    In fact, during the negotiation of the agreement, Mr. Pierce and Mr. Cicci had to

5 approve all of the clauses in the contract and all revisions to the terms of the contract.

6    623.    After a month or so of unsuccessful negotiations regarding a final draft of the

7 "Moving Forward Agreement," Mr. Cavanagh decided, on or about February 9, 2008, not to

8 pursue the Congo project with Morgan Creek.  Mr. Cicci stated that he understood CSB's

9 frustration with the progress of the negotiations, but claimed that he had to be careful when

10 dealing with the funds of a public company (*i.e.*, Morgan Creek).

11
12
### Mr. Urquhart's Service as an Officer, Director, and/or Consultant of Morgan Creek, Mainland, Pierco Petroleum, and Pierco Energy

13    624.    On or about December 21, 2007, while negotiating the Congo deal between CSB

14 and Morgan Creek, Mr. Cicci informed Mr. Urquhart that he and Mr. Pierce wanted Mr.

15 Urquhart to serve as Morgan Creek's Chief Executive Officer and Director.

16    625.    This request was reiterated to Mr. Urquhart on or about February 6, 2008, when

17 Mr. Cicci told Mr. Urquhart that he and Mr. Pierce wanted Mr. Urquhart to be their "oil and gas

18 guy." Specifically, Mr. Cicci and Mr. Pierce wanted Mr. Urquhart to serve as President of

19 Morgan Creek and as an officer and/or director of Mainland after he returned from an upcoming

20 trip to Nigeria and the Congo.

21    626.    Shortly thereafter, on or about February 13, 2008, Mr. Urquhart met with Mr.

22 Cicci, Mr. Johnson, Mr. Pierce, Mr. Paige, and Patrick Lewis, an attorney for Geneva Resources,

23 at Pierco Petroleum's Vancouver office, to discuss Geneva Resources' arbitration with

24 Petaquilla Minerals, Ltd., a mineral exploration company that had allegedly backed out of a

25 contract with Geneva Resources.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 94 of 178

1    627.   Later that same day, Mr. Urquhart had another meeting at Pierco Petroleum's

2    Vancouver office with Mr. Pierce, Mr. Cicci, and Mr. Barbon to discuss Morgan Creek.  Mr.

3    Begley – introduced to Mr. Urquhart as the soon-to-be-officer of Morgan Creek in charge of all

4    operations – and Mr. Markham – introduced to Mr. Urquhart as the geologist for Morgan Creek

5    – joined the meeting by telephone.

6    628.   During this meeting, Mr. Cicci and Mr. Pierce explained to Mr. Urquhart that

7    Morgan Creek had been in existence for a few years, but that it had wasted a lot of money on

8    what they felt were "questionable deals."  Mr. Pierce and Mr. Cicci reiterated that they wanted

9    Mr. Urquhart to take over the management of Morgan Creek, become Chief Executive Officer of

10    the company, and develop some solid prospects for development.

11    629.   Later that same day, Mr. Urquhart had a third meeting at Pierco Petroleum's

12    Vancouver office with Mr. Pierce, Mr. Cicci, Mr. Newport, and Mr. Coulthard to discuss

13    Mainland's interest in a deep gas opportunity in Northwest Louisiana (the "DeSoto Parish

14    prospect").  Mr. Newport was introduced to Mr. Urquhart as a Land Manager of Meagher Oil

15    and Gas Properties, Inc. ("Meagher Oil"), and Mr. Coulthard was introduced to Mr. Urquhart as

16    a friend of Mr. Pierce.  Ms. King Horton also participated in this meeting by telephone, and she

17    was introduced to Mr. Urquhart as an acquaintance of Mr. Newport and the sourcing geologist

18    for the DeSoto Parish Prospect that Mainland was considering.

19    630.   During this meeting, it was reiterated that Mr. Pierce wanted Mr. Urquhart to

20    serve as a director of Mainland.

21    631.   On or about February 18, 2008, Mr. Urquhart traveled to Shreveport, Louisiana,

22    to meet with Mr. Newport and Ms. King Horton regarding Mainland's DeSoto Parish prospect.

23    632.   While in Louisiana, Mr. Urquhart inspected the DeSoto Parish prospect, reviewed

24    Ms. King Horton's field data, and talked to local individuals familiar with drilling and

25    development activity in the Shreveport area.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 95 of 178

633. On or about February 20, 2008, Mr. Urquhart traveled to Dallas, Texas, to meet with Mr. Begley and Mr. Markham to discuss and review Morgan Creek's Boggs #1 well in McLennan County, Texas, as well as Morgan Creek's other prospects in Mississippi, Texas, and New Mexico.

