1    663.    Mr. Urquhart and Westhampton are informed and believe that on or about March

2   14, 2008, Mainland had four leases for properties owned by Ms. King Horton in the DeSoto

3   Parish prospect.

4    664.    On or about March 18, 2008, Mr. Urquhart had a meeting with Mr. Pierce, Mr.

5   Cicci, Mr. Barbon, and Mr. Johnson at Pierco Petroleum's Vancouver office. They discussed:

6   (a) Mainland's leasing efforts in northern Louisiana; (b) the decision to have Ms. King Horton

7   resign from Mainland's Board of Directors (with Mr. Barbon to send Ms. King Horton the

8   resignation letter) and continue to work as a consultant to Mainland; (c) selling Pierco

9   Petroleum's unproductive properties; (d) the clean-up and abandonment of Pierco Petroleum's

10   Ingle 1-19 well; (e) having Mr. Barbon set up Pierco Land Company by the following week; (f)

11   the status of Morgan Creek's Texas and New Mexico prospects; (g) the need to pay the

12   outstanding bills relating to the Boggs #1 well and taking no other action in relation to the well

13   at this time; and (h) potential leases in Mississippi.

14    665.    During this meeting, the parties also discussed having Mr. Braumberger prepare

15   press releases and brochures for Mainland and Morgan Creek, as well as having Mr. Paige focus

16   on drafting a short-form agreement governing OPS Group Limited's relationship with Mainland.

17    666.    On or about March 18, 2008, when Mr. Newport asked for the resignation of Ms.

18   King Horton as a director of Mainland, Mr. Newport reported the resignation to Mr. Cicci, Mr.

19   Barbon, and Mr. Coulthard.

20    667.    That night, Mr. Urquhart went to dinner with Mr. Pierce, Mr. Johnson, Mr. Cicci,

21   and Jonathan More ("Mr. More") of Canaccord Capital to discuss funding a new company called

22   Mira Resources, Inc. ("Mira Resources").

23    668.    Mira Resources was another of the Public Companies that Mr. Pierce worked to

24   promote in the 1990s and/or early 2000s.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 101 of 178

1   669.   Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce began

2   asserting his direct and/or indirect ownership, control, and/or influence over Mira Resources in

3   or around early 2008.

4   670.   Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce was an

5   employee, agent, consultant, and/or direct and/or indirect stockholder of Mira Resources, and

6   that he directly and/or indirectly controlled and/or influenced Mira Resources.

7   671.   Mr. Urquhart and Westhampton are informed and believe that Mr. Cicci was an

8   employee, agent, consultant, and/or direct and/or indirect stockholder of Mira Resources, and

9   that he, along with Mr. Pierce, directly and/or indirectly controlled and/or influenced Mira

10   Resources.

11   672.   In 2008, Mr. Thomas was appointed as Chief Financial Officer of Mira

12   Resources, and he served in this position until 2009.

13   673.   On or about March 18, 2008 and March 19, 2008, Mr. Urquhart met with Mr.

14   Pierce, Mr. Cicci, Mr. Barbon, and Mr. Johnson at Pierco Petroleum's Vancouver office, and it

15   was confirmed that Mr. Urquhart would be appointed to the Board of Directors for both Morgan

16   Creek and Mainland.  Mr. Urquhart was also informed that he would receive 1,563,333 shares of

17   Morgan Creek's common stock and 500,000 options in Morgan Creek's stock for, not only the

18   services to be rendered as President, Chief Executive Officer, and Director of Morgan Creek, but

19   also for the work he had accomplished in February 2008 and March 2008 in analyzing Morgan

20   Creek's wells and attempting to find Morgan Creek new business opportunities.

21   674.   On or about March 18, 2008 or March 19, 2008, Mr. Urquhart met with Mr.

22   Pierce, Mr. Cicci, and Mr. Barbon, and Mr. Urquhart was informed that he would receive

23   500,000 shares of Mainland's common stock and 600,000 options in Mainland's stock for, not

24   only the services to be rendered as Director of Mainland, but also for the work he had

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 102 of 178

1 | accomplished in February 2008 and March 2008 involving the horizontal drilling of the Cotton
2 | Valley zone in the DeSoto Parish prospect.

3 |     675.    During this meeting, Mr. Pierce, Mr. Cicci, and Mr. Barbon also confirmed that
4 | Morgan Creek, Mainland, Pierco Petroleum, and Pierco Energy would be retaining Mr. Urquhart
5 | as a consultant. Mr. Pierce determined that Mr. Urquhart would receive $10,000.00 per month
6 | from Morgan Creek, $5,000.00 per month from Mainland, and $5,000.00 per month from Pierco
7 | Petroleum and/or Pierco Energy.

8 |     676.    On or about March 19, 2008, Mr. Urquhart had breakfast with Mr. Cicci, and
9 | they had a general discussion about the projects of Morgan Creek, Mainland, Pierco Energy, and
10 | Pierco Petroleum. Later that day, Mr. Urquhart and Mr. Cicci had another meeting at Pierco
11 | Petroleum's Vancouver office with Mr. Barbon to discuss the following: (a) Morgan Creek's
12 | decision to authorize a 3 for 1 reverse stock split; (b) Morgan Creek's decision to use Mr.
13 | Linniman, the accountant who tracked the profits and losses of well production for Pierco
14 | Energy and/or Pierco Petroleum, as its production accountant; (c) Morgan Creek's decision to
15 | add Mr. Urquhart to and retain Mr. Johnson on its Board of Directors; (d) Mainland's decision
16 | to add Mr. Urquhart to its Board of Directors after Ms. King Horton's resignation; (e) Morgan
17 | Creek's decision to pay Mr. Markham and Mr. Begley $5,000.00 per month for their services;
18 | and (f) Pierco Petroleum and/or Pierco Energy's decision to pay Mr. Markham and Mr. Begley
19 | $5,000.00 per month for their services.

20 |     677.    On or about March 19, 2008, Mr. Urquhart also met solely with Mr. Barbon, and
21 | Mr. Barbon presented Mr. Urquhart with copies of two Morgan Creek share certificates – one
22 | certificate was for 1,000,000 shares of stock and was post-dated March 26, 2008, and the other
23 | certificate was for 563,333 shares of stock and was post-dated March 28, 2008.

24
25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 103 of 178

1   678.   During this meeting, Mr. Urquhart inquired as to payment for the Morgan Creek

2   stock, and Mr. Barbon informed Mr. Urquhart that it had been taken care of and that Mr.

3   Urquhart did not have to pay anything for the stock.

4   679.   During this meeting, Mr. Barbon also presented Mr. Urquhart with copies of four

5   pre-executed purchase and sale agreements for the shares of common stock Mr. Urquhart was to

6   receive from Mainland.  Mr. Urquhart was told that Mainland could not and/or did not want to

7   issue new shares of stock; therefore, four current Mainland stockholders were transferring to Mr.

8   Urquhart a portion of their holdings.

9   680.   During this meeting, Mr. Barbon presented Mr. Urquhart with a copy of an

10   Agreement for Purchase and Sale of Securities with Mr. Newport ("Newport Agreement") for

11   the acquisition of 196,669 shares of Mainland's common stock.  The agreement had already

12   been executed by Mr. Newport in his individual capacity and in his capacity as President of

13   Mainland, and the agreement was post-dated April 8, 2008.

14   681.   During this meeting, Mr. Barbon presented Mr. Urquhart with a copy of an

15   Agreement for Purchase and Sale of Securities with Ms. King Horton ("King Horton

16   Agreement") for the acquisition of 95,000 shares of Mainland's common stock.  The agreement

17   had already been executed by Ms. King Horton in her individual capacity and by Mr. Newport

18   as President of Mainland.  The agreement was also post-dated April 8, 2008.

19   682.   During this meeting, Mr. Barbon presented Mr. Urquhart with a copy of an

20   Agreement for Purchase and Sale of Securities with Abigail ("Abigail Agreement") for the

21   acquisition of 11,662 shares of Mainland's common stock.  The agreement had already been

22   executed by Mr. Coulthard on behalf of Abigail (as he is the managing member of Abigail) and

23   by Mr. Newport as President of Mainland.  The agreement was also post-dated April 8, 2008.

24   683.   During this meeting, Mr. Barbon presented Mr. Urquhart with a copy of an

25   Agreement for Purchase and Sale of Securities with Mr. Fedun ("Fedun Agreement") for the

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 104 of 178

1  acquisition of 196,669 shares of Mainland's common stock.  The agreement had already been

2  executed by Mr. Fedun in his individual capacity and by Mr. Newport as President of Mainland.

3  The agreement was also post-dated April 8, 2008.

4       684.    Pursuant to the terms of the Abigail Agreement, the Fedun Agreement, the

5  Newport Agreement, and the King Horton Agreement, each agreement must be construed in

6  accordance with Nevada law.

7       685.    During this meeting, Mr. Urquhart inquired as to the nominal payment required

8  for the Mainland stock (approximately $1,250.00), as each Agreement for Purchase and Sale of

9  Securities demanded payment of $0.0025 per share.  Mr. Barbon responded that the payment

10  had been taken care of and that Mr. Urquhart did not have to pay anything for the stock.

11       686.    Finally, during this meeting on or about March 19, 2008, Mr. Barbon gave Mr.

12  Urquhart a share certificate for 500,000 shares of Mainland common stock, and this certificate

13  was post-dated April 9, 2008.

14       687.    On or about March 21, 2008, Mr. Pierce and Mr. Cicci met with Mr. Coulthard to

15  discuss leasing issues Mr. Newport was facing in northern Louisiana – particularly the difficulty

16  in offering a sufficient amount of money per acre for the leases so that Mainland could

17  successfully compete against other oil and gas companies that were seeking to lease land in the

18  same area.

19       688.    In or around mid-March 2008, Mr. Urquhart sent Mr. Pierce, Mr. Cicci, Mr.

20  Barbon, and Mr. Johnson two cost estimates for review and approval relating to a vertically-

21  drilled well and a horizontally-drilled well in the DeSoto Parish prospect.

22       689.    On or about March 26, 2008, Ms. Dalmy – acting as Mainland's attorney – asked

23  Mr. Barbon for information relating to Mr. Urquhart's equity holdings in Mainland, presumably

24  so she could report the same to the Securities & Exchange Commission, and Mr. Barbon

25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 105 of 178

1  informed Ms. Dalmy that Mainland was in the process of issuing Mr. Urquhart his shares and

2  his stock options.

3       690.    On or about March 31, 2008, Mr. Pierce authorized Mr. Newport to offer a

4  higher-than-originally-planned price per acre and royalty to a landowner in northern Louisiana

5  for a commitment to drill a test well in the Haynesville Shale on the leased property within one

6  year.

7       691.    On or about March 31, 2008, Mr. Pierce, Mr. Barbon, and Mr. Coulthard also

8  instructed Mr. Newport to obtain a cost estimate for the drilling and completion of a horizontal

9  well in the Haynesville Shale of the DeSoto Parish prospect.

10       692.    In or around late March 2008, Mainland's competitor, Chesapeake Energy

11  Corporation announced a Haynesville Shale discovery in Louisiana, and after sending a copy of

12  Chesapeake's press release to Mr. Cicci, Mr. Barbon, and Mr. Coulthard, Mr. Newport asked

13  them if this announcement would change Mainland's approach in Louisiana.