634. During this trip to Dallas, Mr. Begley and Mr. Markham also took Mr. Urquhart to Waco, Texas, to visit the site of the Boggs # 1 well. It was Mr. Urquhart's initial opinion that this well was a problem from start to finish, but Mr. Begley and Mr. Markham were determined to prove that recompleting and redrilling this well would be worthwhile for Morgan Creek.

635. Mr. Urquhart and Westhampton are informed and believe that Pierco Energy is the operator of the Boggs #1 well for Morgan Creek.

636. On or about February 21, 2008, Mr. Urquhart drove to Clovis, New Mexico to assess Morgan Creek's leases in New Mexico.

637. Despite the fact that in or around February 2008, Morgan Creek's principal executive office was supposed to be located in Reno, Nevada, when Mr. Urquhart traveled back to Dallas on or about February 22, 2008, he was taken to an office that Morgan Creek maintained in Dallas. Mr. Begley and Mr. Markham informed Mr. Urquhart that the business center where Morgan Creek's Dallas office was located was closing its doors and that Morgan Creek intended to relocate its offices to another building in Dallas owned by its current landlord.

638. Shortly after Mr. Urquhart's return to Canada on or about February 23, 2008, he reported his findings to Mr. Cicci and recommended that Mr. Cicci and Mr. Pierce and/or their associated investors buy the mineral rights being offered with respect to the DeSoto Parish prospect.

639. On February 27, 2008, Mr. Urquhart met with Mr. Pierce, Mr. Cicci, Mr. Johnson, and Mr. Barbon at Pierco Petroleum's Vancouver office to discuss the possibility of Mainland leasing additional mineral rights in Northern Louisiana, close to Mainland's existing

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   lease.  They also discussed the production rates that Mainland's wells would have to return in
2   order to make the project worthwhile to Mr. Pierce.

3        640.    During this meeting, the parties also discussed the status of Morgan Creek's
4   leases in McLennan County, Texas; Zapata County, Texas; and Curry County, New Mexico, as
5   well as the need to wait to pursue any leases in the Cotton Valley zone in Mississippi, until they
6   acquired more information about this zone.

7        641.    During this same meeting, they also decided to terminate any land acquisition
8   deals for Morgan Creek in McLennan County, Texas, so that the deals could be completed in the
9   name of Pierco Energy instead of Morgan Creek.

10       642.    Finally, during this meeting, Mr. Cicci and Mr. Pierce reiterated to Mr. Urquhart
11  that they wanted him to serve: (1) as the President and Director of Morgan Creek; (2) as the
12  Director of and consultant to Mainland; and (3) as a consultant to Pierco Energy and Pierco
13  Petroleum.

14       643.    On or about February 27, 2008, Mainland entered into an option agreement with
15  Kingsley Resources, Inc. ("Kingsley Resources"), pursuant to which Mainland acquired all
16  right, title, and interest that Kingsley had in the sub-surface rights of the DeSoto Parish prospect
17  that it leased on December 11, 2007 from Permian Basin Acquisition Fund.  Under the option
18  agreement, Mainland paid Kingsley $100,000.00 and Permian Basin Acquisition Fund
19  $587,596.00 for the lease.

20       644.    Kingsley Resources is a Nevada corporation, and Mr. Coulthard is its President
21  and Chief Executive Officer.

22       645.    On or about February 28, 2008, Mr. Barbon informed Mr. Urquhart that Morgan
23  Creek paid Mr. Markham and Mr. Begley $10,000.00 a month for their services and a 1.5
24  percent over-riding royalty on any new projects they brought to Morgan Creek.  Mr. Urquhart
25  informed Mr. Pierce and Mr. Cicci, on or about March 1, 2008, that most investors do not look

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 97 of 178

1 kindly upon these over-riding royalty agreements, as most investors feel that management

2 should only receive additional compensation – beyond salary, benefits, and expenses – for

3 successful projects that add value to the company.

4 646.   On that same day, Mr. Cicci informed Mr. Urquhart that Mr. Markham and Mr.

5 Begley had previously reported to Mr. Barbon with regard to their activities on behalf of

6 Morgan Creek, and that this had caused Mr. Barbon to fall behind in his accounting duties.

7 Therefore, Mr. Cicci wanted Mr. Markham and Mr. Begley to begin reporting directly to Mr.

8 Urquhart.

9 647.   During this same conversation, Mr. Cicci also told Mr. Urquhart that Pierco

10 Energy and/or a new entity named Pierco Land Company was going to be used as Morgan

11 Creek's and Mainland's land acquisition agency for oil and gas leases for development, and that

12 Pierco Energy/Pierco Land Company would then farm-out leases to Morgan Creek, Mainland,

13 or third parties as necessary.