14       693.    When Mr. Urquhart traveled to Texas and New Mexico in or around February

15  2008 and March 2008, to review and analyze Morgan Creek's prospects, his travel reservations

16  were made through Mr. Pierce's travel agent, City Square Travel.

17       694.    In or around March 2008 and April 2008, Mr. Newport took instructions from

18  Mr. Pierce, Mr. Cicci, Mr. Barbon, and Mr. Coulthard on the price per acreage that Mainland

19  was to offer landowners for leasing rights in Louisiana.

20       695.    On or about April 1, 2008, Mr. Barbon sent Mr. Urquhart a letter of consent to

21  act as Director of Mainland.

22       696.    On or about April 2, 2008, Mr. Barbon informed Mr. Urquhart that Mr. Pierce

23  wanted Mr. Urquhart to provide him with a spreadsheet of the return on investment for the

24  Mainland properties under various production rate scenarios for each well.  Mr. Urquhart

25  provided this analysis to Mr. Pierce, Mr. Cicci, and Mr. Barbon on or about April 3, 2008.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 106 of 178

1   697.   In or around April 2008, Mr. Urquhart and Morgan Creek entered into an

2   Executive Service Agreement, effective April 1, 2008, pursuant to which Mr. Urquhart was

3   appointed as President, Chief Executive Officer, and Director of Morgan Creek in exchange for

4   a monthly service fee of $10,000.00 for consulting and management services and remuneration

5   of all reasonable expenses incurred in the performance of his services.

6   698.   The Executive Services Agreement also confirmed that Mr. Urquhart was to

7   receive 500,000 shares of Morgan Creek stock options at an exercise price of $1.00 per share.

8   699.   In or around April 2008, Mainland signed a Board of Directors Resolution which

9   approved a Stock Option Plan Agreement executed by Mr. Urquhart and effective, retroactively,

10  on April 7, 2008, which conveyed 600,000 shares of Mainland stock options to Mr. Urquhart at

11  an exercise price of $1.75 per share.

12  700.   On or about April 22, 2008, Morgan Creek's Board of Directors approved a 1 for

13  3 reverse stock split which reduced Mr. Urquhart's holdings of Morgan Creek's common stock

14  to 521,111 shares, but had no effect on Mr. Urquhart's stock options pursuant to the terms of the

15  May 5, 2008 Resolution of Morgan Creek's Board of Directors.

16  701.   In or around May 2008, Mr. Kreczmer was appointed as President of Mira

17  Resources, and he served in this position until in or around September 2009.

18  702.   In or around May 2008, a claim was made against Morgan Creek concerning a

19  project the company had been involved with in 2006.  Mr. Paige investigated the claim, and he

20  sought information for the investigation from Mr. Barbon and Mr. Cicci.  Mr. Paige also initially

21  tried to keep the claim away from Mr. Urquhart's attention – despite the fact that Mr. Urquhart

22  was the Chief Executive Officer of Morgan Creek – allegedly reasoning that he did not want to

23  waste Mr. Urquhart's time with a "spurious claim."

24  703.   In or around May 2008, Mr. Newport assisted in obtaining leases of property in

25  the Emmons area of McLennan County, Texas, for Morgan Creek, and it was intended that these

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

leases would be taken in the name of Meagher Oil – the company for which Mr. Newport served as a Land Manager – until such time as Morgan Creek and/or the Pierco Land Company could establish banking relationships in Texas and New Mexico, so that the leases could be assigned to them.

704.    In or around early May 2008, Mr. Urquhart wanted Morgan Creek business cards, and he sent this request to Mr. Barbon.

705.    In or around late May 2008, Ms. Limanova faxed Mr. Urquhart a director's resolution for Mira Resources for his signature, and the fax was on Pierco Petroleum's letterhead and sent to Mr. Urquhart on Mr. Pierce's behalf.

706.    In or around May 2008, Mr. Urquhart was appointed as a director of Mira Resources.

707.    On or about May 1, 2008, Morgan Creek, Pierco Energy, Pierco Petroleum, and Westrock decided to all share an office located at 5050 Quorum Drive, Suite 700, Dallas Texas, 75254 ("Quorum Drive office"), which had previously been used solely as Morgan Creek's office

708.    Shortly thereafter, Mr. Urquhart informed Mr. Pierce, Mr. Cicci, Mr. Barbon, and Mr. Paige that he had hired an office administrator to run the office for Morgan Creek, Pierco Energy, Pierco Petroleum, and Westrock.

709.    On or about May 21, 2008, Mr. Newport received a call from a reporter at *Forbes* magazine who wanted to ask Mr. Newport some questions about Mainland, and Mr. Cicci made the decision that Mr. Urquhart, as Director of Mainland, should contact the reporter.

710.    On or about May 27, 2008, Mr. Barbon drafted a letter to Morgan Creek's certified public accountants, De Joya Griffith & Company, and he signed the letter as the "Outside Consultant to Morgan Creek."

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 108 of 178

711.   On or about May 29, 2008, Mainland effectuated a 1.5 for 1 forward stock split, which had been approved by the Board of Directors on or about May 12, 2008. This stock split increased Mr. Urquhart's holdings to 750,000 shares of Mainland's common stock and 900,000 options in Mainland's stock.

712.   In or around May 2008 and again in or around July 2008, when Mr. Braumberger revised and/or re-designed Morgan Creek's letterhead, he sent a copy of the revised letterhead to Mr. Harris, Ms. Limanova, Mr. Barbon, and Mr. Paige and instructed each of them to use the new letterhead for all electronic documents involving Morgan Creek.

713.   In or about late May 2008, Mr. Newport prepared a press release about the staking of a Haynesville Shale test well in the DeSoto Parish prospect, and he sent the release to Mr. Coulthard for review and comment. Mr. Coulthard promptly forwarded the release to Mr. Cicci for additional review and comment, and Mr. Cicci then forwarded the draft release to Mr. Pierce, informing him that Mr. Braumberger could edit and revise the release.

714.   In or around late May 2008, Mr. Pierce and/or Mr. Cicci tasked Mr. Braumberger with creating an executive summary for Morgan Creek, and Mr. Urquhart informed Mr. Braumberger that he thought that the creation of the summary was premature, given that Morgan Creek had not yet even secured leasing positions for some of its prospects. In response, Mr. Braumberger stated that the executive summary was not for wide, public release, but rather for a select group of investors who would be instructed to keep the summary confidential.

715.   Before complying with Mr. Braumberger's request for assistance with the summary, Mr. Urquhart asked Mr. Cicci for instructions as to how to proceed, and Mr. Cicci informed Mr. Urquhart that it was "suggested" that he work with Mr. Braumberger as requested and that Mr. Urquhart should take note that time was "exceedingly of the essence," as the executive summary was going to be given to a core group of people that would help "put the money together" for Morgan Creek.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 109 of 178

716.    In or around June 2008, Mr. Barbon was in the process of setting up bank accounts in Dallas, Texas, for Morgan Creek.

717.    In or around June 2008, Mr. Cicci asked Mr. Newport to speak to Mr. Thompson about Mainland and the economic models for the Haynesville Shale in Louisiana, so that Mr. Thompson could make a presentation about Mainland to a "money fund."

718.    In or around late June 2008, Mr. Urquhart provided Mr. Newport, Mr. Cicci, Mr. Pierce, and Mr. Barbon, at their request, with a three-year economic model for a horizontal well in Mainland's Haynesville Shale Desoto Parish prospect.

719.    In or around late June 2008, Mr. Newport informed Mr. Cicci and Mr. Barbon that 21st Century Business had approached Mr. Newport about doing a segment on Mainland, and Mr. Newport asked Mr. Cicci and Mr. Barbon if this was something Mainland would be interested in pursuing.

720.    In or around early July 2008, Mr. Markham sent Mr. Pierce and Mr. Cicci a memorandum detailing the status of all of Morgan Creek's projects, which Mr. Urquhart revised to include his own thoughts and analyses.

721.    In or around early July 2008, Morgan Creek intended to have OPS Group Limited – a potential operator for Mainland – work jointly with Pierco Energy to drill and complete a well on a lease Morgan Creek had acquired on the Cuellar prospect in Zapata County, Texas.

722.    In or around July 2008, Ms. Limanova sent Mr. Urquhart a press release concerning Mainland's agreement with Petrohawk and, at Mr. Cicci's request and direction, an article from the *New York Times* regarding the rush for natural gas in the southern United States.

723.    In or around July 2008, Mr. Harris sent Mr. Barbon an audit engagement letter for Morgan Creek, and Mr. Harris asked that Mr. Barbon obtain Mr. Urquhart's signature on the engagement letter.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 110 of 178

724.    On or about July 9, 2008, Mr. Newport received a project report concerning Morgan Creek's Texas and New Mexico properties, and Mr. Newport promptly forwarded the report to Mr. Barbon and Mr. Cicci for review.

725.    On or about July 17, 2008, Mr. Newport informed Mr. Cicci that a representative from the American Stock Exchange had contacted Mr. Newport several times about Mainland being listed on that exchange, and Mr. Newport told Mr. Cicci that he wanted to speak to someone about what he should say about Mainland, particularly with regard to Mainland's history, shares, warrants, future growth, number of board directors, concentration of stock, and exchange listings. Mr. Newport was very concerned about providing the "wrong or bad answer" to these questions, so he asked Mr. Cicci to let him talk to someone about these issues or have someone provide him with a list of facts about the company.

726.    In or around mid-July 2008, Mainland entered into a farm-out contract with Petrohawk Energy Corporation ("Petrohawk") for Mainland's DeSoto Parish leases, whereby Petrohawk became the senior working-interest owner below the base of the Cotton Valley Sand to the base of the Smackover Sand and the named operator on Mainland's proposed Griffith #1 well in the Haynesville Shale of the DeSoto Parish prospect, in the place and stead of Mainland's original operator, OPS Group Limited.

727.    When Mr. Urquhart expressed concern about Mainland issuing a press release about the Petrohawk contract before giving notice of termination to OPS Group Limited, Mr. Pierce instructed Mr. Urquhart not to give OPS Group Limited notice of termination because Mainland still intended to use OPS Group Limited as the named operator on the DeSoto Parish prospect leases above the base of the Cotton Valley Sand – as this had been exempted from the Petrohawk farm-out contract.

728.    On or about July 25, 2008, Mr. Urquhart informed Mr. Cicci and Mr. Pierce that based on the first production/revenue analysis performed by Mr. Linniman and a "three times

BAILEY ✦ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 111 of 178

1  annual cash flow" formula, it was Mr. Urquhart's belief that the properties included in the

2  proposed Pierco Petroleum sales packages were worth significantly less money than Mr. Barbon

3  and Mr. Begley had originally estimated in or around March 2005, when the sales packages

4  were put together.

5       729.  Specifically, Pierco Petroleum's approximately 50 wells in Oklahoma were

6  determined to have only marginal production, and approximately half of these wells were shut-

7  in or carried a "substantial 'plug-and-abandon' obligation." Therefore, it was estimated that the

8  aggregate value of these wells was closer to $1 million – not the $3 million value originally

9  estimated by Mr. Barbon and Mr. Begley.