14 648.   On or about February 28, 2008, Mr. Urquhart informed Mr. Newport that based

15 on discussions during the February 27, 2008 meeting in Vancouver, the data and projections for

16 vertical wells in the Cotton Valley zone in the DeSoto Parish prospect were "not interesting

17 enough" for Mr. Pierce and Mr. Cicci, and that Mainland needed to obtain figures and

18 projections for a horizontal well for comparison.

19 649.   In or around February 2008, Mr. Markham sent Mr. Urquhart, Mr. Barbon, Mr.

20 Pierce, and Mr. Cicci a memorandum reviewing all of Morgan Creek's oil and gas prospects,

21 including, but not limited to, the San Andres, Ouachita, Sandersville, and Charco Redondo

22 prospects.

23 650.   In or around February 2008 – if not at additional times relevant to this dispute –

24 Morgan Creek carried an accounts payable for Mr. Pierce's travel agent, City Square Travel,

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 98 of 178

1  relating to Mr. Pierce's travels on February 14, 2008 and February 22, 2008, to unknown

2  locations.

3        651.    In or around late February 2008 and early March 2008, Mr. Newport, Mr.

4  Urquhart, Mr. Cicci, and Mr. Paige began negotiating a contract with OPS Group Limited, a

5  potential registered Louisiana operator for Mainland's wells on the DeSoto Parish prospect.

6        652.    In or around March 2008, Pierco Petroleum and/or Pierco Energy intended to

7  have its assets in Oklahoma, sold by employees, agents, and/or consultants who were paid for

8  such services by Morgan Creek – particularly Mr. Begley and Mr. Markham.

9        653.    In or around early March 2008, Pierco Energy entered into four new leases in

10  New Mexico on Morgan Creek's behalf.

11        654.    On or about March 1, 2008, after learning that water had been found in the Boggs

12  #1 well during drilling, Mr. Urquhart asked Mr. Begley to get him a copy of all of the drilling

13  records for this well for review.

14        655.    On or about March 1, 2008, Mr. Urquhart also learned that Mr. Begley and Mr.

15  Markham were involved in the sale of Pierco Petroleum and/or Pierco Energy's oil and gas

16  assets in Oklahoma, with a percentage bonus paid to Morgan Creek's consultants and/or agents

17  if the assets were divested at a price higher than the minimum set by Pierco Petroleum and/or

18  Pierco Energy.

19        656.    Mr. Urquhart suggested that Pierco Petroleum's wells be divided into the

20  following packages to make them more attractive to potential buyers: (a) an oil well package; (b)

21  a gas well package; (c) a package of shale wells operated by Lexington Resources; and (d) the

22  Ingle 1-19 well in Commanche County, Oklahoma, which had no production and a collapsed

23  casing. Mr. Markham and Mr. Begley were tasked with preparing a list of potential buyers for

24  each of these categories.

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 99 of 178

1   657.   From in or around March 2008 to in or around August 2008, Mr. Urquhart

2   continuously provided Mr. Pierce, Mr. Cicci, and Mr. Barbon with updates as to the status of

3   these sale packages.

4   658.   On or about March 5, 2008, Mr. Urquhart held a project status meeting with Mr.

5   Begley and Mr. Markham in Dallas, Texas, at which Mr. Urquhart was informed that Pierco

6   Petroleum owned working interests in over 50 wells in Oklahoma, and that the wells were

7   operated by Pierco Energy.  It was Mr. Urquhart's belief that the production value of these wells

8   was marginal, as approximately half of them were "shut-in" and/or carried a substantial "plug-

9   and-abandon" obligation.

10   659.   From in or around March 2008 to in or around August 2008, Mr. Urquhart also

11   performed consulting services for Pierco Energy, which included putting together a plan for

12   maximizing production from Pierco Energy's wells.  During this time period, Mr. Urquhart

13   continuously provided Mr. Pierce, Mr. Cicci, and Mr. Barbon with updates as to the status of

14   these wells.

15   660.   On or about March 10, 2008, Mr. Urquhart, Mr. Cicci, and Mr. Newport

16   discussed strategies for competing with other major oil and gas companies acquiring leases in

17   northern Louisiana.

18   661.   On or about March 11, 2008, Mr. Cicci asked Mr. Urquhart to come to

19   Vancouver for a meeting with Mr. Pierce to settle Mr. Urquhart's relationship with Morgan

20   Creek, Mainland, Pierco Petroleum, and Pierco Energy.  Mr. Cicci and Mr. Urquhart also

21   discussed Mr. Urquhart being compensated with stock options and $20,000 in aggregate

22   consulting fees.

23   662.   On or about March 13, 2008, Mr. Urquhart and Mr. Cicci discussed their belief

24   that Ms. King Horton should not serve on Mainland's Board of Directors, as she took any

25   disagreement with her drilling recommendations much too personally.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821