10       730.  On or about July 25, 2008, Mr. Urquhart informed Mr. Cicci and Mr. Pierce that

11  he had finally obtained the necessary records and information as to the history of the Boggs #1

12  well near Waco, Texas, and it appeared that everything that could have been "screwed up"

13  during the drilling and completion of the well in 2007, apparently had been "screwed up." Mr.

14  Urquhart informed Mr. Pierce and Mr. Cicci of all of the problems and issues relating to the well

15  and told them that he thought the well had "no real upside" for Morgan Creek.

16       731.  On or about August 1, 2008, Petrohawk's representative requested that Mr.

17  Newport provide Petrohawk with evidence of "corporate authority," in the form of a board of

18  directors' resolution or something of that nature, which demonstrated the authority to enter into

19  the agreement with Petrohawk. Mr. Newport subsequently asked Mr. Barbon and Mr. Cicci if

20  he could get something to demonstrate corporate authority.

21      **Additional Facts Pertaining to Morgan Creek and Mainland**

22      Morgan Creek

23       732.  Mr. Urquhart and Westhampton are informed and believe that, during the

24  relevant times of this dispute, Mr. Pierce, Mr. Cicci, and/or Mr. Barbon are express, implied,

25  and/or apparent agents of Morgan Creek, and they operated and served in this capacity in their

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 112 of 178

1  dealings with Mr. Urquhart and Westhampton, including, but not limited to, in the negotiation

2  and execution of stock transfer agreements, stock option agreements, executive service

3  agreements, and/or consulting and/or management agreements with Mr. Urquhart and

4  Westhampton.

5      733.   Mr. Urquhart and Westhampton are informed and believe that, during the

6  relevant times of this dispute, Mr. Barbon drafted Morgan Creek's financial statements.

7      734.   Mr. Urquhart and Westhampton are informed and believe that, during the

8  relevant times of this dispute, Morgan Creek paid Mr. Barbon $5,000.00 per month for services

9  he performed for Morgan Creek.

10     735.   During the relevant times of this dispute, Mr. Braumberger routinely sent a pre-

11  release version of final drafts of Morgan Creek's press releases to Mr. Pierce, Mr. Pierce's

12  daughter Krista Pierce, Mr. Cicci, Mr. Barbon, Ms. Limanova, Ms. Fralick, and Ms. Ebert.

13     736.   Mr. Urquhart and Westhampton are informed and believe that, during the

14  relevant times of this dispute, Mr. Pierce was involved with Morgan Creek's press releases,

15  having ultimate control over and approval of the content and timing of the press releases.

16     737.   Mr. Urquhart and Westhampton are informed and believe that, during the

17  relevant times of this dispute, Mr. Cicci was involved with Morgan Creek's press releases, as he

18  routinely approved the content of the press releases and was often in control of and/or directed

19  the timing of the press releases.

20     738.   Mr. Urquhart and Westhampton are informed and believe that, during the

21  relevant times of this dispute, Mr. Barbon was also involved with reviewing and revising the

22  content of Morgan Creek's press releases, and at times he even controlled and directed the

23  content and timing of some of the press releases.

24

25

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 113 of 178

739.   During the relevant times of this dispute, Ms. Dalmy routinely sent SEC-related documents for Morgan Creek to Mr. Barbon so that he could obtain the necessary signatures and file the documents with the SEC.

740.   During the relevant times of this dispute, Ms. Dalmy also routinely sent resolutions of the Board of Directors for Morgan Creek to Mr. Barbon so that he could obtain the necessary signatures.

741.   During the relevant times of this dispute, Mr. Paige drafted and/or revised numerous contracts and agreements for Morgan Creek, including, but not limited to, the joint venture agreement with CSB, the engagement letter to PMB + Helin Donovan, Mr. Urquhart and Westhampton's Executive Services Agreement, and a master operating agreement with Harvard Petroleum.

742.   During the term of Mr. Urquhart's service as Director of Morgan Creek, no meetings of the Board of Directors were ever held – either in person or telephonically, other than a few conference calls to discuss the company's financials.  Rather, Mr. Barbon prepared Resolutions for the directors' review and signature for all matters that required the Board of Directors' approval and/or authorization.  The directors would then return the signed resolutions to Mr. Barbon for filing and distribution.

743.   From in or around mid-February 2008 to in or around August 2008, Mr. Urquhart routinely provided Mr. Pierce, Mr. Cicci, Mr. Barbon and Mr. Johnson with updates as to all of Morgan Creek's projects, including, but not limited to: (a) the work performed by Mr. Begley; (b) the work performed by Mr. Markham; (c) the status of Morgan Creek's land leasing and acquisition efforts; (d) the status of efforts to find operators for Morgan Creek's wells; (e) estimates of costs and expenses; (f) analyses of the benefits and risks of Morgan Creek's prospects; and (g) efforts to contract with joint venture partners for the development of Morgan Creek's prospects.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 114 of 178

1      744.    Between in or around mid-February 2008 to in or around August 2008, Mr.

2   Urquhart and Westhampton would routinely send Mr. Pierce and Mr. Cicci copies of Mr.

3   Urquhart and Westhampton's invoices for the services rendered to Morgan Creek, especially if

4   Mr. Barbon was late in paying the invoices.

5      745.    Between in or around mid-February 2008 to in or around August 2008, whenever

6   Mr. Urquhart wanted to pay one of Morgan Creek's invoices or bills, he had to request that Mr.

7   Barbon pay the invoice for Morgan Creek or transfer the funds to the appropriate party on behalf

8   of Morgan Creek.

9      746.    On or about June 7, 2007, Morgan Creek commenced drilling its first well – the

10   Boggs #1 well – and drilling was completed on or about July 13, 2007.

11      747.    In or around September 2007, Morgan Creek reported that four of the five tested

12   zones in the Boggs #1 well produced significant volumes of natural gas with BTU values of

13   1,000, which Morgan Creek claimed would yield a premium price over the current U.S. average

14   natural gas price.

15      748.    However, Morgan Creek also disclosed that water was also produced in the tested

16   zones, and, therefore, the well was "under evaluation" by Morgan Creek.

17      749.    The Boggs #1 well is still under "evaluation" today, and no additional

18   information about the status or prospects of this well have ever been disclosed to the public.

19      750.    Drilling costs for the Boggs #1 well totaled approximately $1.3 million by

20   February 2008, and 100 percent of these costs were supposed to have been funded by non-

21   publicly-disclosed investors who received a 75-percent working interest and 54-percent net

22   revenue interest in the lease.  However, the investors only funded $759,000.00 of the incurred

23   costs.

24      751.    On or about March 24, 2008, Morgan Creek negotiated with the investors to

25   acquire their interest in the lease for an amount equal to their $759,000.00 investment and

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 115 of 178

1   forgiveness of the additional amounts due and owing.  Morgan Creek repaid the $759,000.00

2   investment to the private investors through the issuance of over 3.7 million shares of stock (pre-

3   April 2008 stock split).

### Mainland

5       752.    Mr. Urquhart and Westhampton are informed and believe that, during the

6   relevant times of this dispute, Mr. Pierce, Mr. Cicci, and/or Mr. Barbon are express, implied,

7   and/or apparent agents of Mainland, and they operated and served in this capacity in their

8   dealings with Mr. Urquhart and Westhampton, including, but not limited to, the negotiation and

9   execution of stock transfer agreements, stock option agreements, and/or a consulting agreement

10  with Mr. Urquhart and Westhampton.

11      753.    Mr. Urquhart and Westhampton are informed and believe that, during the

12  relevant times of this dispute, Abigail was the express, implied, and/or apparent agent of

13  Mainland, and Abigail served in this capacity in its dealings with Mr. Urquhart and

14  Westhampton during the negotiation and execution of the stock transfer agreements, and all

15  other related agreements thereto.

16      754.    Mr. Urquhart and Westhampton are informed and believe that, during the

17  relevant times of this dispute, Mr. Fedun, Ms. King Horton, and/or Mr. Newport were the

18  express, implied, and/or apparent agents of Mainland, and Mr. Fedun, Ms. King Horton, and Mr.

19  Newport served in this capacity in their dealings with Mr. Urquhart and Westhampton during the

20  negotiation and execution of the stock transfer agreements, and all other agreements related

21  thereto.

22      755.    Mr. Urquhart and Westhampton are informed and believe that, during the

23  relevant times of this dispute, Mr. Pierce, Mr. Cicci, and/or Mr. Barbon are express, implied,

24  and/or apparent agents of Abigail, Mr. Fedun, Ms. King Horton, and/or Mr. Newport, and they

25  operated and served in this capacity in their dealings with Mr. Urquhart and Westhampton,

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 116 of 178

1 | including, but not limited to, the negotiation and execution of the stock transfer agreements and
2 | all other agreements related thereto.

3 |      756.   Throughout the course of Mr. Urquhart's involvement with Mainland, Mr. Cicci
4 | reviewed, revised, and edited draft contracts between Mainland and third-party operators and/or
5 | joint venture partners.

6 |      757.   During the first six months of 2008, Mr. Barbon set up bank accounts in Houston,
7 | Texas, for Mainland, performed a year-end audit for Mainland, and circulated board of director
8 | resolutions for review and execution.

9 |      758.   Mr. Urquhart and Westhampton are informed and believe that, during the
10 | relevant times of this dispute, Mr. Paige reviewed, revised, and edited draft contracts between
11 | Mainland and third-party operators and/or joint venture partners.

12 |      759.   Mr. Paige also reviewed and revised Mainland's documents relating to the
13 | acquisition of leases in the DeSoto Parish prospect from Kingsley Resources.

14 |      760.   Throughout the first six months of 2008, Mr. Cicci sent Mr. Pierce numerous
15 | news articles regarding the Haynesville Shale prospects in northern Louisiana and the potential
16 | for great drilling success in that area.

17 |      761.   Mr. Urquhart and Westhampton are informed and believe that, during the
18 | relevant times of this dispute, Mr. Pierce was involved with Mainland's press releases, having
19 | ultimate control over and approval of the content and timing of the press releases.

20 |      762.   Mr. Urquhart and Westhampton are informed and believe that, during the
21 | relevant times of this dispute, Mr. Cicci was also involved with Mainland's press releases, as he
22 | routinely approved the content of the press releases and was often in control of and/or directed
23 | the timing of the press releases.

24 |      763.   Mr. Urquhart and Westhampton are informed and believe that, during the
25 | relevant times of this dispute, Mr. Barbon was involved with reviewing and revising drafts of

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1  Mainland's press releases, and, at times, he even controlled and/or directed the content and

2  timing of some of the press releases.

3      764.   Mr. Urquhart and Westhampton are informed and believe that, during the

4  relevant times of this dispute, Mr. Coulthard was involved with Mainland's press releases, as he

5  reviewed and revised drafts of Mainland's press releases, and, at times, controlled and/or

6  directed the content and timing of the press releases.

7      765.   Throughout the course of Mr. Urquhart's involvement with Mainland, Mr.

8  Newport routinely used an e-mail address with the domain name of his other employer –

9  Meagher Oil – to conduct Mainland-related business.

10     766.   During the relevant times of this dispute, Mr. Newport routinely sent Mr. Cicci,

11 Mr. Coulthard, and Mr. Barbon status updates concerning Mainland's land leasing and

12 acquisition efforts, leasing strategies, and negotiations of agreements with operators and joint

13 venture partners, among other things.

14     767.   During the term of Mr. Urquhart's service as Director of Mainland, no meetings

15 of the Board of Directors were ever held – either in person or telephonically.  Rather, Mr.

16 Barbon prepared Resolutions for the directors' review and signature for all matters that required

17 the Board of Directors' approval and/or authorization.  The directors would then return the

18 signed resolutions to Mr. Barbon for filing and distribution.

19     768.   On or about June 16, 2009, Mainland effectuated a 2 for 1 forward stock split,

20 which the Board of Directors had previously approved on June 12, 2009.

21     769.   The June 2009 stock split increased Mr. Urquhart's holdings to 1,500,000 shares

22 of Mainland's common stock and 1,800,000 options in Mainland's stock.

23 ///

24 ///

25 ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

### The Creation of Westrock Land Corporation

2      770.   Mr. Urquhart and Westhampton are informed and believe that, during the

3   relevant times of this dispute, Mr. Pierce directly and/or indirectly owned, controlled, and/or

4   influenced Westrock Land Corporation ("Westrock").

5      771.   Mr. Urquhart and Westhampton are informed and believe that, during the

6   relevant times of this dispute, Mr. Cicci, along with Mr. Pierce, directly and/or indirectly

7   controlled and/or influenced Westrock.

8      772.   Mr. Urquhart and Westhampton are informed and believe that, during the

9   relevant times of this dispute, Mr. Barbon is and/or was an employee, agent, and/or consultant of

10  Westrock.

11     773.   On or about March 1, 2008, Mr. Urquhart prepared a "moving forward proposal"

12  for Mr. Pierce and Mr. Cicci which addressed future plans for Morgan Creek, Pierco Energy and

13  Pierco Land, Inc.  Mr. Urquhart suggested that Pierco Land Inc., a new subsidiary, be created to

14  acquire oil and gas leases for development through farm-out agreements with Morgan Creek,

15  Pierco Energy, Mainland, and other parties.

16     774.   Mr. Cicci approved of Mr. Urquhart's "moving forward proposal," and he

17  informed Mr. Urquhart on or about March 1, 2008, that he would discuss the proposal with Mr.

18  Pierce as soon as Mr. Pierce returned from his trip from Europe, because Mr. Pierce would make

19  "the final decision."

20     775.   Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce

21  approved of the moving forward proposal, because Mr. Barbon was tasked with setting up the

22  new land company.

23     776.   On or about April 9, 2008, Mr. Barbon informed Mr. Urquhart that the new land

24  company had been set up as a new, separate entity.  It had been incorporated in Texas, and it was

25  called Westrock, rather than Pierco Land Company.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 119 of 178

1      777.    Between in or around April 2008 and in or around August 2008, Mr. Barbon

2  worked on setting up bank accounts for Westrock.

3      778.    Mr. Urquhart and Westhampton are informed and believe that, during the

4  relevant times of this dispute, Mr. Powers is and/or was the President of Westrock.

5      779.    Mr. Urquhart and Westhampton are informed and believe that, during the

6  relevant times of this dispute, Mr. Markham performed services for Westrock.

7      780.    Mr. Urquhart and Westhampton are informed and believe that Mr. Pierce made

8  the decision that Westrock should have its own logo, rather than use Pierco Petroleum and/or

9  Pierco Energy's logo.

10      781.    Mr. Urquhart and Westhampton are informed and believe that, during the

11  relevant times of this dispute, Mr. Braumberger designed the logo and letterhead for Westrock.

12      782.    In or around early May 2008, Mr. Urquhart wanted Westrock business cards, and

13  he sent this request to Mr. Barbon.

14      783.    In or around May 2008 to in or around August 2008, many of the lands and leases

15  acquired by Morgan Creek were ultimately leased and acquired in the name of Westrock – rather

16  than Morgan Creek – and the costs and expenses associated with these leases were also billed to

17  Westrock rather than Morgan Creek.

18      784.    In or around May 2008 to July 2008, Mr. Newport's employer, Meagher Oil, sent

19  Westrock invoices for work it performed in Lamar County, Mississippi; in the Emmons Prospect

20  in Texas; in McLennan County, Texas; and in Curry County, New Mexico.

21      785.    In or around June 2008, Mr. Pierce and Mr. Cicci agreed to establish a policy to

22  award a gross over-riding royalty through Westrock to anyone involved in the generation of

23  viable exploration and development projects for Westrock.

24

25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 120 of 178

786.    In or around August 2008, Mira Resources and Westrock negotiated an option agreement pursuant to which Mira Resources could acquire acreage in Lamar and Forrest Counties, Mississippi, from Westrock.

787.    On or about September 3, 2008, Mainland entered into an option agreement with Westrock to acquire the same acreage in Lamar and Forrest Counties, Mississippi.  After paying Westrock between $1,300,000.00 to $1,400,000.00 to extend the option period for over one year, Mainland's Board of Directors, on or about February 10, 2010, determined that this project was not in the best interests of Mainland and forfeited all of the money.

788.    In or around October 2008, Morgan Creek entered into an option agreement with Westrock to acquire an interest in Westrock's acreage in Curry County, New Mexico.

### The Termination of Mr. Urquhart's Executive Positions and Services

789.    In or around late July 2008 or early August 2008, Mainland, Morgan Creek, Pierco Petroleum, Pierco Energy, and Mira Resources terminated Mr. Urquhart's services and positions with the companies.

790.    On or about August 8, 2008, after the request for Mr. Urquhart's resignation, Mr. Urquhart and Westhampton sent Mr. Barbon an invoice for the engineering services that Mr. Urquhart had rendered to Mainland in the amount of $5,250.00.

791.    On or about August 8, 2008, Mr. Urquhart and Westhampton also sent Mr. Barbon an invoice for management services that Mr. Urquhart had rendered to Morgan Creek in the amount of $10,500.00.

792.    On or about August 8, 2008, Mr. Urquhart and Westhampton also sent Mr. Barbon an invoice for management services that Mr. Urquhart had rendered to Pierco Petroleum and/or Pierco Energy in the amount of $5,250.00.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 121 of 178

793.    On or about August 8, 2008, Mr. Urquhart and Westhampton also sent Mr. Barbon an invoice for the expenses that Mr. Urquhart had incurred while engaging in services for Morgan Creek in the amount of $5,187.27.

794.    Between in and around mid-February 2008 to in or around August 2008, Mr. Urquhart and Westhampton sent all of their invoices for services rendered to Pierco Energy and/or Pierco Petroleum to Mr. Barbon's attention at the Quorum Drive office, with copies of the invoices also being sent to Mr. Pierce and Mr. Cicci.

795.    Between in or around mid-February 2008 to in or around March 2008, Mr. Urquhart and Westhampton sent their invoices for the services rendered to Morgan Creek to Mr. Barbon's attention at Morgan Creek, care of Pierco Petroleum at Pierco Petroleum's Vancouver office.

796.    Between in or around April 2008 to in or around August 2008, Mr. Urquhart and Westhampton sent their invoices for services rendered to Morgan Creek to Mr. Barbon's attention at Morgan Creek's Quorum Drive office.

797.    Between in and around mid-February 2008 to in or around August 2008, Westhampton and Mr. Urquhart sent their invoices for the services rendered to Mainland to Mr. Barbon's attention at Mainland's Houston office.

798.    During August 2008 and September 2008, after the request for Mr. Urquhart's resignation, Mr. Urquhart's attorney, Phillip Meyers ("Mr. Meyers"), and Mr. Urquhart exchanged numerous written communications with Ms. Dalmy regarding the details of the termination of Mr. Urquhart's services and agreements with Mainland, Morgan Creek, Pierco Petroleum, Pierco Energy, and Mira Resources.

799.    On or about August 8, 2008, Ms. Dalmy sent Mr. Urquhart and Westhampton a letter ("Termination Letter") – in her capacity as "US corporate counsel for Morgan Creek Energy Corporation . . . [and] Mainland Resources Inc. . . ., and as agent and legal representative

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 122 of 178

1    for Mira Resources Corp. . . . and Pierco Petroleum Inc. and Pierco Energy Inc. . ." – advising

2    Mr. Urquhart that Mainland and Mira had decided to replace him as director of both companies.

3    The Termination Letter also advised Mr. Urquhart that Morgan Creek had decided to replace

4    him as Chief Executive Officer, President, and Director of the company.

5        800.    The Termination Letter informed Mr. Urquhart that Mainland and Morgan Creek

6    were heading in "new direction[s] in corporate governance and management," and that this

7    required "strategic changes in the style and emphasis of management and board of director

8    personnel."

9        801.    The Termination Letter also informed Mr. Urquhart that the termination of his

10   positions with Mainland and Morgan Creek was not intended to reflect adversely on the

11   contributions he had made to both companies.

12       802.    The Termination Letter also advised Mr. Urquhart and Westhampton that the

13   Morgan Creek Executive Service Agreement was being terminated, and, pursuant to the terms of

14   the contract, Mr. Urquhart and Westhampton were entitled to a one-month termination fee of

15   $10,000.00, as well as reimbursement of any costs and expenses submitted for payment through

16   August 8, 2008.

17       803.    The Termination Letter further advised that Mr. Urquhart and Westhampton

18   would be paid a 30-day service fee in the amount of $10,000.00 for the termination of their

19   verbal consulting agreement with "certain private companies forming the Pierco Group."

20       804.    The Termination Letter also informed Mr. Urquhart that he had 90 days, until

21   November 6, 2008, in which to exercise his stock options in both Mainland and Morgan Creek

22       805.    The Termination Letter also stated that Mr. Urquhart would retain all of the

23   shares of common stock issued to him by Mainland and Morgan Creek.

24       806.    Finally, Ms. Dalmy attempted to classify the Termination Letter as a "settlement

25   agreement" and informed Mr. Urquhart that he would be paid pursuant to the terms set forth in

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 123 of 178

1   the Termination Letter if he executed the Termination Letter, signaling his agreement to "release

2   and remise [Mainland, Morgan Creek, Mira Resources, Pierco Petroleum, and Pierco Energy]

3   from any and all claims [he and/or Westhampton] have or may have against" the companies.

4       807.    Mr. Urquhart did not execute the Termination Letter and did not understand why

5   Ms. Dalmy would refer to its contents as a "settlement agreement," as opposed to a notice of

6   termination, as there were no disputes between Mr. Urquhart and/or Westhampton and

7   Mainland, Morgan Creek, Mira Resources, Pierco Petroleum, and/or Pierco Energy between

8   August 2008 and early September 2008.

9       808.    Finally, the Termination Letter did not demand payment for the stock transfers

10   set forth in the Abigail Agreement, the Fedun Agreement, the King Horton Agreement, or the

11   Newport Agreement, or for the stock transfer from Morgan Creek.  The Termination Letter also

12   did not make any reference to any monies due and owing for such stock transactions.

13       809.    On or about August 19, 2009, Mr. Meyers responded to the Termination Letter

14   by informing Ms. Dalmy that Mr. Urquhart and Westhampton were agreeable to a parting of

15   ways with Mainland, Morgan Creek, Mira Resources, Pierco Petroleum, and Pierco Energy, and

16   that Mr. Urquhart only requested assistance in verifying his ownership of his common shares of

17   Mainland and Morgan Creek stock and his entitlement to stock options in both companies.

18       810.    Specifically, Mr. Meyers asked Ms. Dalmy to confirm that Mr. Urquhart owned:

19   (1) 750,000 shares of stock in Mainland (post-May 2008 stock split) that had been fully paid for

20   and were not restricted; (2) 900,000 shares of unrestricted options in Mainland stock (post-May

21   2008 stock split) at an exercise price of $1.166 per share; (3) 521,111 shares of stock in Morgan

22   Creek (post-April 2008 stock split) that had been fully paid for and were not restricted; and (4)

23   500,000 shares of unrestricted options in Morgan Creek stock (post-April 2008 stock split) at an

24   exercise price of $1.00 per share.

25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 124 of 178

811.   On or about September 2, 2008, Ms. Dalmy sent Mr. Meyers a letter ("Confirmation Letter") in response to the August 19, 2008 correspondence, confirming Mr. Urquhart's ownership of 750,000 shares of Mainland common stock and mistakenly representing that Mr. Urquhart owned 600,000 shares of Mainland stock options (as Ms. Dalmy properly credited Mr. Urquhart with the May 2008 stock split for his shares of common stock, but failed to account for the May 2008 stock split for his stock options).

812.   The Confirmation Letter provided Mr. Urquhart with an explanation of Rule 144 of the Securities Act of 1933 and disclosed that Mr. Urquhart was free to commence selling his shares of stock in compliance with this rule on October 8, 2008.

813.   Ms. Dalmy represented that she would be sending Mr. Urquhart a similar letter confirming his ownership of the Morgan Creek stock and stock options; however, this letter was never received.

814.   On or about September 4, 2008, Mr. Meyers sent Ms. Dalmy a letter in response to the Confirmation Letter, informing her that Mr. Urquhart intended to commence selling his shares of Mainland's common stock on October 8, 2008, and that his required brokerage dealer would be RBC Dominion Securities, Inc.

815.   Mr. Meyers also informed Ms. Dalmy, in his September 4, 2008 correspondence, that Mr. Urquhart intended to exercise his options in Mainland stock around the same time that he commenced selling his stock in Mainland – around October 2008.  To that end, Mr. Meyers requested that Mr. Urquhart be given 180 days, rather than 90 days, to exercise his options.

816.   On or about September 7, 2008, Ms. Dalmy e-mailed Mr. Urquhart, Mr. Meyers, Mr. Barbon, and a representative of RBC Dominion Securities, Inc., advising them of the volume limitations on the sale of securities under Rule 144 of the Securities Act of 1933, and stating that she would ask "management" about extending the option-exercise period to 180 days for Mr. Urquhart's options in Mainland stock.

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 125 of 178

817.    On or about September 8, 2008, Mr. Cicci called Mr. Urquhart to discuss what he called a "confidential" subject matter; however, Mr. Urquhart never gave Mr. Cicci any formal acknowledgement or affirmation of Mr. Cicci's characterization of the subject of their telephone call.

818.    During this September 8, 2008 telephone call, Mr. Cicci stated that Mainland was prepared to extend the option-exercise period for Mr. Urquhart's options in Mainland's stock to a term of one year if Mr. Urquhart agreed to cooperate with Mainland in controlling Mainland's stock price. Specifically, Mr. Cicci asked Mr. Urquhart to postpone the sale of his shares of Mainland common stock until the following year and to sell in volumes significantly lower than the volume limitations imposed by Rule 144 of the Securities Act of 1933 so that Mainland could maintain and/or increase its stock price while Mainland drilled its first well on the DeSoto Parish prospect.

819.    Mr. Urquhart responded to this request by informing Mr. Cicci that he intended to liquidate $1 million of his stock in Mainland by the end of 2008 (approximately 166,000 shares of stock or 1/3 of the allowable limit pursuant to Rule 144 of the Securities Act of 1933). Mr. Urquhart also informed Mr. Cicci that he would agree to sell his remaining shares of stock in Mainland in similarly low volumes if Mainland agreed to extend his option-exercise period to 12 months for 300,000 shares of stock options, 18 months for another 300,000 shares of stock options, and 24 months for the remaining 300,000 shares of stock options.

820.    Mr. Urquhart never received a response to this request.

821.    Rather, on or about September 12, 2008, Ms. Dalmy sent Mr. Urquhart, Westhampton, and Mr. Meyers a letter stamped "Without Prejudice" ("Without Prejudice Letter"), stating that a so-called "settlement offer" set forth in the Termination Letter was being rescinded.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

822.    The Without Prejudice Letter inaccurately claims that Mr. Urquhart had refused to tender his resignation as a director of Mainland and as an officer and director of Morgan Creek; therefore, the Boards of Directors of both entities were going to formally commence meetings to remove Mr. Urquhart as a director of Mainland and as director, President, and Chief Executive Officer of Morgan Creek.

823.    In complete contradiction to the representations made in the Termination Letter, the Without Prejudice Letter stated that Morgan Creek was terminating Mr. Urquhart's Executive Service Agreement because the "managers," Board of Directors, and "investors" had "lost confidence" in Mr. Urquhart's "competence to effectively manage and lead" Morgan Creek.

824.    The Without Prejudice Letter further claimed that the same reasoning applied to the termination of Mr. Urquhart's executive positions with Mainland.

825.    The Without Prejudice Letter also informed Mr. Urquhart – for the very first time – that Mainland and Morgan Creek were taking the position that Mr. Urquhart had not paid for his shares of common stock in the two entities, and that Mainland and Morgan Creek considered the alleged non-payment to be reasonable grounds to refuse to issue the shares to any purported transferee or to remove the trading restrictions on the shares.

826.    Finally, the Without Prejudice Letter stated that the Board of Directors of Morgan Creek was reconsidering the "appropriateness" of giving Mr. Urquhart 500,000 shares of stock options for "less than six months' employment."

827.    Similarly, in or around September 2008 and/or October 2008, Mainland and/or its agents expressly and/or impliedly threatened to also have its Board of Directors "reconsider" giving Mr. Urquhart 900,000 shares of stock options for such a short period of employment.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 127 of 178

828. Between March 19, 2008 and September 12, 2008, Mr. Newport, Mr. Fedun, Ms. King Horton, Abigail, and Mainland never demanded that Mr. Urquhart tender payment for his 500,000 shares of Mainland stock (pre-May 2008 stock split).

829. Between March 19, 2008 and September 12, 2008, Morgan Creek never demanded that Mr. Urquhart tender payment for his 1,563,333 shares of Morgan Creek stock (pre-April 2008 stock split).

830. On or about September 17, 2008, as a result of the August 8, 2008 Termination Letter from Ms. Dalmy, Mr. Urquhart executed a resignation as a director of Mira Resources. Mr. Urquhart owned no shares of stock in Mira Resources at the time of his resignation.

831. Mr. Urquhart is informed and believes that on or about October 30, 2008, Abigail, Mr. Fedun, Ms. Horton, Mr. Newport, and Mainland executed an agreement pursuant to which they declared as void and rescinded the Abigail Agreement, Fedun Agreement, King Horton Agreement, and Newport Agreement ("Rescinding Agreement). Mr. Urquhart is also informed and believes that Abigail, Mr. Fedun, Ms. Horton, and Mr. Newport transferred Mr. Urquhart's 750,000 shares of Mainland stock to Abigail, and Mr. Fedun, Ms. Horton, and Mr. Newport assigned their rights to sue Mr. Urquhart pursuant to the terms of the Abigail Agreement, the Fedun Agreement, the King Horton Agreement, and the Newport Agreement to Abigail.

832. Abigail, Mr. Fedun, Ms. King Horton, Mr. Newport, and Mainland expressly agreed that the Rescinding Agreement was to be construed and enforced in accordance with, and the rights of the parties were to be governed by, Nevada law.

833. Abigail, Mr. Fedun, Ms. King Horton, Mr. Newport, and Mainland expressly agreed that all disputes arising under the Rescinding Agreement, whether as to interpretation, performance, or otherwise, were subject to the jurisdiction of the courts of Nevada.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 128 of 178

834.    Abigail, Mr. Fedun, Ms. King Horton, Mr. Newport, and Mainland expressly agreed that for all disputes arising under the Rescinding Agreement, whether as to interpretation, performance, or otherwise, they each irrevocably attorned to the jurisdiction of the Nevada courts.

835.    In or around October 2008 or November 2008, Mr. Urquhart, unaware of the Rescinding Agreement, attempted to sell a portion of his 750,000 shares of Mainland common stock pursuant to the restrictions imposed by Rule 144 of the Securities Act of 1933; however, Mr. Urquhart was prevented from doing so due to additional restrictions that Mainland placed on the stock.

836.    Specifically, Mr. Urquhart and Westhampton are informed and believe that Mainland's Board of Directors and/or its officers, employees, agents, and/or consultants contacted Empire – Mainland's transfer agent – and requested that Empire place a legend on Mr. Urquhart's 750,000 shares of Mainland stock preventing him from selling and/or transferring any of the stock.

837.    Mr. Urquhart and Westhampton are informed and believe that Morgan Creek's Board of Directors and/or its officers, employees, agents, and/or consultants requested that its transfer agent also place a legend on Mr. Urquhart's 521,111 shares of Morgan Creek stock preventing him from selling and/or transferring any of the stock.

838.    While Mr. Urquhart was trying: (1) to determine why restrictions had been placed on his shares of Mainland stock; (2) to get the restriction removed; and (3) to obtain confirmation that Mainland was not rescinding his Mainland stock options, the time to exercise his Mainland stock options expired.

839.    Because Mainland would not remove the restrictions and/or legends from Mr. Urquhart's stock certificate, Mr. Urquhart was prevented from liquidating his stock at a time when the Mainland stock price was fluctuating between $5.00-$7.00 per share.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 129 of 178

1    840.    Furthermore, because Mr. Urquhart could not liquidate his shares of common

2  stock in Mainland or Morgan Creek, Mr. Urquhart was prevented from using the funds gained

3  from the liquidation to exercise his stock options in Mainland.

4    841.    Moreover, because Mr. Urquhart could not liquidate his shares of common stock

5  in Mainland or Morgan Creek, Mr. Urquhart could not get bankers or brokers to loan him funds

6  against the stock in order to exercise his stock options in Mainland.

7    842.    Finally, because Mainland implied, suggested, and/or represented that it was

8  considering revoking Mr. Urquhart's stock options, Mr. Urquhart could not risk using other

9  sources of income to exercise his stock options for shares of stock that may never ultimately be

10  issued to him.

11    843.    On or about November 19, 2008, Mr. More contacted Mr. Urquhart about

12  completing a form necessary for Mira Resources to obtain its listing on the TSX-Venture

13  Exchange. Mr. Urquhart informed Mr. More that he had resigned from Mira Resources in

14  September 2008, in response to Ms. Dalmy – acting in her capacity as an attorney for Mira

15  Resources – requesting his resignation.

16    844.    Mr. More informed Mr. Urquhart that neither he nor Mira Resources' president,

17  Mr. Kreczmer, had ever been informed of Mr. Urquhart's resignation. Mr. More also informed

18  Mr. Urquhart that Ms. Dalmy had absolutely no association with Mira Resources – Mira

19  Resources' lawyer was actually Gerald Tuskey of McDonald Tuskey in Vancouver, British

20  Columbia.

21    845.    Therefore, on or about November 20, 2008, Mr. Kreczmer sent Mr. Urquhart a

22  letter stating that Mira Resources declined to accept Mr. Urquhart's resignation and that Mira

23  Resources wanted Mr. Urquhart to continue to serve on its Board of Directors and advise Mira

24  Resources on its exploration and development planning. Mr. Urquhart currently remains a

25  director of Mira Resources.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 130 of 178

1    846.    On or about February 4, 2009, Mainland cancelled Mr. Urquhart's 900,000 fully-

2    vested options in Mainland stock (post-May 2008 stock split).

3    847.    To date, the legends and/or restrictions placed on Mr. Urquhart's shares of

4    Mainland and Morgan Creek stock have not been removed by Mainland or Morgan Creek.

5    848.    To date, Mr. Urquhart has been prevented from selling or transferring his

6    1,500,000 shares of Mainland stock (post-June 2009 stock split) and his approximately 521,111

7    shares of Morgan Creek stock (post-April 2008 stock split).

8    849.    To date, Mr. Urquhart has been prevented from exercising his 1,800,000 options

9    in Mainland stock (post-June 2009 stock split).

10    850.    To date, Mr. Urquhart and Westhampton have not been paid for the consulting

11    and/or managing services provided to Mainland, Morgan Creek, Pierco Petroleum, and/or Pierco

12    Energy, and Morgan Creek has not reimbursed Mr. Urquhart and Westhampton for the expenses

13    he incurred on Morgan Creek's behalf.

14    851.    At this time, Mr. Urquhart and Westhampton are not able to plead fraud with any

15    more particularity, as most of the facts which demonstrate the Counter-defendants' fraudulent

16    scheme are within the Counter-defendants' peculiar knowledge and possession.  This is

17    particularly true of the facts which demonstrate the nature and extent of the direct and indirect

18    relationships between the Counter-defendants.  However, based upon the above facts which

19    support a strong inference of fraud, Mr. Urquhart and Westhampton demand that a relaxed

20    standard for the pleading of fraud be applied to their claims.  Mr. Urquhart and Westhampton

21    believe that if they are permitted to conduct the necessary discovery, they could then move to

22    amend their complaint and allege fraud with the particularity required of F.R.C.P. 9(b).

23    ///

24    ///

25    ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

## **FIRST CAUSE OF ACTION**

### **(Breach of Contract against Abigail)**

852.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-851, inclusive.

853.    Mr. Urquhart was a party to the Abigail Agreement with Abigail.

854.    Mr. Urquhart was also a party to an oral agreement with Abigail regarding the fact that he was not required to pay Abigail the purchase price for the stock he received pursuant to the Abigail Agreement.

855.    Mr. Urquhart fully and faithfully performed his obligations and duties under said contracts with Abigail, except for those obligations and duties which were excused and/or rendered impossible.

856.    Abigail breached its contracts with Mr. Urquhart, as detailed *supra*, at ¶¶ 589-851.

857.    As a result of Abigail's breaches, Mr. Urquhart has suffered damages in excess of $75,000.00.

858.    It has been necessary for Mr. Urquhart to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable attorney's fees and costs incurred in this matter.

### **SECOND CAUSE OF ACTION**

### **(Breach of Contract against Mr. Fedun)**

859.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-858, inclusive.

860.    Mr. Urquhart was a party to the Fedun Agreement with Mr. Fedun.

BAILEY✥KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 132 of 178

861.    Mr. Urquhart was also a party to an oral agreement with Mr. Fedun regarding the fact that Mr. Urquhart was not required to pay Mr. Fedun the purchase price for the stock Mr. Urquhart received pursuant to the Fedun Agreement.

862.    Mr. Urquhart fully and faithfully performed his obligations and duties under said contracts with Mr. Fedun, except for those obligations and duties which were excused and/or rendered impossible.

863.    Mr. Fedun breached his contracts with Mr. Urquhart, as detailed *supra*, at ¶¶ 589-851.

864.    As a result of Mr. Fedun's breaches, Mr. Urquhart has suffered damages in excess of $75,000.00.

865.    It has been necessary for Mr. Urquhart to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable attorney's fees and costs incurred in this matter.

### THIRD CAUSE OF ACTION

### (Breach of Contract against Ms. King Horton)

866.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-865, inclusive.

867.    Mr. Urquhart was a party to the King Horton Agreement with Ms. King Horton.

868.    Mr. Urquhart was also a party to an oral agreement with Ms. King Horton regarding the fact that Mr. Urquhart was not required to pay Ms. King Horton the purchase price for the stock Mr. Urquhart received pursuant to the King Horton Agreement.

869.    Mr. Urquhart fully and faithfully performed his obligations and duties under said contracts with Ms. King Horton, except for those obligations and duties which were excused and/or rendered impossible.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 133 of 178

1   870.   Ms. King Horton breached her contracts with Mr. Urquhart, as detailed *supra*, at

2   ¶¶ 589-851.

3   871.   As a result of Ms. King Horton's breaches, Mr. Urquhart has suffered damages in

4   excess of $75,000.00.

5   872.   It has been necessary for Mr. Urquhart to obtain the services of an attorney in

6   order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

7   attorney's fees and costs incurred in this matter.

8   ### FOURTH CAUSE OF ACTION

9   ### (Breach of Contract against Mr. Newport)

10   873.   Mr. Urquhart and Westhampton reallege and reincorporate the allegations

11   contained in paragraphs 1-872, inclusive.

12   874.   Mr. Urquhart was a party to the Newport Agreement with Mr. Newport.

13   875.   Mr. Urquhart was also a party to an oral agreement with Mr. Newport regarding

14   the fact that Mr. Urquhart was not required to pay Mr. Newport the purchase price for the stock

15   Mr. Urquhart received pursuant to the Newport Agreement.

16   876.   Mr. Urquhart fully and faithfully performed his obligations and duties under said

17   contracts with Mr. Newport, except for those obligations and duties which were excused and/or

18   rendered impossible.

19   877.   Mr. Newport breached his contracts with Mr. Urquhart, as detailed *supra*, at ¶¶

20   589-851.

21   878.   As a result of Newport's breaches, Mr. Urquhart has suffered damages in excess

22   of $75,000.00.

23   879.   It has been necessary for Mr. Urquhart to obtain the services of an attorney in

24   order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

25   attorney's fees and costs incurred in this matter.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 134 of 178

## **FIFTH CAUSE OF ACTION**

### **(Breach of Contract against Mainland)**

880.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-879, inclusive.

881.    Mr. Urquhart was a party to a written stock option agreement with Mainland.

882.    Mr. Urquhart and Westhampton were also parties to an oral consulting agreement with Mainland.

883.    Mr. Urquhart was also a party to the Abigail Agreement, the Fedun Agreement, the King Horton Agreement, and the Newport Agreement with – in the alternative to the causes of action pleaded *supra* – Mainland, as Abigail, Mr. Fedun, Ms. King Horton, and Mr. Newport acted as implied and/or apparent agents for Mainland and entered into the stock purchase agreements with Mr. Urquhart at Mainland's direction and for Mainland's benefit.

884.    Mr. Urquhart and Westhampton fully and faithfully performed their obligations and duties under said contracts with Mainland, except for those obligations and duties which were excused and/or rendered impossible.

885.    Mainland breached its contracts with Mr. Urquhart and Westhampton, as detailed *supra*, at ¶¶ 589-851.

886.    As a result of Mainland's breaches, Mr. Urquhart and Westhampton have suffered damages in excess of $75,000.00.

887.    It has been necessary for Mr. Urquhart and Westhampton to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart and Westhampton are entitled to an award of reasonable attorney's fees and costs incurred in this matter.

///

///

///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

## SIXTH CAUSE OF ACTION

### (Breach of Contract Against Morgan Creek)

888.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-887, inclusive.

889.    Mr. Urquhart and Westhampton were parties to a written and/or oral executive services agreement with Morgan Creek.

890.    Mr. Urquhart is also a party to an agreement pursuant to which he received shares of common stock in Morgan Creek.

891.    Mr. Urquhart was also a party to an oral agreement with Morgan Creek regarding the fact that he was not required to pay Morgan Creek the purchase price for the stock he received pursuant to the stock transfer agreements with Morgan Creek.

892.    Mr. Urquhart and Westhampton were also parties to an oral consulting and/or management agreement with Morgan Creek.

893.    Mr. Urquhart and Westhampton fully and faithfully performed their obligations and duties under said contracts with Morgan Creek, except for those obligations and duties which were excused and/or rendered impossible.

894.    Morgan Creek breached its contracts with Mr. Urquhart and/or Westhampton, as described *supra*, at ¶¶ 589-851.

895.    As a result of Morgan Creek's breaches, Mr. Urquhart and Westhampton have suffered damages in excess of $75,000.00.

896.    It has been necessary for Mr. Urquhart and/or Westhampton to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart and Westhampton are entitled to an award of reasonable attorney's fees and costs incurred in this matter.

///

///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 136 of 178

1

**SEVENTH CAUSE OF ACTION**
**(Contractual Breach of the Implied Covenant of Good**
**Faith and Fair Dealing against Abigail)**

2

3       897.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations

4    contained in paragraphs 1-896, inclusive.

5       898.    Mr. Urquhart entered into the Abigail Agreement with Abigail, which fully sets

6    forth the duties and obligation running between the parties.

7       899.    Mr. Urquhart was also a party to an oral agreement with Abigail regarding the

8    fact that he was not required to pay Abigail the purchase price for the stock he received pursuant

9    to the Abigail Agreement, and this oral agreement fully sets forth the duties and obligations

10   running between the parties.

11      900.    Abigail owed a duty of good faith and fair dealing to Mr. Urquhart arising from

12   the contracts.

13      901.    Abigail was unfaithful to the purpose of the contracts, engaging in the activities

14   described *supra*, at ¶¶ 589-851, to the detriment of Mr. Urquhart.

15      902.    Mr. Urquhart's justified expectations were denied as a proximate result of

16   Abigail's breaches of the duty of good faith and fair dealing.

17      903.    As a result of Abigail's breaches, Mr. Urquhart has sustained damages in an

18   amount in excess of $75,000.00.

19      904.    It has been necessary for Mr. Urquhart to obtain the services of an attorney in

20   order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

21   attorney's fees costs incurred in this matter.

22

**EIGHTH CAUSE OF ACTION**
**(Contractual Breach of the Implied Covenant of Good**
**Faith and Fair Dealing against Mr. Fedun)**

23

24      905.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations

25   contained in paragraphs 1-904, inclusive.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

906.   Mr. Urquhart entered into the Fedun Agreement with Mr. Fedun, which fully sets forth the duties and obligation running between the parties.

907.   Mr. Urquhart was also a party to an oral agreement with Mr. Fedun regarding the fact that Mr. Urquhart was not required to pay Mr. Fedun the purchase price for the stock Mr. Urquhart received pursuant to the Fedun Agreement, and this oral agreement fully sets forth the duties and obligations running between the parties.

908.   Mr. Fedun owed a duty of good faith and fair dealing to Mr. Urquhart arising from the contracts.

909.   Mr. Fedun was unfaithful to the purpose of the contracts, engaging in the activities described *supra*, at ¶¶ 589-851, to the detriment of Mr. Urquhart.

910.   Mr. Urquhart's justified expectations were denied as a proximate result of Mr. Fedun's breaches of the duty of good faith and fair dealing.

911.   As a result of Mr. Fedun's breaches, Mr. Urquhart has sustained damages in an amount in excess of $75,000.00.

912.   It has been necessary for Mr. Urquhart to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable attorney's fees and costs incurred in this matter.

### NINTH CAUSE OF ACTION
### (Contractual Breach of the Implied Covenant of Good
### Faith and Fair Dealing against Ms. King Horton)

913.   Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-912, inclusive.

914.   Mr. Urquhart entered into the King Horton Agreement with Ms. King Horton, which fully sets forth the duties and obligation running between the parties.

915.   Mr. Urquhart was also a party to an oral agreement with Ms. King Horton regarding the fact that Mr. Urquhart was not required to pay Ms. King Horton the purchase price

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1 | for the stock Mr. Urquhart received pursuant to the King Horton Agreement, and this oral
2 | agreement fully sets forth the duties and obligations running between the parties.

3 | 916. Ms. King Horton owed a duty of good faith and fair dealing to Mr. Urquhart
4 | arising from the contracts.

5 | 917. Ms. King Horton was unfaithful to the purpose of the contracts, engaging in the
6 | activities described *supra*, at ¶¶ 589-851, to the detriment of Mr. Urquhart.

7 | 918. Mr. Urquhart's justified expectations were denied as a proximate result of Ms.
8 | King Horton's breaches of the duty of good faith and fair dealing.

9 | 919. As a result of Ms. King Horton's breaches, Mr. Urquhart has sustained damages
10 | in an amount in excess of $75,000.00.

11 | 920. It has been necessary for Mr. Urquhart to obtain the services of an attorney in
12 | order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable
13 | attorney's fees and costs incurred in this matter.

14 |
15 |

**TENTH CAUSE OF ACTION**
**(Contractual Breach of the Implied Covenant of Good**
**Faith and Fair Dealing against Mr. Newport)**

16 | 921. Mr. Urquhart and Westhampton reallege and reincorporate the allegations
17 | contained in paragraphs 1-920, inclusive.

18 | 922. Mr. Urquhart entered into the Newport Agreement with Mr. Newport, which
19 | fully sets forth the duties and obligation running between the parties.

20 | 923. Mr. Urquhart was also a party to an oral agreement with Mr. Newport regarding
21 | the fact that Mr. Urquhart was not required to pay Mr. Newport the purchase price for the stock
22 | Mr. Urquhart received pursuant to the Newport Agreement, and this oral agreement fully sets
23 | forth the duties and obligations running between the parties.

24 | 924. Mr. Newport owed a duty of good faith and fair dealing to Mr. Urquhart arising
25 | from the contracts.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    925.    Mr. Newport was unfaithful to the purpose of the contracts, engaging in the

2    activities described *supra*, at ¶¶ 589-851, to the detriment of Mr. Urquhart.

3    926.    Mr. Urquhart's justified expectations were denied as a proximate result of Mr.

4    Newport's breaches of the duty of good faith and fair dealing.

5    927.    As a result of Mr. Newport's breaches, Mr. Urquhart has sustained damages in an

6    amount in excess of $75,000.00.

7    928.    It has been necessary for Mr. Urquhart to obtain the services of an attorney in

8    order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

9    attorney's fees and costs incurred in this matter.

## ELEVENTH CAUSE OF ACTION
### (Contractual Breach of the Implied Covenant of Good
### Faith and Fair Dealing against Mainland)

12    929.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations

13    contained in paragraphs 1-928, inclusive.

14    930.    Mr. Urquhart was a party to a written stock option agreement with Mainland,

15    which fully sets forth the duties and obligations running between the parties.

16    931.    Mr. Urquhart and Westhampton were also parties to an oral consulting agreement

17    with Mainland, and this oral agreement fully sets forth the duties and obligations running

18    between the parties.

19    932.    Mr. Urquhart was also a party to the Abigail Agreement, the Fedun Agreement,

20    the King Horton Agreement, and the Newport Agreement – in the alternative to the causes of

21    action pleaded *supra* – Mainland, as Abigail, Mr. Fedun, Ms. King Horton, and Mr. Newport

22    acted as implied and/or apparent agents for Mainland and entered into the stock purchase

23    agreements with Mr. Urquhart at Mainland's direction and for Mainland's benefit.  The Abigail

24    Agreement, the Fedun Agreement, the King Horton Agreement, and the Newport Agreement

25    fully set forth the duties and obligations running between the parties.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 140 of 178

933.    Mainland owed duties of good faith and fair dealing to Mr. Urquhart and Westhampton arising from the contracts.

934.    Mainland was unfaithful to the purpose of the contracts, engaging in the activities described *supra*, at ¶¶ 589-851, to the detriment of Mr. Urquhart and Westhampton.

935.    Mr. Urquhart and Westhampton's justified expectations were denied as a proximate result of Mainland's breaches of the duty of good faith and fair dealing.

936.    As a result of Mainland's breaches, Mr. Urquhart and Westhampton have sustained damages in an amount in excess of $75,000.00.

937.    It has been necessary for Mr. Urquhart and Westhampton to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart are Westhampton are entitled to an award of reasonable attorney's fees and costs incurred in this matter.

## TWELFTH CAUSE OF ACTION
### (Contractual Breach of the Implied Covenant of Good
### Faith and Fair Dealing against Morgan Creek)

938.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-937, inclusive.

939.    Mr. Urquhart and Westhampton were parties to a written and/or oral executive services agreement with Morgan Creek, and this agreement fully sets forth the duties and obligations running between the parties.

940.    Mr. Urquhart is also a party to an agreement pursuant to which he received shares of common stock in Morgan Creek, and this agreement fully sets forth the duties and obligations running between the parties.

941.    Mr. Urquhart was also a party to an oral agreement with Morgan Creek regarding the fact that he was not required to pay Morgan Creek the purchase price for the stock he received pursuant to the stock transfer agreement with Morgan Creek, and this oral agreement fully sets forth the duties and obligations running between the parties.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 141 of 178

942. Mr. Urquhart and Westhampton were also parties to an oral consulting and/or management agreement with Morgan Creek, and this oral agreement fully sets forth the duties and obligations running between the parties.

943. Morgan Creek owed duties of good faith and fair dealing to Mr. Urquhart and Westhampton arising from the contracts.

944. Morgan Creek was unfaithful to the purpose of the contracts, engaging in the activities described *supra*, at ¶¶ 589-851, to the detriment of Mr. Urquhart and Westhampton.

945. Mr. Urquhart and Westhampton's justified expectations were denied as a proximate result of Morgan Creek's breaches of the duty of good faith and fair dealing.

946. As a result of Morgan Creek's breaches, Mr. Urquhart and Westhampton have sustained damages in an amount in excess of $75,000.00.

947. It has been necessary for Mr. Urquhart and Westhampton to obtain the services of an attorney in order to seek relief in this matter, and Mr. Urquhart and Westhampton are entitled to an award of reasonable attorney's fees and costs incurred in this matter.

## **THIRTEENTH CAUSE OF ACTION**

### **(Promissory Estoppel against Abigail)**

948. Mr. Urquhart and Westhampton reallege and reincorporate the allegations contained in paragraphs 1-947, inclusive.

949. Abigail intended to transfer some of its shares of stock in Mainland to Mr. Urquhart.

950. Abigail intended to induce Mr. Urquhart to acquire shares of common stock in Mainland with the oral and/or written promise that he need not pay the purchase price of the stock as set forth in the Abigail Agreement between Abigail and Mr. Urquhart.

951. Abigail made this oral and/or written promise to Mr. Urquhart directly and/or indirectly through its agents Mr. Barbon, Mr. Pierce, and/or Mr. Cicci.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 142 of 178

1    952.   Mr. Urquhart relied on Abigail's oral and/or written promise concerning the fact

2  that he would not have to pay the purchase price for his shares of common stock in Mainland,

3  and Mr. Urquhart entered into the Abigail Agreement with Abigail.

4    953.   Abigail confirmed this oral and/or written promise on several occasions through

5  its and/or Mainland's agent Ms. Dalmy.

6    954.   Mr. Urquhart was not aware of the fact that Abigail never intended to honor its

7  oral and/or written promises concerning the payment of the purchase price for the Mainland

8  stock, or that Abigail intended to instruct, direct, and/or request that Mainland subsequently

9  place a legend on Mr. Urquhart's shares of Mainland stock preventing Mr. Urquhart from selling

10  and/or transferring the shares on the open market.

11    955.   Abigail is therefore estopped from failing to honor its original oral and/or written

12  promise regarding the fact that Mr. Urquhart was not required to pay the purchase price for the

13  shares of Mainland stock.

14    956.   It has been necessary for Mr. Urquhart to obtain the services of an attorney in

15  order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

16  attorney's fees and costs incurred in this matter.

17    **FOURTEENTH CAUSE OF ACTION**

18    **(Promissory Estoppel against Mr. Fedun)**

19    957.   Mr. Urquhart and Westhampton reallege and reincorporate the allegations

20  contained in paragraphs 1-956, inclusive.

21    958.   Mr. Fedun intended to transfer some of his shares of stock in Mainland to Mr.

22  Urquhart.

23    959.   Mr. Fedun intended to induce Mr. Urquhart to acquire shares of common stock in

24  Mainland with the oral and/or written promise that he need not pay the purchase price of the

25  stock as set forth in the Fedun Agreement between Mr. Fedun and Mr. Urquhart.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 143 of 178

1    960.    Mr. Fedun made this oral and/or written promise to Mr. Urquhart directly and/or

2    indirectly through his agents Mr. Barbon, Mr. Pierce, and/or Mr. Cicci.

3    961.    Mr. Urquhart relied on Mr. Fedun's oral and/or written promise concerning the

4    fact that he would not have to pay the purchase price for his shares of common stock in

5    Mainland, and Mr. Urquhart entered into the Fedun Agreement with Mr. Fedun.

6    962.    Mr. Fedun confirmed this oral and/or written promise on several occasions

7    through his and/or Mainland's agent, Ms. Dalmy.

8    963.    Mr. Urquhart was not aware of the fact that Mr. Fedun never intended to honor

9    his oral and/or written promises concerning the payment of the purchase price for the Mainland

10   stock, or that Mr. Fedun intended to instruct, direct, and/or request that Mainland subsequently

11   place a legend on Mr. Urquhart's shares of Mainland stock preventing Mr. Urquhart from selling

12   and/or transferring the shares on the open market.

13   964.    Mr. Fedun is therefore estopped from failing to honor his original oral and/or

14   written promise regarding the fact that Mr. Urquhart was not required to pay the purchase price

15   for the shares of Mainland stock.

16   965.    It has been necessary for Mr. Urquhart to obtain the services of an attorney in

17   order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

18   attorney's fees and costs incurred in this matter.

19                        **FIFTEENTH CAUSE OF ACTION**

20                   **(Promissory Estoppel against Ms. King Horton)**

21   966.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations

22   contained in paragraphs 1-965, inclusive.

23   967.    Ms. King Horton intended to transfer some of her shares of stock in Mainland to

24   Mr. Urquhart.

25

BAILEY✤KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    968.    Ms. King Horton intended to induce Mr. Urquhart to acquire shares of common

2    stock in Mainland with the oral and/or written promise that he need not pay the purchase price of

3    the stock as set forth in the King Horton Agreement between Ms. King Horton and Mr.

4    Urquhart.

5    969.    Ms. King Horton made this oral and/or written promise to Mr. Urquhart directly

6    and/or indirectly through her agents Mr. Barbon, Mr. Pierce, and/or Mr. Cicci.

7    970.    Mr. Urquhart relied on Ms. King Horton's oral and/or written promise concerning

8    the fact that he would not have to pay the purchase price for his shares of common stock in

9    Mainland, and Mr. Urquhart entered into the King Horton Agreement with Ms. King Horton.

10    971.    Ms. King Horton confirmed this oral and/or written promise on several occasions

11    through her and/or Mainland's agent, Ms. Dalmy.

12    972.    Mr. Urquhart was not aware of the fact that Ms. King Horton never intended to

13    honor her oral and/or written promises concerning the payment of the purchase price for the

14    Mainland stock, or that Ms. King Horton intended to instruct, direct, and/or request that

15    Mainland subsequently place a legend on Mr. Urquhart's shares of Mainland stock preventing

16    Mr. Urquhart from selling and/or transferring the shares on the open market.

17    973.    Ms. King Horton is therefore estopped from failing to honor her original oral

18    and/or written promise regarding the fact that Mr. Urquhart was not required to pay the purchase

19    price for the shares of Mainland stock.

20    974.    It has been necessary for Mr. Urquhart to obtain the services of an attorney in

21    order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

22    attorney's fees and costs incurred in this matter.

23    ///

24    ///

25    ///

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1

2

## SIXTEENTH CAUSE OF ACTION

### (Promissory Estoppel against Mr. Newport)

3      975.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations

4   contained in paragraphs 1-974, inclusive.

5      976.    Mr. Newport intended to transfer some of his shares of stock in Mainland to Mr.

6   Urquhart.

7      977.    Mr. Newport intended to induce Mr. Urquhart to acquire shares of common stock

8   in Mainland with the oral and/or written promise that he need not pay the purchase price of the

9   stock as set forth in the Newport Agreement between Mr. Newport and Mr. Urquhart.

10     978.    Mr. Newport made this oral and/or written promise to Mr. Urquhart directly

11  and/or indirectly through his agents Mr. Barbon, Mr. Pierce, and/or Mr. Cicci.

12     979.    Mr. Urquhart relied on Mr. Newport's oral and/or written promise concerning the

13  fact that he would not have to pay the purchase price for his shares of common stock in

14  Mainland, and Mr. Urquhart entered into the Newport Agreement with Mr. Newport.

15     980.    Mr. Newport confirmed this oral and/or written promise on several occasions

16  through his and/or Mainland's agent, Ms. Dalmy.

17     981.    Mr. Urquhart was not aware of the fact that Mr. Newport never intended to honor

18  his oral and/or written promises concerning the payment of the purchase price for the Mainland

19  stock, or that Mr. Newport intended to instruct, direct, and/or request that Mainland

20  subsequently place a legend on Mr. Urquhart's shares of Mainland stock preventing Mr.

21  Urquhart from selling and/or transferring the shares on the open market.

22     982.    Mr. Newport is therefore estopped from failing to honor his original oral and/or

23  written promise regarding the fact that Mr. Urquhart was not required to pay the purchase price

24  for the shares of Mainland stock.

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

Page 146 of 178

1    983.   It has been necessary for Mr. Urquhart to obtain the services of an attorney in

2  order to seek relief in this matter, and Mr. Urquhart is entitled to an award of reasonable

3  attorney's fees and costs incurred in this matter.

4                  **SEVENTEENTH CAUSE OF ACTION**

5                  **(Promissory Estoppel against Mainland)**

6    984.   Mr. Urquhart and Westhampton reallege and reincorporate the allegations

7  contained in paragraphs 1-983, inclusive.

8    985.   Mainland intended to retain Mr. Urquhart and Westhampton as a consultant for

9  Mainland.

10    986.   Mainland, in the alternative to the causes of action pleaded *supra*, also intended

11  to transfer some of its stock to Mr. Urquhart

12    987.   Mainland intended to induce Mr. Urquhart and Westhampton to act as a

13  consultant for Mainland by promising – directly and/or indirectly through its agents Mr. Barbon,

14  Mr. Pierce, and/or Mr. Cicci – that Mr. Urquhart and Westhampton would be compensated

15  $5,000.00 per month for their services.

16    988.   Mainland intended to induce Mr. Urquhart to acquire shares of common stock in

17  Mainland with the oral and/or written promise – made by Mainland through its agents Mr.

18  Pierce, Mr. Cicci, and/or Mr. Barbon – that he need not pay the purchase price of the stock to be

19  transferred to him from four Mainland stockholders.

20    989.   Mr. Urquhart and Westhampton relied on Mainland's oral and/or written promise

21  concerning the monthly compensation fee for consulting services and entered into the consulting

22  agreement with Mainland.

23    990.   Mr. Urquhart relied on Mainland's oral and/or written promise concerning the

24  fact that he would not have to pay the purchase price for his shares of common stock in

25

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    Mainland, and Mr. Urquhart entered into the Abigail Agreement, the Fedun Agreement, the

2    King Horton Agreement, and the Newport Agreement with Mainland and/or Mainland's agents.

3          991.    Mr. Urquhart and Westhampton were not aware of the fact that Mainland never

4    intended to honor its oral and/or written promise to pay the monthly consulting fee in exchange

5    for Mr. Urquhart's and Westhampton's services.

6          992.    Mr. Urquhart was not aware of the fact that Mainland never intended to honor its

7    oral and/or written promises concerning the payment of the purchase price for the Mainland

8    stock, or that Mainland intended to instruct, direct, and/or request that Empire place a legend on

9    Mr. Urquhart's shares of Mainland stock preventing Mr. Urquhart from selling and/or

10   transferring the shares on the open market.

11         993.    Mainland is therefore estopped from failing to honor its oral and/or written

12   promise regarding the fact that Mr. Urquhart and Westhampton were entitled to a monthly

13   consulting fee in exchange for services rendered.

14         994.    Mainland is therefore estopped from failing to honor its oral and/or written

15   promise regarding the fact that Mr. Urquhart was not required to pay the purchase price for the

16   shares of Mainland stock.

17         995.    It has been necessary for Mr. Urquhart and Westhampton to obtain the services of

18   an attorney in order to seek relief in this matter, and Mr. Urquhart and Westhampton are entitled

19   to an award of reasonable attorney's fees and costs incurred in this matter.

20                          **EIGHTEENTH CAUSE OF ACTION**

21                  **(Promissory Estoppel against Morgan Creek)**

22         996.    Mr. Urquhart and Westhampton reallege and reincorporate the allegations

23   contained in paragraphs 1-995, inclusive.

24         997.    Morgan Creek intended to retain Mr. Urquhart and Westhampton as a consultant

25   and manager for Morgan Creek.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1    998.   Morgan Creek also intended to transfer some of its shares of stock to Mr.
2    Urquhart.

3    999.   Morgan Creek intended to induce Mr. Urquhart and Westhampton to act as a
4    consultant and manager for Morgan Creek by promising compensation of $10,000.00 per month
5    for their services.

6    1000.   Morgan Creek also intended to induce Mr. Urquhart to acquire shares of common
7    stock in Morgan Creek with the oral and/or written promise that he need not pay the purchase
8    price of the stock Morgan Creek granted to him.

9    1001.   Morgan Creek made these oral and/or written promises to Mr. Urquhart and
10    Westhampton directly and/or indirectly through its agents Mr. Barbon, Mr. Pierce, and/or Mr.
11    Cicci.

12    1002.   Morgan Creek also confirmed the oral and/or written promise concerning the
13    purchase price of the stock directly and/or indirectly through its agent Ms. Dalmy.

14    1003.   Mr. Urquhart and Westhampton relied on Morgan Creek's oral and/or written
15    promises concerning the monthly compensation fee and the fact that Mr. Urquhart did not have
16    to pay the purchase price of the common stock granted to him by Morgan Creek and entered into
17    the consulting and/or management agreement and the stock transfer agreement with Morgan
18    Creek.

19    1004.   Mr. Urquhart and Westhampton were not aware of the fact that Morgan Creek
20    never intended to honor its oral and/or written promise to pay the monthly consulting fee in
21    exchange for Mr. Urquhart's and Westhampton's services.

22    1005.   Mr. Urquhart was also not aware of the fact that Morgan Creek never intended to
23    honor its oral and/or written promise concerning the payment of the purchase price for the
24    Morgan Creek stock, or that Morgan Creek intended to instruct, direct, and/or request that a
25

BAILEY ❖ KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821

1   legend subsequently be placed on Mr. Urquhart's shares of Morgan Creek stock, thereby

2   preventing Mr. Urquhart from selling and/or transferring the shares on the open market.

3       1006.   Morgan Creek is therefore estopped from failing to honor its oral and/or written

4   promise regarding the fact that Mr. Urquhart and Westhampton were entitled to a monthly

5   consulting fee in exchange for services rendered.

6       1007.   Morgan Creek is therefore also estopped from failing to honor its oral and/or

7   written promise regarding the fact that Mr. Urquhart was not required to pay the purchase price

8   for the shares of Morgan Creek stock.

9       1008.   It has been necessary for Mr. Urquhart and Westhampton to obtain the services of

10   an attorney in order to seek relief in this matter, and Mr. Urquhart and Westhampton are entitled

11   to an award of reasonable attorney's fees and costs incurred in this matter.

12
### NINETEENTH CAUSE OF ACTION
### (Tortious Breach of the Implied Covenant of Good
13
### Faith and Fair Dealing against Mainland)

14       1009.   Mr. Urquhart and Westhampton reallege and reincorporate the allegations

15   contained in paragraphs 1-1008, inclusive.

16       1010.   The Abigail Agreement, the Fedun Agreement, the King Horton Agreement, and

17   the Newport Agreement between Mr. Urquhart and – in the alternative to the causes of action

18   pleaded *supra* – Mainland and/or Mainland's agents was characterized by a special element of

19   reliance and a fiduciary duty, and Mainland was in a superior and entrusted position to Mr.

20   Urquhart.

21       1011.   The stock option agreement between Mr. Urquhart and Mainland was

22   characterized by a special element of reliance and a fiduciary duty, and Mainland was in a

23   superior and entrusted position to Mr. Urquhart.

24       1012.   Mainland tortiously breached its duty of good faith and fair dealing by engaging

25   in misconduct as described in detail *supra*, at ¶¶589-851.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148
PHONE (702) 562-8820
FAX (702) 562-8821